**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| WESTERN MASSACHUSETTS | ) | Case No. 09-_____ ( ) |
| LIFECARE CORPORATION, | ) |  |
| d/b/a Reeds Landing | ) |  |
|  | ) |  |
| Debtor. | ) |  |

**MOTION FOR AN ORDER, <u>INTER ALIA</u>,**
**(A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE**
**DEBTOR'S ASSETS TO A DESIGNEE OF LOOMIS COMMUNITIES, INC.**
**OR SUCH OTHER WINNING BIDDER FREE AND CLEAR OF ALL**
**LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES;**
**(B) APPROVING AND AUTHORIZING THE ASSUMPTION**
**AND ASSIGNMENT OF CERTAIN**
**<u>CONTRACTS; AND (C) GRANTING RELATED RELIEF</u>**

Pursuant to sections 105(a), 363 and 365 of the Title 11 of the United States Code (the "Bankruptcy Code"), Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-5 and 6004-1 of the Local Rules of Bankruptcy Procedure for this District (the "MLBR"), Western Massachusetts Lifecare Corporation, the above-captioned debtor and debtor in possession (the "Debtor"), hereby moves this Court for the entry of an order (a) approving the sale of substantially all of the Debtor's assets (the "Assets") to a newly created company sponsored by Loomis Communities, Inc. (the "Stalking Horse Bidder"), in exchange for cash consideration of $2,750,000, plus the assumption by the Stalking Horse Bidder of certain material liabilities of the Debtor, as more fully described below (the "Stalking Horse Bid"), or such person that makes a higher and better qualified bid in accordance with the Bidding

Procedures (hereinafter defined) (the "Winning Bidder"), if different[1], (b) approving and

authorizing the assumption and assignment to the Stalking Horse Bidder or the Winning Bidder

of the Ground Lease referred to below and various contracts between the Debtor and its existing

residents and related refund obligations, and (c) granting related relief. Capitalized terms used

herein and not otherwise defined shall have the meanings ascribed to them in the Stalking Horse

LOI.

The Debtor has filed herewith its *Motion for Order (A) Approving Sale Procedures,*

*Including Break-Up Fee, for Proposed Sale of the Substantially All of the Debtor's Assets, (B)*

*Approving Form and Manner of Notice, (C) Scheduling a Hearing to Consider the Sale of*

*Substantially all of the Debtor's Assets, and (D) Granting Related Relief* (the "Procedures

Motion"). Pursuant to the Procedures Motion, the Debtor seeks approval of bid procedures (the

"Bid Procedures"), which provide, *inter alia*, for the solicitation of higher and better offers for

the Assets, an auction (the "Auction") to be conducted at the offices of Choate, Hall & Stewart

LLP ("CH&S"), the Debtor's proposed counsel, if a higher and better offer is received and a

hearing (the "Sale Hearing") to approve the sale of the Assets to the Stalking Horse Bidder or, if

different, the bidder that submits the highest and best bid at the Auction (or to the Next Best

Bidder, as defined in the Procedures Motion). The Procedures Motion also provides for the

Stalking Horse Bidder to be paid a break-up fee in the amount of $75,000.00 (the "Break-Up

Fee") if the Debtor receives and closes on a higher and better offer and certain other conditions

are met.

---

[1] The Debtor and the Stalking Horse Bidder have entered into a letter of intent (the "Stalking Horse LOI") that sets forth the key terms of the Stalking Horse Bidder's bid for the Debtor's assets. A copy of the Stalking Horse LOI is attached hereto as Exhibit A. The Debtor and the Stalking Horse Bidder currently are negotiating a definitive asset purchase agreement (the "Stalking Horse Agreement"). To the extent necessary, the Debtor shall file a supplement to this motion to describe more fully the terms of such Stalking Horse Agreement.

In support of this Motion, the Debtor submits the Declaration of Matthew Leahey in Support of Chapter 11 Petitions and First Day Motions and Applications dated May 4, 2009, and respectfully represents as follows:

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**BACKGROUND**

**A.      The Debtor's Business.**

2.      The Debtor is a Massachusetts non-profit corporation that was incorporated in 1989 under Chapter 180 of the General Laws for the purpose of developing, constructing and operating the continuing care retirement community (the "Community") known as Reeds Landing.  The Debtor is exempt from federal income taxes under Section 501(a) of the Internal Revenue Code of 1986, as amended (the "Code"), as a charitable organization described in Section 501(c)(3) of the Code.

3.      The Debtor was organized through the efforts of Baystate Health, Inc. ("Baystate") and Springfield College (the "College"), the original sponsors of the development of the Community.  The Debtor is neither a subsidiary nor an affiliate of Baystate or the College.

4.      The Community is located on approximately 23.2 acres of land in Springfield, Massachusetts, which the Debtor leases from the College pursuant to the terms of that certain Ground Lease dated May 22, 1990 (as amended, the "Ground Lease").  Pursuant to the terms of the Ground Lease, the Debtor leases the property from the College for $150,000 annually, which

payments are subordinate to the Debtor's payment obligations with respect to the Series 2006

Bonds (as defined below). The Ground Lease has a term of 75 years and expires in 2068.

5.      The Community consists of 120 independent living units, 56 assisted living units,

a 42 bed nursing care facility (the "Nursing Center"), and common facilities for residents. The

120 independent living units include 110 apartment units and 10 semi-detached, cottage-style

cluster homes. The assisted living units are designed as apartment units, and 16 of the 56

assisted living units were specially designed to care for the needs of memory-impaired adults.[2]

The 42-bed Nursing Center is licensed as a Level II long-term care facility and is designed to

meet the long-term care needs of residents who transfer to it on a temporary or permanent basis.

Common facilities include a "Wellness Center" in which residents can receive routine medical

examinations and assistance with minor health problems, rehabilitation services, occupational

and physical therapy, and prevention and fitness programs. The Community's facilities are

staffed by one hundred and sixty-three (163) non-unionized employees.

6.      Presently, there are one hundred seventy-two (172) residents at the Community.

Approximately one hundred six (106) reside in the independent living units, approximately

twenty-six (26) reside in the assisted living units, and approximately forty (40) reside in the

Nursing Center. Typically, residents entering the Community at the independent living and

assisted living levels execute Residence and Care Agreements (often referred to as "lifecare"

contracts). A Residence and Care Agreement gives the resident the right to occupy a living unit

in the Community and delineates the services to be provided. Residence and Care Agreements

have differing payment structures depending on whether the resident arrives at the independent

living level and seeks continuing care or whether the resident arrives at the assisted living level.

---

[2] The memory-impaired apartments were closed in December 2007.

7.      For example, Residence and Care Agreements entered into at the independent living level are contracts for continuing care pursuant to which the resident pays a one-time entrance fee and a monthly service fee based upon the size and type of unit and number of occupants in the unit.  Depending on the size and type of unit, the entrance fee can range from approximately $161,745 to $540,189.  Residents that choose to enter the Community at the assisted living level sign a one-year Residence and Care Agreement and pay a monthly service fee based on the size and type of unit and number of occupants in the unit, as well as the level of assisted living care required by the resident.  Residents moving to the assisted living level from independent living and who have executed continuing care Residence and Care Agreements sign an annual subcontract for as long as they reside in assisted living in order to comply with state regulations.  Meanwhile, a limited number of residents enter the Community at the skilled nursing level and sign an Admission Agreement, which contains provisions required by state and federal law.  Under the Admission Agreement, the resident pays a daily rate for his or her care.[3]

**B.      Financing of the Debtor.**[4]

*The Series 2006 Bonds.*

8.      In 2006, the Massachusetts Development Finance Agency (the "MDFA") issued its First Mortgage Revenue Refunding Bonds, Reeds Landing Project, Series 2006, dated December 21, 2006 (the "Series 2006 Bonds"), in the aggregate principal amount of $29,115,000.  The MDFA issued the Series 2006 Bonds pursuant to the terms of that certain Loan and Trust Agreement dated as of December 1, 2006 (the "Loan and Trust Agreement"), by

---

[3] Typically, residents that enter the Community at the assisted living level or the skilled nursing level do not pay an entrance fee.

[4] The description of the Debtor's financing agreements set forth herein is for informational purposes only and is qualified in its entirety by the actual terms of the referenced documents.

and among the Debtor, the MDFA and U.S. Bank National Association, not individually but as indenture trustee with respect to the Series 2006 Bonds ("U.S. Bank").[5] The proceeds of the Series 2006 Bonds, together with other funds available to the Debtor, were used to refund a previous bond issuance, establish a debt service reserve fund for the Series 2006 Bonds, and pay transaction costs related to the issuance of the Series 2006 Bonds. As of the Petition Date, the outstanding principal amount of the Series 2006 Bonds is $28,175,000.

9.      To secure the obligations under the Loan and Trust Agreement, the Debtor entered into that certain Leasehold Mortgage and Security Agreement dated as of December 21, 2006 (the "Mortgage"). Pursuant to the Mortgage, the Loan and Trust Agreement, and that certain Collateral Assignment of Residency Agreements dated as of December 21, 2006, by the Debtor in favor of U.S. Bank, the Debtor (i) granted U.S. Bank, for the benefit of the holders of the Series 2006 Bonds (the "Bond Holders") and the MDFA, a lien on the "Mortgaged Property", including, inter alia, the Debtor's interest in the leasehold estate created by the Ground Lease, (ii) granted U.S. Bank a lien on the "Gross Revenues," including, inter alia, all receipts, revenues, payments and other moneys received by or on behalf of the Debtor from any source, including, without limitation, any entrance fees and monthly service fees, and (iii) assigned to U.S. Bank its interests in the Residence and Care Agreements (collectively, the "Collateral").[6]

10.      In addition, the Loan and Trust Agreement required the Debtor to establish a "Bond Fund" with U.S. Bank, into which the Debtor made monthly payments of principal and

---

[5] As used in this Motion, U.S. Bank, Baystate and the College may be collectively referred to as the "Pre-Petition Secured Creditors".

[6] In addition, substantially all rights of the MDFA under the Loan and Trust Agreement were assigned to U.S. Bank as additional security for the Series 2006 Bonds.

interest with respect to the Series 2006 Bonds. The Debtor also established a "Debt Service
Reserve Fund" with U.S. Bank, which was funded at the closing of the transactions contemplated
under the Loan and Trust Agreement as a reserve to cure any future deficiencies in the Bond
Fund. As of April 30, 2009, there was approximately $1,328,056.70 in the Bond Fund and $0 in
the Debt Service Reserve Fund.

*Baystate Unsecured Indebtedness.*

11.     In addition to the foregoing amounts, as of the Petition Date the Debtor is
indebted to Baystate in an amount of no less than $5,296,500 on account of certain unsecured
loans made by Baystate in connection with the construction and development of the Community.
Such obligations are evidenced by that certain Subordinated Note dated as of September 29,
2000, in the face amount of $5,296,500. In connection therewith, the Debtor and Baystate also
executed that certain Subordinated Indebtedness Agreement dated as of October 12, 1993 (as
amended by that certain First Supplement to Subordinated Indebtedness Agreement dated as of
September 29, 2000, and by that certain Second Supplement to Subordinated Indebtedness
Agreement dated as of December 21, 2006, the "Subordinated Indebtedness Agreement"). As
set forth in the Subordinated Indebtedness Agreement, the Debtor's obligations under the
Subordinated Note are subordinate to the Debtor's obligations with respect the Series 2006
Bonds.

## C.    **Events Leading to the Debtor's Chapter 11 Petition.**

12.     The Community admitted its first residents in 1995 and enjoyed a number of
years of strong occupancy and financial performance. Over the past two years, however, the
Community has experienced declining occupancy and received significantly fewer entrance fees
than its historical average as a direct result of the ongoing housing market crisis in the United

States and a decline in housing values along with other negative economic factors affecting the primary market area.  Many potential new residents, who typically sell their existing homes in order to fund the substantial entrance fee payments due to the Community, have been unable or unwilling to do so in the current economic climate.  During this period, the Community's revenue has declined consistent with reductions in its occupancy rate while its operating expenses (particularly salaries, wages and related benefits) have increased.  In addition, the Community, per the terms of the Residence and Care Agreements for the independent living units, has continued to refund a substantial portion of the entrance fees to residents that have left the Community or to the heirs of residents that have passed away, thereby further draining available cash.  The Debtor estimates that its obligations to its existing residents under each Residence and Care Agreement and Admission Agreement, and its refund obligations to any former resident party to a Residence and Care Agreement, were equal to approximately $15,700,000 in the aggregate as of March 31, 2009.

13.     In mid-2008, it became apparent that the Debtor was facing liquidity constraints due to the continued decline in its occupancy rate and the fewer entrance fees and resulting refunds associated with that decline.  Accordingly, the Debtor retained the restructuring advisory firm Argus Management Corporation ("Argus") to advise it in connection therewith.  Argus quickly determined that, absent any financial and operational changes, the Debtor could run out of cash as early as October 2008, and that a going-concern sale of the Debtor's assets would be in the best interests of the Community's residents as well as the Debtor's creditors.  Thereafter, the Debtor retained the law firm Choate, Hall & Stewart LLP and the investment banking firm B.C. Ziegler and Company ("Ziegler") to advise it in connection with the potential sale of its assets.

14.    In late September 2008, the Debtor initiated discussions with counsel for U.S.

Bank in order to seek a deferral of the Issuer Loan Payment in the amount of $182,505.21 due

under the terms of the Loan and Trust Agreement on or before October 1, 2008.  Simultaneously

therewith, the Debtor, Baystate and the College engaged in negotiations over the possibility of

Baystate and the College providing a bridge loan.  These efforts were designed to preserve the

Debtor's liquidity and fund the Community's operations until the Debtor consummated a sale.

15.    As a result of these discussions, the Debtor, Baystate and the College entered into

that certain Loan and Security Agreement dated as of December 19, 2008 (the "Bridge Loan

Agreement").  Pursuant to the Bridge Loan Agreement, Baystate and the College agreed, subject

to the terms and conditions set forth therein, to provide bridge loans to the Debtor in the

maximum aggregate principal amount of up to $1,000,000 (collectively, the "Bridge Loan").  As

of the Petition Date, the outstanding principal amount of the Bridge Loan is $1,000,000.

16.    To secure the Bridge Loan, the Debtor entered into that certain Leasehold

Mortgage and Security Agreement dated as of December 19, 2008 (the "Bridge Mortgage").

Pursuant to the Bridge Mortgage, the Bridge Loan Agreement and that certain Collateral

Assignment of Residency Agreements dated as of December 19, 2008, by the Debtor in favor of

Baystate and the College, the Debtor granted Baystate and the College a lien on the Collateral.

17.    In connection with the Bridge Loan, U.S. Bank, Baystate and the College entered

into that certain Subordination Agreement dated as of December 19, 2008 (the "Subordination

Agreement").  The Subordination Agreement governs the respective rights of U.S. Bank,

Baystate and the College with respect to the Collateral.  Pursuant thereto, U.S. Bank, Baystate

and the College have agreed that liens on the Collateral securing the obligations under the Bridge

Loan Agreement and the documents executed in connection therewith are senior and prior to any

lien on the Collateral securing obligations under the Loan and Trust Agreement and the Series

2006 Bonds.

18.     Concurrently with the execution of the Bridge Loan Agreement, the Debtor and

U.S. Bank entered into that certain Forbearance Agreement dated as of December 19, 2008 (as

amended by that certain First Amendment to Forbearance Agreement dated as of January 26,

2009, the "Forbearance Agreement").  Among other things, the Forbearance Agreement

permitted the Debtor to obtain the Bridge Loan, market its assets for sale and defer to May 1,

2009 the payment of the monthly Issuer Loan Payments and all other payments that were

payable to U.S. Bank or the holders of the Series 2006 Bonds during the period beginning

October 1, 2008, and ending on April 30, 2009.  In addition, the Forbearance Agreement

delineated certain milestones that the Debtor needed to reach in connection with the sale of its

assets in order to avoid the termination of U.S. Bank's agreement to forbear from exercising its

remedies under the Loan and Trust Agreement.

## THE DEBTOR'S EFFORTS TO SELL THE ASSETS

19.     Since December 2008, the Debtor and Ziegler, which is a leading investment

banking firm in the senior living field, have marketed the Debtor's assets intensively.  In

particular, Ziegler identified and contacted more than 160 entities that it believed might have a

serious interest in purchasing the Debtor's assets.  Ziegler worked with the Debtor to assemble

informational materials relevant to the Community to present to potential buyers and created a

"sale book" that included, among other things, the Debtor's financial results and projections.

The Debtor itself identified Loomis as a potential bidder.  Loomis is a Massachusetts non-profit

corporation with extensive experience in the senior living industry. It presently owns and

operates senior living communities in Amherst, Holyoke and South Hadley, Massachusetts.
There is no existing relationship or affiliation between the Debtor and Loomis.

20.     Approximately 45 entities executed non-disclosure agreements and received the
sale book.  By late February 2009, nine of those entities, including the Stalking Horse Bidder,
had submitted non-binding letters of intent to purchase the Debtor's assets.  Five of those entities
visited the Community and toured the Debtor's facility in Springfield.  By March 17, 2009,
however, five of the nine potential purchasers indicated that they were no longer interested in
pursuing an acquisition.

21.     Subsequently, the Debtor and Ziegler considered the four remaining offers and
concluded that the Stalking Horse Bidder had submitted the best offer.  The key terms of the
Stalking Horse Bid are set forth in the Stalking Horse LOI and summarized below.  The Debtor
and the Stalking Horse Bidder have begun negotiations regarding the terms of the Stalking Horse
Agreement.  The Debtor will endeavor to file the Stalking Horse Agreement with the Court prior
to the hearing on the Procedures Motion and in any event no later than ten (10) days prior to the
Bid Deadline (as defined in the Procedures Motion).

22.     Due to its inability to attract new residents, the Community has lost and will
continue to lose value as a going concern as existing residents pass away, move out of the
Community or move to a higher level on the Community's continuum of care (e.g. from
independent living to assisted living).  In addition, the Debtor has projected that, without a
bankruptcy filing, it will need additional funding to continue its operations by the summer of
2009.  Accordingly, on the date hereof (the "Petition Date"), the Debtor commenced this case by
filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

## SUMMARY OF RELIEF REQUESTED

23.     Pursuant to the Stalking Horse LOI, the Stalking Horse Bidder has agreed to purchase the Assets in exchange for (a) a cash payment of $2,750,000 payable to U.S. Bank;[7] (b) the assumption of the obligations with respect to the Bridge Loan, which shall be restructured in accordance with the Stalking Horse LOI; (c) the assumption of all of the Debtor's obligations and liabilities to its existing residents under each Residence and Care Agreement and Admission Agreement (collectively, the "Existing Resident Contracts") and the assumption of all of the Debtor's refund obligations, if any, to any former resident party to a Residence and Care Agreement, which obligations and liabilities were estimated to be equal to approximately $15,700,000 in the aggregate as of March 31, 2009 (the "Resident Obligations");[8] and (d) the assumption of the Ground Lease, which shall be restructured in accordance with the Stalking Horse LOI (the "Restructured Ground Lease").  By this Motion, the Debtor requests that the Court enter an order, *inter alia*, approving the sale of the Assets to the Stalking Horse Bidder, or such other Winning Bidder, pursuant to the sale procedures set forth in the Procedures Motion, free and clear of all liens, claims, interests and encumbrances, except as specified in the Stalking Horse Bid.

## SUMMARY OF STALKING HORSE LOI

24.     The following paragraphs summarize the Stalking Horse Bid.

---

[7] Such payment shall be without prejudice to the right of any statutory committee appointed in this chapter 11 case, or the right of any other person or entity, to assert claims and defenses against U.S. Bank as set forth in any order approving the use of cash collateral entered in this chapter 11 case.

[8] At the end of each fiscal year, the Resident Obligations are calculated based on an actuarial analysis of medical costs and ultimate refunds due.  The Resident Obligations as of March 31, 2009, are based on the Debtor's rollforward of the year end obligations.

25.   Upon execution of the Stalking Horse LOI, the Stalking Horse Bidder delivered to the Debtor a deposit in the amount of $100,000 (the "Performance Deposit").   The Stalking Horse Bid is subject to various contingencies, including a financing contingency and a due diligence contingency, each of which expires on or about June 30, 2009.

26.   The Assets include substantially all of the Debtor's tangible and intangible assets and properties, including leased real estate, all buildings and improvements thereon, owned and leased machinery and equipment, inventory, general intangibles, intellectual property, all Existing Resident Contracts, deposits, escrows and patients accounts, entrance fee receivables, foundation and endowment funds, waiting and prospect lists, supplier orders and commitments, books and records and related rights.   As set forth in the Stalking Horse LOI, certain assets are expressly excluded from the Assets, and therefore will be retained for the benefit of the Debtor's estate.   The Excluded Assets include cash and cash equivalents, certain real estate abatement rights and the Debtor's claims and causes of action under the Bankruptcy Code and such other actions and claims (including insurance claims) which have arisen prior to the closing date.

27.   As consideration for the Assets, the Stalking Horse Bidder has agreed to make a cash payment of $2,750,000 (the "Purchase Price") (minus the Performance Deposit) on the closing date.   The Purchase Price (including the Performance Deposit) shall be payable to U.S. Bank for the benefit of the Bond Holders.   In addition, the Stalking Horse Bidder has agreed to assume certain of the Debtor's material contractual obligations and other liabilities (collectively, the "Assumed Liabilities").   The Assumed Liabilities include the Resident Obligations, which obligations were estimated to be equal to approximately $15,700,000 in the aggregate as of March 31, 2009.   In addition, the Assumed Liabilities include the Debtor's obligations with

respect to the Bridge Loan and the Ground Lease, each of which shall be restructured in accordance with the Stalking Horse LOI on or prior to the closing date.

28.    In connection with the foregoing, the Stalking Horse LOI provides that the Debtor shall assume and assign to the Stalking Horse Bidder certain unexpired leases and executory contracts.  In particular, the Debtor shall assume and assign to the Stalking Horse Bidder the Existing Resident Contracts and the Restructured Ground Lease.

29.    As discussed more fully in the Procedures Motion, the Stalking Horse LOI requires the payment of the Break-Up Fee if the Stalking Horse Bidder is not the winning bidder pursuant to the procedures set forth in the Procedures Motion and the Debtor closes on a transaction with another bidder.

### THE SALE OF THE ASSETS TO THE STALKING HORSE BIDDER OR SUCH OTHER WINNING BIDDER SHOULD BE APPROVED

30.    The Debtor requests that the Court enter an order approving the Stalking Horse Agreement and the sale of the Assets to the Stalking Horse Bidder or, if different, the Winning Bidder pursuant to section 363(b)(1) of the Bankruptcy Code and Bankruptcy Rule 6004(f)(1) (the "Sale Order").

31.    Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  To sell property under section 363(b), the Debtor must demonstrate to the Court a legitimate business justification for the proposed action.  See In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).  The Debtor has ample business justification for selling the Assets.  The value to be received pursuant to the

Stalking Horse Bid, including, without limitation, the Purchase Price and the assumption of the

Assumed Liabilities, represents fair value for the Debtor's business. The opportunity to convey

the Assets for such fair value, under the circumstances of this case and given risks related to

operating the Community for an extended period of time in Chapter 11, provides compelling

justification for the proposed sale. The Debtor submits that the sale of the Assets to the Stalking

Horse Bidder (or to the Winning Bidder) will help ensure that its operations and the services it

provides to its residents continue uninterrupted without further cost to the Debtor's estate.

32.    Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of

business may be by private sale or by public auction." Fed. R. Bankr. P. 6004(f)(1). The Debtor

has determined the sale of the Assets by public auction will enable it to obtain the highest or best

offer for the Assets and, as discussed above, the auction process set forth in the Procedures

Motion is designed to achieve such a result. In the event that the Auction does not result in a

higher and better bid for the Assets, then the Debtor shall seek approval of the sale of the Assets

to the Stalking Horse Bidder. Accordingly, the sale of the Assets to the Stalking Horse Bidder or

the Winning Bidder will provide ample value to the Debtor's estate and the Debtor, therefore,

requests that the Court approve such sale.

33.    The Debtor respectfully submits that a sale of the Assets to the Stalking Horse

Bidder or the Winning Bidder will result in a greater return to the Debtor's estate than would a

sale or reorganization through a Chapter 11 plan. The Debtor believes that a prompt sale of the

Assets as a "going concern" will maximize the value received for the Debtor's' estate.

A.    **The Sale Should be Free and Clear of Liens and Interests**

34.    The Debtor also requests that the sale of the Assets to the Stalking Horse Bidder

be free and clear of liens, claims, encumbrances and interests (collectively, "Liens") pursuant to

section 363(f) of the Bankruptcy Code, with any such Liens attaching to the net sale proceeds of

the Assets.[9] See Circus Time, Inc. v. Oxford Bank and Trust (In re Circus Time, Inc.), 5 B.R. 1,

3 (Bankr. D. Me. 1979) (finding the Court's power to sell property free and clear of liens has

long been recognized). Section 363(f) of the Bankruptcy Code provides:

> The Debtor may sell property under subsection (b) or (c) of this
> section free and clear of any interest in such property of an entity
> other than the estate, only if –
>
> (1)   applicable nonbankruptcy law permits sale of such property
>        free and clear of such interest;
>
> (2)   such entity consents;
>
> (3)   such interest is a lien and the price at which such property
>        is to be sold is greater than the aggregate value of all liens
>        on such property;
>
> (4)   such interest is in bona fide dispute; or
>
> (5)   such entity could be compelled, in a legal or equitable
>        proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Because section 363(f) is stated in the disjunctive, it is only necessary to

meet one of the five conditions of that section when selling property of the estate. See In re

Dundee Equity Corp., No. 89-B-10233, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992).

35.   The Debtor believes that it is appropriate to sell the Assets free and clear of

certain Liens (other than the Liens securing the Bridge Loan) pursuant to sections 363(f)(2).

Attached hereto as Exhibit B is a list of parties known to the Debtor that assert Liens against the

Assets. The Debtor anticipates that the sale of the Assets to the Stalking Horse Bidder (or any

alternative transaction under the terms of the Sale Procedures) shall be consensual as it relates to

U.S. Bank and the Bond Holders because any cash proceeds of such sale shall be paid to U.S.

---

[9] The sale of the Assets will not be free and clear of the Liens securing the Bridge Loan.

Bank for the benefit of the Bond Holders. As set forth in the Stalking Horse LOI, the Assets will remain subject to the Liens securing the Bridge Loan.

**B.** **Finding of Good Faith For Purposes of Section 363(m) of the Bankruptcy Code.**

36. The Debtor additionally requests that the Court find that the Stalking Horse Bidder (or the bidder ultimately determined to be the Winning Bidder) is entitled to the protections provided by section 363(m) of the Bankruptcy Code in connection with the proposed purchase of the Assets pursuant to the Stalking Horse Agreement (or, in the case of a Winning Bidder other than the Stalking Horse Bidder, a form of purchase agreement at least as favorable to the Debtor's estate as the Stalking Horse Agreement).

37. Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) ... of this section of a sale ... of property does not affect the validity of a sale ... under such authorization to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) thus protects the purchaser of assets sold pursuant to section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.

38. The Debtor and the Stalking Horse Bidder have acted in good faith in negotiating the proposed transaction. Although the Bankruptcy Code does not define "good faith purchaser," the Court of Appeals for the First Circuit, construing section 363(m) of the Bankruptcy Code, has suggested that the phrase encompasses a purchaser who buys for value, in good faith, and without knowledge of adverse claims. See In re Mark Bell Furniture Warehouse,

Inc., 992 F.2d 7, 8 (1ˢᵗ Cir. 1993) (citations omitted).  To constitute lack of good faith, a party's

conduct in connection with the sale must usually amount to "fraud, collusion between the

purchaser and other bidders or the Debtor or an attempt to take grossly unfair advantage of the

other bidders."  Id.; see also In re Bedford Springs Hotel. Inc., 99 B.R. 302, 305 (Bankr. W.D.

Pa. 1989); Matter of Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995).  Thus, the

determination with respect to "good faith" is based on the facts of each case, concentrating on

the "integrity of [an actor's] conduct during the sale proceedings."  In re Pisces Leasing Corp.,

66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting Rock Indus. Machinery Corp., 572 F.2d at 1198).

39.     The sale of the Assets to the Stalking Horse Bidder is in good faith.  The Stalking

Horse Bidder is an arms-length buyer.  The Assets have been duly marketed by the Debtor over

the last several months.  There is no evidence of fraud or collusion with respect to the terms of

the proposed sale.  To the contrary, the key economic terms of the Stalking Horse Bid were the

subject of intensive, arms-length negotiations between the Debtor, the Stalking Horse Bidder and

the Pre-Petition Secured Creditors.  Accordingly, the Debtor submits that the Stalking Horse

Bidder has acted in good faith within the meaning ascribed to the term by the courts in this

circuit.

40.     If the Debtor ultimately sells the Assets to a Winning Bidder other than the

Stalking Horse Bidder, the Debtor believes that a finding of good faith within the meaning of

section 363(m) would be appropriate for that purchaser as well.  Pursuant to the Procedures

Motion, any Winning Bidder that is not the Stalking Horse Bidder will have had to present a

superior proposal in an open and competitive bidding process.  Moreover, the Debtor will not

choose any Winning Bidder whose good faith under section 363(m) reasonably can be doubted,

and the Debtor will be prepared to present the Court with sufficient evidence to allow the Court

to find that the "good faith" standard of section 363(m) of the Bankruptcy Code had been met with respect to a particular Winning Bidder.

## C.    Assumption and Assignment of Unexpired Leases and Executory Contracts

41.    Pursuant to this Motion, the Debtor requests that the Court approve the assumption and assignment to the Stalking Horse Bidder (or if different, the Winning Bidder or Next Best Bidder) of the Existing Resident Contracts and the Restructured Ground Lease.  To the extent that the Stalking Horse Bidder (or if different, the Winning Bidder or Next Best Bidder) wishes to assume any other unexpired leases or executory contracts of the Debtor, the Debtor will file a separate motion setting forth (a) a list of such unexpired leases or executory contracts that may be assumed and assigned to the Stalking Horse Bidder in connection with the sale of the Assets; (ii) the estimated cure amounts with respect to such unexpired leases or executory contracts; and (iii) the proposed procedure for non-debtor parties to object to such cure amounts.

42.    Section 365(a) of the Bankruptcy Code provides that a trustee "subject to the court's approval may assume or reject any executory contracts or unexpired leases of the debtor." 11 U.S.C. § 365(a).  Upon finding that a trustee has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code.  See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir. 1996); Orion Pictures Corp. v. Showtime Networks. Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

43.    Section 365(b)(1) of the Bankruptcy Code requires that a trustee meet certain additional requirements to assume an executory contract or unexpired lease:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or

lease unless, at the time of assumption of such contract or lease,
the trustee –

    (A)    cures, or provides adequate assurance that the trustee will
promptly cure, such default …;

    (B)    compensates, or provides adequate assurance that the
trustee will promptly compensate, a party other than the
debtor to such contract or lease, for any actual pecuniary
loss to such party resulting from such default; and

    (C)    provides adequate assurance of future performance under
such contract or lease.

11 U.S.C. § 365(b)(1).

44.    Section 365(b)(1) of the Bankruptcy Code requires that the Debtor cure, or

provide adequate assurance that he promptly will cure, any outstanding defaults under the

Existing Resident Contracts and the Restructured Ground Lease.  The Debtor submits that there

are no outstanding defaults under any Existing Resident Contract that the Debtor will need to

cure.  Moreover, the Ground Lease will be restructured pursuant to the terms set forth in the

Stalking Horse LOI prior to or simultaneously with the assumption and assignment of the

Ground Lease to the Stalking Horse Bidder (or if different, the Winning Bidder or Next Best

Bidder).  As a result, the Debtor does not anticipate that there will be any outstanding defaults

under the Restructured Ground Lease that the Debtor will need to cure.

45.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a trustee may assign an

executory contract or unexpired lease of nonresidential real property if:

    (A)    the trustee assumes such contract or lease in accordance
with the provisions of this section; and

    (B)    adequate assurance of future performance by the assignee
of such contract or lease is provided, whether or not there
has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

46.     The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case, but should be given "practical, pragmatic construction." See

Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J.

1989) (citation omitted). See also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y.

1985) (adequate assurance of future performance does not mean absolute assurance that the

debtor will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803

(Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required

assurance will fall considerably short of an absolute guarantee of performance.")

47.     Among other things, adequate assurance may be given by demonstrating the

assignee's financial health and experience in managing the type of enterprise or property

assigned. See In re Bygaph, Inc., 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate

assurance of future performance is present when prospective assignee of lease has financial

resources and expressed willingness to devote sufficient funding to business to give it strong

likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

48.     The Debtor anticipates that the Stalking Horse Bidder, whose parent company

operates several continuing care retirement communities, readily will be able to provide adequate

assurance of future performance.  In connection with the Sale Hearing, the Debtor will provide

evidence that all requirements for the assumption and assignment of the Existing Resident

Contracts and the Restructured Ground Lease will be satisfied.  The bidding procedures set forth

in the Procedures Motion expressly require that a potential bidder submit proof of its financial

wherewithal to consummate a purchase of the Assets in order to be deemed a Qualified Bidder.

49.     For the foregoing reasons, the Debtor respectfully submits that by the conclusion

of the Sale Hearing, the assumption and assignment of the Existing Resident Contracts and the

Restructured Ground Lease to the Stalking Horse Bidder or, if different, to the Winning Bidder

or the Next Best Bidder, should be approved.

50.    Accordingly, the Debtor requests that this Court enter an order[10], authorizing the

assumption of the Existing Resident Contracts and the Restructured Ground Lease by the Debtor,

authorizing the assignment of the Existing Resident Contracts and the Restructured Ground

Lease to the Stalking Horse Bidder (or, if different, the Winning Bidder or Next Best Bidder)

free and clear of all Liens, other than Permitted Liens and Assumed Liabilities, and, effective

upon the Closing Date, finding that:

(a)    That the Existing Resident Contracts and the Restructured
Ground Lease, upon assignment to the Stalking Horse Bidder (or, if
different, the Winning Bidder or Next Best Bidder), are deemed to be
valid and binding and in full force and effect and enforceable in
accordance with their terms notwithstanding any provision in any such
assignment to the Stalking Horse Bidder (or, if different, the Winning
Bidder or Next Best Bidder) (including those of the type described in
sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts
or conditions such assignment or transfer;

(b)    Pursuant to section 365(k) of the Bankruptcy Code, the
Debtor is relieved from any liability for any breach of such Existing
Resident Contracts or the Restructured Ground Lease occurring after such
assignment;

(c)    Non-Debtor parties to the Existing Resident Contracts and
the Restructured Ground Lease who failed to file a timely objection to this
Motion are forever barred from asserting an objection as to the assumption
and assignment of the applicable contract;

(d)    No consent from any third party is required under any
Existing Resident Contracts or the Restructured Ground Lease in order to
effectuate the assumption and assignment of such contract; and

(e)    The Stalking Horse Bidder (or, if different, the Winning
Bidder or Next Best Bidder) has provided adequate assurance of its future
performance under the Existing Resident Contracts and the Restructured
Ground Lease and the proposed assumption and assignment of the

---

[10] The Debtor will submit a proposed order approving the Sale prior to the hearing to consider the Sale Motion.

Existing Resident Contracts and the Restructured Ground Lease satisfies
the requirements of the Bankruptcy Code including, inter alia, sections
365(b)(1), 365(b)(3) and 365(f), to the extent applicable.

## NOTICE

51.    Notice of this Motion has been given to: (i) the U.S. Trustee; (ii) each of the

Debtor's 20 largest unsecured creditors; (iii) counsel to U.S. Bank; (iv) counsel to Baystate; (v)

counsel to the College; (vi) counsel to the Stalking Horse Bidder; (vii) all applicable taxing and

regulatory authorities; (viii) all parties that have requested notice pursuant to Bankruptcy Rule

2002; (ix) counsel to the residents; (x) all parties who had delivered to the Debtor or its advisors

written expressions of interest in acquiring, or offers to acquire, the Assets as of the date hereof;

and (xi) all other parties required to receive service under Local Rule 9013-3.  In light of the

relief requested herein, the Debtor submits that no further or other notice need be provided.

## NO PRIOR REQUEST

52.    No previous motion for the relief sought herein has been made to this or any other

court.

[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]

**WHEREFORE**, the Debtor respectfully requests that this Court:

1.      Grant the relief requested herein;

2.      Following the Sale Hearing, enter a Sale Order approving the sale of the Assets to the Stalking Horse Bidder or the Winning Bidder, if different;

3.      Authorize and approve the assumption and assignment of the Existing Resident Contracts and the Restructured Ground Lease to the Stalking Horse Bidder or, if different, the Winning Bidder; and

4.      Grant the Debtor such other and further relief as the Court deems appropriate.

Dated: May 4, 2009
       Boston, Massachusetts

Respectfully submitted,

WESTERN MASSACHUSETTS
LIFECARE CORPORATION

By its proposed counsel,


/s/   John F. Ventola

John F. Ventola (BBO No. 567972)
jventola@choate.com
Sean M. Monahan (BBO No. 660884)
smonahan@choate.com
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000
Facsimile: (617) 248-4000

# EXHIBIT A

## STALKING HORSE LOI



The
# Loomis
**Communities**

LOOMIS COMMUNITIES
ADMINISTRATIVE OFFICES

246 No. Main Street
South Hadley, MA 01075

May 1, 2009

## LETTER OF INTENT

Western Massachusetts Lifecare Corporation
807 Wilbraham Road
Springfield, MA  01109
Attn:  Board of Directors

Dear Board Members:

Newco ("Purchaser"), an entity to be established by Loomis Communities, Inc., wishes to submit the following proposal, more particularly described in the Term Sheet attached hereto, for the possible acquisition of the assets of Western Massachusetts Lifecare Corporation d/b/a Reeds Landing ("Seller") located at 807 Wilbraham Road, Springfield, MA (the "Site").

1.      This letter (the "Letter of Intent"), including the attached Term Sheet which is an integral part hereof (the "Term Sheet"), sets forth the general terms of a proposed purchase (the "Acquisition") by Purchaser, of the Assets (as defined in the Term Sheet) of the Seller relating to its operation of a continuing care retirement community on the Site, including (a) independent facilities for senior citizens ( "IL"), (b) assisted living facilities for senior citizens ("AL"), and (c) a 42 bed nursing home ("SNF").

2.      Neither this Letter of Intent nor the Term Sheet is intended to be binding on either the Purchaser or the Seller, except for the respective obligations of the parties in paragraphs 4 through 7 of this Letter of Intent (the "Binding Provisions"), and will be superseded in its entirety upon the execution of a purchase and sale agreement (the "Purchase Agreement") referred to in the Term Sheet.

3.      Seller anticipates filing a petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on or about May 4, 2009 (the "Petition Date").  The sale of the Assets is subject to (i) higher and better offers and (ii) the approval of the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court").  On the Petition

Purchaser submits a higher and better bid for the Assets, then to such party) pursuant to Section 363 of the Bankruptcy Code, and (b) a motion seeking approval of sale procedures pursuant to which, among other things, Seller will solicit higher and better offers for the assets, in accordance with the Bankruptcy Code.

4.      After the execution of this Letter of Intent and pending the preparation and execution of the Purchase Agreement and thereafter until the Closing, Seller will give the Purchaser and its representatives full access to the Site and provide such records and information as set forth in the Term Sheet.  Such due diligence investigation shall include, but not be limited to, the right to perform detailed building and equipment inspections, and environmental audits, including without limitation the right to perform subsoil investigations.  Purchaser hereby agrees to defend, indemnify and save Seller harmless from and against any and all claims, costs, liabilities, damages and expenses arising from the presence of Purchaser, its agents, representatives, and contractors, on the Site.

5.      Seller and the Purchaser agree to proceed in good faith with a view toward negotiating and executing the definitive Purchase Agreement with respect to the transaction contemplated in the Term Sheet.

6.      Each party shall bear its own expenses in connection with the negotiation of this Letter of Intent and the attached Term Sheet and the transactions contemplated hereby and thereby.

7.      Neither party shall make any public disclosure or publicity/news release pertaining to the existence of this Letter of Intent or the Acquisition without the consent of the other party hereto; provided, however, that Seller shall file a copy of this Letter of Intent with the Bankruptcy Court and shall describe the Acquisition in pleadings filed with the Bankruptcy Court.

This Letter of Intent and the attached Term Sheet, unless executed by all parties, shall automatically expire on Monday, May 4, 2009 at 5:00 PM Eastern Daylight Savings Time.

If the foregoing is acceptable to you, kindly acknowledge your agreement by executing this letter where indicated below.

Sincerely

NEWCO,

_Carol C Katz_

for  Loomis Communities, Inc., Sponsor

ACCEPTED AND AGREED:

WESTERN MASSACHUSETTS LIFE CARE CORPORATION

By:      _____
Name:
Title:
Date: May 1, 2009

Date, Seller shall cause to be filed with the Bankruptcy Court (a) a motion seeking the approval of the sale of the Assets to Purchaser as generally described herein (or, if a party other than the Purchaser submits a higher and better bid for the Assets, then to such party) pursuant to Section 363 of the Bankruptcy Code, and (b) a motion seeking approval of sale procedures pursuant to which, among other things, Seller will solicit higher and better offers for the assets, in accordance with the Bankruptcy Code.

4.      After the execution of this Letter of Intent and pending the preparation and execution of the Purchase Agreement and thereafter until the Closing, Seller will give the Purchaser and its representatives full access to the Site and provide such records and information as set forth in the Term Sheet.  Such due diligence investigation shall include, but not be limited to, the right to perform detailed building and equipment inspections, and environmental audits, including without limitation the right to perform subsoil investigations. Purchaser hereby agrees to defend, indemnify and save Seller harmless from and against any and all claims, costs, liabilities, damages and expenses arising from the presence of Purchaser, its agents, representatives, and contractors, on the Site.

5.      Seller and the Purchaser agree to proceed in good faith with a view toward negotiating and executing the definitive Purchase Agreement with respect to the transaction contemplated in the Term Sheet.

6.      Each party shall bear its own expenses in connection with the negotiation of this Letter of Intent and the attached Term Sheet and the transactions contemplated hereby and thereby.

7.      Neither party shall make any public disclosure or publicity/news release pertaining to the existence of this Letter of Intent or the Acquisition without the consent of the other party hereto; provided, however, that Seller shall file a copy of this Letter of Intent with the Bankruptcy Court and shall describe the Acquisition in pleadings filed with the Bankruptcy Court.

This Letter of Intent and the attached Term Sheet, unless executed by all parties, shall automatically expire on Monday, May 4, 2009 at 5:00 PM Eastern Daylight Savings Time.

If the foregoing is acceptable to you, kindly acknowledge your agreement by executing this letter where indicated below.

Sincerely,

NEWCO

By:_____

Loomis Communities, Inc., Sponsor

ACCEPTED AND AGREED:

WESTERN MASSACHUSETTS LIFE CARE CORPORATION

By:_____

Name: MATT J. GINLEY

Title: EXECUTIVE DIRECTOR

Date: May 1, 2009

**TERM SHEET**

**TERMS PROPOSED FOR PURCHASE**
**OF**
**THE ASSETS OF WESTERN MASSACHUSETTS LIFECARE CORPORATION D/B/A**
**REEDS LANDING LOCATED AT 807 WILBRAHAM ROAD, SPRINGFIELD, MA**
**BY**
**NEWCO**

This Term Sheet and the Letter of Intent to which this Term Sheet is attached, summarizes the proposed principal terms of the contemplated Acquisition.  Except as specifically set forth in the Letter of Intent, neither the Letter of Intent nor this Term Sheet shall constitute a legally binding obligation, and no legally binding obligation will exist until the execution and delivery of a definitive Purchase Agreement, regardless of any draft agreement or oral understanding between or among the parties, and there shall be no obligation whatsoever based upon principles of parol evidence, extended negotiations, "handshakes," oral understandings, e-mail communications or courses of conduct (including reliance and changes of position).

| | |
|---|---|
| **Seller:** | Western Massachusetts Lifecare Corporation d/b/a Reeds Landing |
| **Purchaser:** | Newco to be formed and sponsored by Loomis Communities, Inc. |
| **Assets:** | The Assets consist of: |

(a)  all buildings and improvements owned by Seller and located at or adjacent to the Site as generally shown on Exhibit A attached hereto (the "Premises");

(b)  all motor vehicles, equipment, machinery, tools, spare parts, etc., owned by Seller and located or used at the Site and/or by the Business, other than that certain 1958 Cadillac owned by Seller;

(c)  all inventory, including food and sundries, linens, and other items owned by Seller and necessary to operate the Business in the ordinary course of business;

(d)  all supplies, including maintenance and cleaning supplies; furniture, furnishings; promotional materials; websites and telephone numbers of or relating to the Business that are owned by Seller;

(e)  the name "Reeds Landing" and all variations thereof, which Seller agrees to cease using of the Closing and agrees that it shall forthwith file all appropriate documents necessary to accomplish a name change, and all goodwill associated with such name;

(f)  all deposits, escrows (inclusive of security deposits), patient accounts; entrance fee receivables (as all of the foregoing relate to

the Sellers' residents); the Seller's interest, if any, in foundation/endowment funds; waiting and prospects lists; all studies and reports relating to the Business; all books and records of Seller (or true copies thereof) relating to the operation of the Business; and

(g) assignment of:

(1) such supply and other contracts and leases as Purchaser shall identify as necessary or desirable relating to the operations of the Business and which are assignable, and

(2) all current resident agreements for independent units, assisted living leases and nursing home admission agreements to which the Seller is bound relating to operation of the Business (the "Resident Contracts").

At the time of the conveyance, the Assets to be purchased shall be free and clear of all restrictions, liens, encumbrances and claims of all parties, except for Assumed Liabilities, described below.

**Excluded Assets:** All of the Seller's cash and cash equivalents (except as described below under "Cash Purchase Price"), insurance policies and refunds, certain real estate abatement rights of the Seller for periods ending prior to the Closing Date; the Seller's claims and causes of action under the Bankruptcy Code and such other actions and claims (including insurance claims) which have arisen prior to Closing.

**Cash Purchase Price:** Two Million Seven Hundred Fifty Thousand Dollars ($2,750,000.00) to be paid by wire transfer of immediately available funds at Closing to U.S. Bank as indenture trustee, subject to normal and customary closing adjustments for rents; per diem occupancy and services (monthly service fees, etc) for IL; AL and SNF; taxes, water, sewer and other utilities on a pro rata basis payable from cash on hand.

**Assumed Liabilities:** Purchaser shall assume all of the Seller's obligations with respect to:

(a) the Resident Contracts;

(b) all of the Seller's obligations with respect to refund obligations, if any, to any former resident party to a Residence and Care Agreement to be disclosed in an exhibit to the Purchase Agreement;

(c) the Ground Lease, dated May 22, 1990, as amended, by and between the Seller and Springfield College (the "College"), as restructured or substituted pursuant to the terms described on Schedule A hereto;

(d) the Loan and Security Agreement dated as of December 19,

2008 (the "Bridge Loan Agreement") by and among the Seller, the College and Baystate Health, Inc. ("Baystate," and together with the College, the "Bridge Lenders"), as restructured or substituted pursuant to the terms described on Schedule B hereto; and

      (e)    such supply and other contracts and leases as Purchaser shall identify as necessary or desirable relating to the operations of the Business and which are assigned to Purchaser in connection with the Acquisition.

| | |
|---|---|
| **Capital Contributions:** | Loomis Communities, Inc. shall invest Four Million Dollars ($4,000,000.00) to be deposited with Purchaser prior to the Closing. |
| **Deposit:** | One Hundred Thousand Dollars ($100,000.00) shall be placed in escrow and applied toward the Purchase Price unless Seller is entitled thereto as liquidated damages following the Purchaser's default, to be provided in the Purchase Agreement. |
| **Due Diligence Period:** | Beginning on the date of the acceptance of this Letter of Intent and for a period of sixty (60) days thereafter (the "Due Diligence Period"), Seller shall permit full access to the Seller's Business and the Site in order for Purchaser to undertake, at its cost, any and all investigations, examinations of the Business as it deems appropriate. Purchaser agrees to complete those portions of its investigation to be undertaken directly by it within forty-five (45) days of the acceptance of this Letter of Intent, but specifically excluding any third party reports and investigations, such as 21E reports, appraisals, property and facilities inspections, audits; and title and zoning review. Seller shall cooperate with Purchaser during the Due Diligence Period and provide such information and documentation Purchaser shall reasonably request in such undertaking, including but not limited to providing reasonable access to employees and officers of Seller. The Purchaser may terminate the Purchase Agreement by written notice prior to the expiration of the Due Diligence Period if the results of its due diligence investigation are unsatisfactory to the Purchaser. Within five (5) days of the execution of this Letter of Intent, Seller shall provide Purchaser with copies of: all environmental/geo-technical reports in its possession related to the Premises and/or surrounding property occupied by Seller; all licenses and permits relating to the Premises or the operations thereon; construction documents, plans and related information; any existing title insurance policy; records documenting all underground storage tanks located on the Premises; copies of all material contracts to which Seller is bound, including but not limited to, all contracts relating to services provided to or the Site or the Business, insurance contracts, and current and expired residency and care agreements, contracts with residents of its independent and assisted living facilities and nursing residents' admission contracts, records and files; all records relating to current and/or prior investigations, suits, complaints, citations issued by any governmental |

board, agency, regulatory authority relating to the Business or its facilities.

**Closing Date:** Subject to approval of the Acquisition by the Bankruptcy Court, thirty (30) days following the expiration of the Due Diligence Period. The parties shall execute all instruments, agreements and other documents deemed necessary or desirable by their respective counsel to complete the Acquisition.

**Contingencies:** The consummation of the Acquisition is contingent upon:

(a) Financing commitment of $3,500,000.00 upon terms acceptable to Purchaser with a minimum of a ten year term loan, 20 year amortization, to be obtained within thirty (30) days after the date of this letter of intent (it being understood that such commitment may contain a due diligence contingency that extends beyond such thirty (30) day period); and

(b) Entry by the Bankruptcy Court of an order that provides for, among other things, the approval of the Purchase Agreement and authorization of the Seller's performance under the same.

The Purchaser acknowledges and agrees that its bid for the Assets as set forth herein and as will be documented by the Purchase Agreement is subject to the receipt of higher and better offers. In the event that the Purchaser is out-bid for the Assets and the Seller completes the sale of the Assets to a party other than the Purchaser, then, subject to the approval of the Bankruptcy Court and provided that the Purchaser has not terminated its rights under the Purchase Agreement, the Purchaser shall be entitled to receive as a break-up fee the sum of $75,000 as compensation for its costs incurred in negotiating the Letter of Intent, the Purchase Agreement and completing its due diligence.

**As Is:** The Property is to be sold AS IS, WHERE IS without any representation or warranty except as provided below.

**Limited
Representations:**

Seller and the Purchaser shall make representations and warranties as to: (i) each party's power and authority to enter into the Purchase Agreement and to perform their obligations thereunder (provided, however, that it is expressly understood that the Seller's power and authority to enter into the Purchase Agreement and to perform its obligations thereunder is contingent upon Bankruptcy Court approval); (ii) due organization; (iii) good standing; and (iv) absence of a material violation of other agreements and laws.

**Conditions Precedent:**

The Purchaser's obligation to consummate the Acquisition shall be subject to the following conditions precedent: (i) entry by the Bankruptcy Court of an order approving the Purchase Agreement and authorizing the Seller to perform its obligations under the same; (ii) Purchaser's completion of its due diligence investigation during the Due Diligence Period, the results of which shall be satisfactory to Purchaser in its reasonable discretion; (iii) Purchaser's agreement with the College with respect to the restructuring or substitution of the terms of the Ground Lease, as described in Schedule A hereto; (iv) absence of material litigation relating to the Assets; (v) absence of material casualty prior to Closing; (vi) transfer of all existing federal, state and local permits and licenses relating to the Business to the extent transferable; (vi) transfer of good, clear and marketable title to the Assets by warranty bill of sale, and assignment of the resident contracts free and clear of liens, encumbrances and claims of others, other than the liens, encumbrances and claims of the residents under Resident Contracts [and the Bridge Lenders]; (vii) completion of the restructuring or substitution of the debt owed by the Seller to the Bridge Lenders upon the terms set forth in Schedule B, which debt is to be assumed by Purchaser provided the same does not exceed $1 million; (viii) issuance by a national title insurance company of a commitment to the Purchaser and its lender of title insurance policies in standard ALTA form with waiver of all exceptions regarding liens, survey, and zoning with only such other exceptions as Purchaser deems acceptable; (ix) approval by the Massachusetts Department of Public Health of the transfer of the Nursing Home license to Purchaser and the Executive Officer of Elder Affairs for approval of the transfer of the assisted living units; (x) completion of the financing transaction as described in "Contingencies" set forth above; (xi) that no material adverse changes in the Business shall have occurred or been threatened between the end of the Due Diligence Period and the Closing Date, including, but not limited to, material increases (as will be defined in the Purchase Agreement) in the vacancy rates of IL, AL or SNF or increase in the life care patients in the SNF; and (xii) no material increase in the aggregate amount of entrance fee refunds due and owing and not paid.

**Actions Pending
Closing:**

Seller agrees to operate the Business only in the ordinary course of business and to not enter into any transaction or perform any act that would violate the Purchase Agreement or increase the benefits, pay or salaries of its employees, market or accept entrance fees or lease payments to new residents solely with respect to the independent living units except with the approval of the Purchaser. Pending the Closing, Purchaser and Seller shall cooperate in the preparation of Purchaser's marketing campaign, to commence post-closing.

**Brokers:**

Each party will represent and covenant to the other party in the Purchase Agreement that such party shall not hold the other party liable, and such other party shall not have any indemnification obligations with respect to, any broker retained by such party in connection with this transaction.

## SCHEDULE A TO LETTER OF INTENT

Terms and conditions of revised Ground Lease
between SPRINGFIELD COLLEGE as Landlord
and NEWCO as Tenant

- Term – Seventy-five (75) years

- Rent - $3,010,000 for entire term

- Payment of Rent –

  o There shall be no required payments of rent until August 1, 2014.

  o Rent Commencement Date shall be August 1, 2014 – Annual rent of $40,000 shall be payable in equal monthly installments commencing on Rent Commencement Date through July 31, 2018 ($3,333.33 per month).

  o Commencing August 1, 2018 through July 31, 2022 – Annual Rent shall be $75,000 ($6,250 per month).

  o Commencing August 1, 2022 - Annual Rent shall be $100,000 ($8,333.33 per month) through the entire term until rent of $3,010,000 has been paid in full.

Notwithstanding the foregoing, in the event that NEWCO is able to begin repayment of deferred management fees earlier than 2022, then and in such event, Annual Rent shall increase to $100,000 as of such earlier date when deferred management fees are in the process of being repaid.

The Lease shall be a triple-net lease with Tenant paying all costs and expenses relating to the premises, including without limitation, real estate taxes, insurance, repairs, replacements, and maintenance and shall contain similar terms as in the ground lease with Reeds Landing including permitting the tenant to grant a leasehold mortgage.

The Lease shall not be subject to any financial covenants.

The parties shall negotiate the final terms of the ground lease prior to submission of the Purchase Agreement to the Bankruptcy Court

## SCHEDULE B

[i] Terms and conditions for repayment of Bridge Loan
by NEWCO to Baystate Health, Inc. ("BH") and
Springfield College (the "College")

- There shall be no required cash payments of principal or interest until August 1, 2011

  - Repayment of the Bridge Loan will commence on August 1, 2011 with interest payments, at the rate of five percent (5%) per annum, only being paid for the first three (3) years thereafter.

  - Commencing on August 1, 2014, the Bridge Loan shall be amortized over the next ten (10) years with monthly payments of principal and interest at five (5%) percent per annum on a direct reduction basis being made until paid in full.

  - The present loan documents shall remain in place and be assumed by NEWCO which will execute such loan modification documentation as may be required by BH and the College at closing in order to document the above modifications.

  - In the event that NEWCO reaches certain net income levels (to be negotiated by the parties) then repayment terms of the Note shall be accelerated.

  - The Bridge Loan shall be subordinate to bank financing in the maximum amount of $3,500,000 with payments of principal and interest being permitted to be paid provided that NEWCO is not in payment default with the bank.

    The parties shall negotiate the final terms of the contemplated agreement prior to submission of the Purchase Agreement to the Bankruptcy Court.

---

[i] Any agreement by BH or the College shall be subject to (i) U.S. Bankruptcy Court approval of sale of assets of Western Massachusetts Life Care Corporation d/b/a Reeds Landing to NEWCO pursuant to terms of definitive Purchase Agreement containing terms substantially similar to those contained in Term Sheet; and (ii) all required board or committee approvals of BH and the College in their sole and exclusive discretion.

U:\WP80\L\LOOMIS\Reeds Landing\Reeds Letter of Intent v2 compare.doc

**EXHIBIT B**

**KNOWN LIENHOLDERS**

U.S. Bank National Association

Baystate Health, Inc.

Springfield College