# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## (WESTERN DIVISION)

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| WESTERN MASSACHUSETTS | ) ) | Case No. 09-30737 (HJB) |
| LIFECARE CORPORATION | ) |  |
| d/b/a Reeds Landing | ) ) |  |
| Debtor. | ) ) |  |

## ORDER APPROVING DEBTOR'S MOTION FOR AN ORDER, INTER ALIA, (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS TO LOOMIS SENIOR LIVING, INC. FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (B) APPROVING AND AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS; AND (C) GRANTING RELATED RELIEF

Upon the motion (the "Sale Motion") of Western Massachusetts Lifecare Corporation, the above-captioned debtor and debtor in possession (the "Debtor"), requesting entry of an order under sections 105(a), 363 and 365 of the Bankruptcy Code, Rule 6004 of the Bankruptcy Rules and MLBR 2002-5 and 6004-1 (this "Sale Order")[1]:  (a) approving the sale of substantially all of the Debtor's assets (including, without limitation and to the extent permitted under applicable law, all rights, licenses, permits and agreements required for the ongoing operations of the Debtor's business, which shall include Debtor's Medicare and MassHealth provider agreements, the Debtor's Assisted Living Residence Certification and its Skilled Nursing Facility License) (as more explicitly defined in the Asset Purchase Agreement, the "Acquired Assets") to Loomis Senior Living, Inc., a Massachusetts non-profit corporation (the "Buyer"), in exchange for cash

---

[1] To the extent not otherwise defined herein or in the Sale Motion, capitalized terms shall have the meanings ascribed to them in the Asset Purchase Agreement or the Sale Procedures attached to the Sale Procedures Order.  The Asset Purchase Agreement is attached hereto as Exhibit A.

4507998

consideration of $3,550,000 (the "Cash Purchase Price"), plus the assumption by the Buyer of

certain material liabilities of the Debtor, as more fully described in that certain Asset Purchase

Agreement, dated as of June 22, 2009 (as amended, the "Asset Purchase Agreement"), between

the Debtor and the Buyer, (b) approving and authorizing the assumption and assignment to the

Buyer of the Restructured Ground Lease and the Existing Resident Contracts (collectively, the

"Assigned Contracts"), and (c) granting related relief; and upon the Order of this Court dated May

19, 2009 [Dkt. No. 57] (the "Sale Procedures Order"), approving the relief requested in the

Debtor's *Motion for Order (A) Approving Sale Procedures, Including Break-Up Fee, for*

*Proposed Sale of the Substantially All of the Debtor's Assets, (B) Approving Form and Manner of*

*Notice, (C) Scheduling a Hearing to Consider the Sale of Substantially all of the Debtor's Assets,*

*and (D) Granting Related Relief*; and notice of the Sale Motion and the hearing held thereon on

July 28, 2009, to consider the Sale Motion (the "Hearing") was given in accordance with the Sale

Procedures Order and the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules

and the MLBR, and no other or further notice need be given; and one (1) additional Qualified Bid

having been received for the Acquired Assets; and the Debtor having conducted the Auction at the

Hearing in accordance with the Sale Procedures Order; and the Court having held the Hearing to

consider the Sale Motion; and based upon the Sale Motion, any exhibits annexed thereto and the

evidence presented and arguments made at the Hearing, it appearing that the relief requested in the

Sale Motion is in the best interest of the Debtor, its estate and its creditors; and upon due

deliberation, good and sufficient cause appearing therefor, the Court hereby:

### FINDS, DETERMINES, AND CONCLUDES THAT:

A.      This Court has jurisdiction to consider the Sale Motion and the relief requested

therein in accordance with 28 U.S.C. §§ 157(b) and 1334.

B.     Venue of this case in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     Determination of the Sale Motion is a core proceeding under 28 U.S.C. § 157(b)(2).

D.     The statutory predicates for the relief requested herein include sections 105, 363 and 365 of the Bankruptcy Code, Bankruptcy Rule 6004 and MLBR 2002-5 and 6004-1.

E.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

F.     To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

G.     The bidding procedures established by the Sale Procedures Order (the "Sale Procedures") have been fully complied with.

H.     Proper, timely, adequate and sufficient notice of the Sale Procedures Order, the Auction, the Sale Motion and the Hearing was given in accordance with sections 102, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 6006 and MLBR 2002-5 and 6004-1, as modified by the Sale Procedures Order where applicable, and in compliance with the Sale Procedures Order. Actual written notice of the Sale Procedures Order, the Auction, the Sale Motion and the Hearing and a reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities, including but not limited to: (i) the Office of the United States Trustee for this District, (ii) each of the Debtor's 20 largest unsecured creditors, (iii) counsel to each of the Pre-Petition Secured Creditors, (iv) counsel to the Buyer, (v) all parties who had delivered to the Debtor or its advisors written expressions of interest in acquiring, or offers to acquire, the Acquired Assets as of the date

the Sale Motion was filed, (vi) appropriate federal, state and local taxing and regulatory

authorities, (vii) all known persons holding or asserting a lien on or other interest in part or all of

the Acquired Assets, (viii) counsel to the residents, (ix) counsel to the official committee of

unsecured creditors, and (x) all parties who had requested notice in these cases pursuant to

Bankruptcy Rule 2002 as of the date the Sale Motion was filed.

     I.     The Debtor published notice of the time and place of the Auction, the Hearing and

the time for filing an objection to the Sale Motion in the The Boston Globe and The Springfield

Republican in accordance with of the Sale Procedures Order.

     J.     Proper, timely, adequate and sufficient written notice of the assumption and

assignment of the Assigned Contracts was provided in accordance with sections 105(a) and 365 of

the Bankruptcy Code and Bankruptcy Rules 6006(c) and 9014. The foregoing notice constitutes

good, appropriate and sufficient notice, and no other or further notice of the assumption and

assignment of the Assigned Contracts is or shall be required.

     K.     A reasonable opportunity has been afforded to any interested party to make a

higher or otherwise better offer to purchase the Acquired Assets, and to assert an objection to or be

heard regarding the relief requested in the Sale Motion.

     L.     The Debtor has marketed the Acquired Assets and conducted the sale process in

compliance with, and has complied with all of its obligations under, the Sale Procedures Order.

     M.     The Debtor has full corporate power and authority to comply with each and every

one of its obligations under the Asset Purchase Agreement and under any documents executed in

connection therewith.

     N.     Neither the execution of the Asset Purchase Agreement nor the consummation of

the transactions contemplated thereby will constitute a violation of any provision of the Debtor's

organizational documents, or any other instrument, law, regulation or ordinance by which the Debtor is bound.

O.    The Debtor has full power and authority to execute and deliver the Asset Purchase Agreement and all other documents contemplated thereby, and the sale of the Acquired Assets and the other transactions contemplated by the Asset Purchase Agreement have been duly and validly authorized by all necessary action. The Debtor has all the power and authority necessary to consummate the sale of the Acquired Assets to the Buyer and the other transactions contemplated by the Asset Purchase Agreement and no consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, are required for the Debtor to consummate the sale of the Acquired Assets and such other transactions.

P.    Entry into the Asset Purchase Agreement and consummation of the transactions contemplated thereby constitute the exercise by the Debtor of sound business judgment and such acts, and the relief requested in the Sale Motion, are in the best interests of the Debtor, its bankruptcy estate, its creditors, and other parties in interest.

Q.    The Cash Purchase Price to be paid by the Buyer, plus the assumption by the Buyer of certain material liabilities of the Debtor, each as more fully described in the Asset Purchase Agreement, constitutes the highest and best offer received for the Acquired Assets, and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. The Debtor's determination that the Asset Purchase Agreement constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtor's business judgment.

R.    The Debtor has demonstrated both (i) good, sufficient and sound business purpose and justification and (ii) compelling circumstances for consummating the sale of the Acquired

4507998                                         5

Assets to the Buyer pursuant to section 363(b) of the Bankruptcy Code, in that, among other things: (a) prompt approval and consummation of the sale of the Acquired Assets will preserve the viability of the Debtor's business as a going concern, protect against deterioration in the value of the Debtor's asset due to uncertainty about its future and maximize the value of its bankruptcy estate; (b) the Buyer has made a substantial offer to acquire the Acquired Assets; and (c) the sale process conducted by the Debtor pursuant to the Sale Procedures Order permitted the Buyer's offer to be tested against other offers and the market generally.

S.     The terms and conditions of the Asset Purchase Agreement and the consideration to be realized by the Debtor's estate pursuant to the Asset Purchase Agreement are fair and reasonable and the Cash Purchase Price to be paid by the Buyer, plus the assumption by the Buyer of certain material liabilities of the Debtor, each as more fully described in the Asset Purchase Agreement, constitutes reasonably equivalent value.

T.     The sale of the Acquired Assets and the other transactions contemplated by the Asset Purchase Agreement must be approved and consummated promptly in order to preserve the value of the Acquired Assets.  Absent prompt consummation of the Sale, there is a risk of diminution in the value of the Acquired Assets.

U.     The Buyer is not an "insider" or "affiliate" of the Debtor (as each term is defined in section 101 of the Bankruptcy Code).  The transactions contemplated by the Asset Purchase Agreement were proposed and negotiated and entered into by the Debtor and the Buyer at arm's length, without collusion and in good faith within the meaning of section 363(m) of the Bankruptcy Code.  The Buyer is a purchaser in good faith of the Acquired Assets under section 363(m) of the Bankruptcy Code and, as such, is entitled to the protections afforded thereby.  The Buyer will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code

4507998                                          6

in consummating such transactions immediately upon and at all times after entry of this Sale Order.

V.    The Buyer and the Debtor have not engaged in any conduct that would cause or permit the Asset Purchase Agreement and the transactions contemplated thereby to be avoided under section 363(n) of the Bankruptcy Code.

W.    The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtor, its estate, and its creditors, if the sale of the Acquired Assets to the Buyer were not free and clear of all Liens, other than Permitted Liens and the Assumed Liabilities, or if the Buyer would, or in the future could, be liable for any of such Liens.

X.    Entry into the Asset Purchase Agreement and consummation of the sale and the other transactions contemplated by the Asset Purchase Agreement do not and shall not subject the Buyer to any debts, liabilities, obligations, commitments, responsibilities or claims of any kind of the Debtor or its property or any affiliate of the Debtor or its property, whether known or unknown, contingent or otherwise, whether existing as of the date hereof or hereafter arising, except that the Buyer shall be liable for the Assumed Liabilities as set forth in the Asset Purchase Agreement.

Y.    The bid for the Acquired Assets submitted by Five Star Quality Care, Inc. ("Five Star") was a Qualified Bid and Five Star is an Actual Bidder. Neither the bid for the Acquired Assets submitted by Top Rock LLC nor the bid for the Acquired Assets submitted by Covington Investments, LLC was a "Qualified Bid" and, therefore, such bidders are not Actual Bidders.

Z.    Each of the Assigned Contracts is an executory contract within the meaning of section 365(a) of the Bankruptcy Code. Pursuant to section 365(f) of the Bankruptcy Code, all

restrictions on assignment in any such agreements are unenforceable against the Debtor and each

of the Assigned Contracts may be lawfully assumed and assigned to the Buyer.

AA.    The decision to assume and assign the Assigned Contracts pursuant to the Asset

Purchase Agreement is a reasonable exercise of the Debtor's business judgment and is in the best

interests of the Debtor, its bankruptcy estate and its creditors. The Assigned Contracts are an

integral part of the Acquired Assets and, accordingly, such assumption and assignment thereof is

reasonable, enhances the value of the Debtor's estate and does not constitute unfair discrimination.

BB.    There are no outstanding defaults under any Assigned Contract that the Debtor will

need to cure in connection with the assumption and assignment thereof.

CC.    The Buyer has demonstrated adequate assurance of future performance with respect

to each of the Assigned Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) and

(f)(2)(B) of the Bankruptcy Code.

DD.    The Debtor may sell the Acquired Assets free and clear of all Liens (other than

Permitted Liens and the Assumed Liabilities) because, in each case, one or more of the standards

set forth in subsections (1)-(5) of section 363(f) of the Bankruptcy Code has been satisfied. Those

holders of Liens (other than Permitted Liens and the Assumed Liabilities) who did not object, or

who withdrew their objections, to the Sale or the Sale Motion, are deemed to have consented

pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Liens who did object, if

any, fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and

are adequately protected by having their Liens, if any, attach to the proceeds of the Sale as more

fully described herein.

EE.    Except with respect to the Assumed Liabilities, the transfer of the Acquired Assets

to the Buyer will not subject the Buyer to any liability whatsoever with respect to the operation of

4507998                                      8

the Debtor's business prior to the Closing Date or otherwise under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of successor or transferee liability.

FF.    The Asset Purchase Agreement, and each of the agreements executed in connection therewith (including, without limitation, the Performance Escrow Agreement, the Amended and Restated Ground Lease, the Foundation Agreement, and the Restructured Bridge Loan Agreements) (collectively, the "Ancillary Agreements") are valid and binding contracts between the Debtor and the Buyer, which contracts are and shall be enforceable in accordance with their respective terms.

For all of the foregoing and after due deliberation, the Court hereby

**ORDERS, ADJUDGES, AND DECREES THAT:**

1.    The Sale Motion is Granted and the Asset Purchase Agreement, the Ancillary Agreements, the sale of the Acquired Assets and the other transactions contemplated thereby are approved.

2.    All objections to the entry of this Sale Order, if any, that have not been withdrawn, waived, resolved or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits with prejudice.

<u>**Approval of the Asset Purchase Agreement and Ancillary Agreements**</u>

3.    The terms and conditions of the Asset Purchase Agreement and the Ancillary Agreements are hereby approved in all respects.  Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is authorized and directed to sell the Acquired Assets to the Buyer upon the terms and subject to the conditions set forth in the Asset Purchase Agreement.

4507998

4.      Pursuant to sections 363(b) and 365 of the Bankruptcy Code, the Debtor is hereby

authorized and directed on and after the Closing Date to perform under, consummate and

implement the Asset Purchase Agreement, together with the Ancillary Agreements and all other

additional instruments and documents that may be reasonably necessary or desirable to implement

the Asset Purchase Agreement and the transactions contemplated thereby, and, pursuant to the

Asset Purchase Agreement, to take all further actions, including the execution and delivery of any

documents, as may reasonably be requested by the Buyer for the purpose of assigning,

transferring, granting, conveying and conferring to the Buyer, or reducing to possession, any or all

of the Acquired Assets, or as may otherwise be necessary or appropriate to the performance of the

Debtor's obligations as contemplated by the Asset Purchase Agreement.  Without limiting the

foregoing, the Debtor is hereby authorized and directed on and after the Closing Date to execute

and deliver all instruments and documents that may be reasonably necessary or desirable to

restructure the Bridge Loans as contemplated by the Asset Purchase Agreement and to transfer all

liabilities and obligations arising out of and relating to the Restructured Bridge Loan Agreements

to the Buyer.  The Liens granted in connection with the Bridge Loans shall constitute Permitted

Liens and shall secure the Buyer's obligations and liabilities under the Restructured Bridge Loan

Agreements.

5.      The Cash Purchase Price shall be payable at Closing as follows:  (a) the Buyer shall

pay to U.S. Bank in cash in immediately available funds an amount equal to $3,285,000 (as

adjusted pursuant to Section 2.1 of the Asset Purchase Agreement), which may be applied by U.S.

Bank as provided in that certain Loan and Trust Agreement dated as of December 1, 2006; and (b)

the Buyer shall pay to B.C. Ziegler and Company ("Ziegler") in cash in immediately available

funds an amount equal to $265,000, which amount (together with the application of the $25,000

retainer held by Ziegler) shall pay in full the "Transaction Success Fee" payable to Ziegler in accordance with the terms set forth in the Order entered by this Court authorizing the retention of Ziegler by the Debtor (provided, that the payment of such fee shall not modify Ziegler's obligation under such Order to file a final fee application at the conclusion of Ziegler's retention by the Debtor).

### Transfer of the Acquired Assets

6.    Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon the Closing under the Asset Purchase Agreement, the Acquired Assets shall be transferred to the Buyer free and clear of all Liens (other than Permitted Liens and the Assumed Liabilities). This Sale Order is and shall be effective as a determination that, on the Closing Date, all Liens existing on the Acquired Assets prior to the Closing Date, other than Permitted Liens and the Assumed Liabilities, have been unconditionally released from such Acquired Assets. Other than Permitted Liens and the Assumed Liabilities, all Liens and all debts arising in any way in connection with any acts or omissions of the Debtor, and all claims (as such term is defined in the Bankruptcy Code), obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests and other matters of any kind and nature, arising prior to the Closing or relating to acts occurring prior to the Closing, and whether imposed by agreement, understanding, law, equity or otherwise (the foregoing collectively referred to as "Claims" herein), shall attach to the proceeds of the Sale, with the same validity, extent and priority as such Liens had immediately prior to the Sale (without prejudice to the rights, claims, defenses, offsets, demands and objections, if any, of the Debtor and all interested parties with respect to, among other things, the validity, extent and priority of such Liens).

7.      The transfer of the Acquired Assets and the assignment of the Assigned Contracts pursuant to the Asset Purchase Agreement (a) shall constitute legal, valid and effective transfers of property of the Debtor's estate to the Buyer, and (b) shall vest in the Buyer the Debtor's right, title and interest in the Acquired Assets and the Assigned Contracts free and clear of all Liens (other than Permitted Liens and the Assumed Liabilities).

8.      The sale of the Acquired Assets to the Buyer under the Asset Purchase Agreement will constitute good faith transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

9.      The Debtor and the Buyer shall be entitled to the protections provided under section 363(m) of the Bankruptcy Code.

10.     The consideration provided by the Buyer for the Acquired Assets under the Asset Purchase Agreement is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

11.     Except as expressly set forth in the Asset Purchase Agreement, all persons and entities holding Liens or Claims against the Debtor or the Acquired Assets of any kind and nature whatsoever (other than holders of Permitted Liens or the Assumed Liabilities), hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Liens or Claims against the Buyer, its successors or assigns, their properties, or the Acquired Assets with respect to any Lien or Claims of any kind or nature whatsoever such person or entity had, has, or may have against or in the Debtor, its estate, officers, directors, or the Acquired Assets.  Following the Closing Date, no holder of a Lien or Claim against the Debtor (other than

Permitted Liens and the Assumed Liabilities) shall interfere with the Buyer's title to or use and enjoyment of the Acquired Assets.

12.    The Buyer shall have no liability or obligation for or in connection with any of the Excluded Liabilities.  Except as expressly set forth in the Asset Purchase Agreement, the Buyer is not assuming nor shall it in any way whatsoever be liable or responsible, as a successor or otherwise, for any debts, liabilities, obligations, commitments or responsibilities of the Debtor or any of its predecessors or affiliates, or for any debts, liabilities, obligations, commitments, responsibilities or Liens in any way whatsoever relating to or arising from the Acquired Assets or the Debtor's operations or use or ownership of the Acquired Assets, arising prior to consummation of the transactions contemplated by the Asset Purchase Agreement.  Except as expressly set forth in the Asset Purchase Agreement, the Buyer shall not have any successor, transferee or vicarious liabilities of any kind or character, whether known or unknown, as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date.

13.    Except as expressly provided in the Asset Purchase Agreement, the Buyer is not acquiring or assuming, and the consummation of the Sale shall not subject the Buyer to, any Liens or Claims of any kind or nature whatsoever (other than Permitted Liens and the Assumed Liabilities), whether known or unknown, contingent or otherwise, existing as of the date hereof or hereafter arising, of or against the Debtor, any affiliate of the Debtor, or any other person under the laws of the United States, any state, territory or possession thereof or the District of Columbia applicable to such transactions including, but not limited to, liability based, in whole or in part, directly or indirectly, on any theory of successor, vicarious or transferee liability.

14.    This Sale Order (a) is and shall be effective as a determination that the conveyance

of the Acquired Assets has been effected upon the Closing and (b) shall be binding upon and

govern the acts of all entities including without limitation, all filing agents, filing officers, title

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars

of patents, trademarks or other intellectual property, administrative agencies, governmental

departments, secretaries of state, federal, state, and local officials, and all other persons and

entities who may be required by operation of law, the duties of their office, or contract, to accept,

file, register or otherwise record or release any documents or instruments, or who may be required

to report or insure any title or state of title in or to any of the Acquired Assets.  At or prior to the

Closing Date, each person holding a Lien against any or all of the Acquired Assets is authorized

and directed to execute such documents and take all other actions as may be necessary or

appropriate to release such Liens, other than Permitted Liens and the Assumed Liabilities, as such

Liens may have been recorded or may otherwise exist.

15.    If any person or entity having filed financing statements or other documents or

agreements evidencing Liens (other than Permitted Liens) in the Acquired Assets shall not have

delivered to the Debtor prior to Closing, in proper form for filing and executed by the appropriate

parties, termination statements, instruments of satisfaction, re-assignments or releases of all Liens

which the person or entity has with respect to the Acquired Assets, then (i) the Debtor is hereby

authorized to execute and file such statements, instruments, releases and other documents on

behalf of the person or entity with respect to the Acquired Assets and (ii) the Buyer is hereby

authorized to file, register or otherwise record a certified copy of this Sale Order, which, once

filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all

4507998                                        14

Liens (other than Permitted Liens) of any kind or nature whatsoever in, against, or with respect to, the Acquired Assets.

**Assumption and Assignment of the Existing Resident Contracts
and the Restructured Ground Lease**

16.    Pursuant to sections 363(b), 363(f), 365(a), 365(b) and 365(f) of the Bankruptcy Code, the assumption, assignment and sale by the Debtor to the Buyer of the Assigned Contracts, free and clear of all Liens, other than Permitted Liens and the Assumed Liabilities, is hereby authorized and approved and shall be effected by this Sale Order. The Debtor is hereby authorized and directed to execute and deliver to the Buyer and the College, as lessor, such documents or other instruments as may be reasonably necessary to give full effect to the assignment and transfer of the Assigned Contracts to the Buyer, all as of the Closing Date.

17.    No cure payment or other payment of any kind shall be required in connection with the assumption and assignment to the Buyer of any Assigned Contract.

18.    The Assigned Contracts shall, upon and after assignment to the Buyer, be deemed to be valid and binding and in full force and effect and enforceable in accordance with their terms notwithstanding any provision in any such agreement (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer. The Buyer shall assume the obligations of the Debtor arising out of and related to the Assigned Contracts. Pursuant to section 365(k) of the Bankruptcy Code, the Debtor shall be relieved from any liability for any breach of such agreements occurring after such assignment.

19.    No consent from any third party is required under the Assigned Contracts in order to effectuate assumption and assignment of such contracts.

20.     The Buyer has provided adequate assurance of its future performance under the Assigned Contracts and the proposed assumption and assignment of the Assigned Contracts satisfies the requirements of the Bankruptcy Code including, inter alia, sections 365(b)(1), 365(b)(3) and 365(f), to the extent applicable.

### Next Best Bidder

21.     In accordance with the Sale Procedures, the bid for the Acquired Assets submitted by Five Star at the Auction shall be considered the Next Best Bid. Five Star is not an "insider" or "affiliate" of the Debtor (as each term is defined in section 101 of the Bankruptcy Code) and the transactions contemplated by Five Star's bid were proposed and negotiated at arm's length, without collusion and in good faith within the meaning of section 363(m) of the Bankruptcy Code. As such, Five Star shall be considered the Next Best Bidder. The Debtor is authorized and directed to sell the Acquired Assets to Five Star, upon the terms and subject to the conditions of the Next Best Bid, without further order of the Court in the event that the consummation of the sale of the Acquired Assets to the Buyer does not take place due to the Buyer's inability or unwillingness to consummate such sale. In such event, Five Star shall be entitled to all of the protections of the Bankruptcy Code as a purchaser in good faith, including the protections provided under section 363(m), and all the protections afforded the Buyer pursuant to this Order. The Next Best Bid submitted by Five Star shall be irrevocable until the earlier of (a) the consummation of the sale to the Buyer and (b) August 30, 2009.

### Additional Provisions

22.     Nothing contained in any subsequent order of this Court, Chapter 11 plan confirmed in this case or the order confirming any such Chapter 11 plan or any other order entered

4507998                                    16

in these cases shall conflict with or derogate from the Asset Purchase Agreement or this Sale

Order. This Sale Order shall survive any conversion or dismissal of the Debtor's Chapter 11 case.

23.     All objections and responses concerning the Sale Motion are resolved in

accordance with the terms of this Sale Order and as set forth in the record of the Hearing and to

the extent any such objection or response was not otherwise withdrawn, waived or settled, it (and

all reservations and rights therein) is hereby overruled and denied.

24.     This Sale Order shall be effective and enforceable immediately upon entry, shall

not be subject to any stay of enforcement, including any stay provided by Bankruptcy Rules 6004

and 6006, and its provisions shall be self-executing.

25.     The Asset Purchase Agreement, the Ancillary Agreements and any related

agreements, documents or instruments may be modified, restructured, amended or supplemented

by the parties thereto in accordance with the terms thereof without further order of the Court.

26.     Subject to the provisions of, and except as provided in the Asset Purchase

Agreement, this Court shall retain jurisdiction (i) to interpret and enforce the provisions of this

Sale Order and the Asset Purchase Agreement, all amendments thereto, any waivers and consents

thereunder, and each of the agreements executed in connection therewith in all respects, (ii) to

compel delivery of the Acquired Assets to the Buyer, (iii) to protect the Buyer against any Liens

(other than Permitted Liens) in the Acquired Assets, (iv) to compel delivery of the Cash Purchase

Price under the Asset Purchase Agreement, (v) to interpret, implement and enforce the provisions

of this Sale Order, and (vi) to hear and determine any and all disputes between the Debtor and/or

the Buyer arising out of or relating to the Asset Purchase Agreement or this Sale Order, and any

non-Debtor party arising out of or relating to, among other things, any Assigned Contract

concerning, inter alia, the Debtor's assumption and assignment thereof to the Buyer under the

Asset Purchase Agreement; provided, however, that in the event the Court abstains from

exercising or declines to exercise such jurisdiction or is without jurisdiction with respect to the

Asset Purchase Agreement or this Sale Order, such abstention, refusal, or lack of jurisdiction shall

have no effect upon, and shall not control, prohibit, or limit the exercise of jurisdiction of any

other court having competent jurisdiction with respect to any such matter.

27.     The Buyer shall not be required to seek or obtain relief from the automatic stay

under section 362 of the Bankruptcy Code to enforce any of its remedies under the Asset Purchase

Agreement or any other document related to the sale of the Acquired Assets.  The automatic stay

imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to

implement the preceding sentence.

28.     All provisions of the Asset Purchase Agreement and this Sale Order are

nonseverable and mutually dependent.

29.     The terms and provisions of the Asset Purchase Agreement and this Sale Order

shall be binding on the Debtor, its estate and creditors and each of their affiliates, successors and

assigns, including but not limited to any Chapter 7 or Chapter 11 trustee that may be appointed in

the Debtor's bankruptcy case and shall also be binding upon all non-Debtor third parties to the

Assigned Contracts, and all persons asserting a Lien or Claim against the Debtor's estate or any of

the Acquired Assets, and any fiduciary or other entity that may be appointed in connection with

this case or any other or further case involving the Debtor under any chapter of the Bankruptcy

Code.  The Asset Purchase Agreement, the Sale and the other transactions contemplated thereby

shall be specifically performable and enforceable against and binding upon, and not subject to

rejection or avoidance by, the Debtor and any Chapter 7 or Chapter 11 trustee of the Debtor and its

estate.

4507998                                    18

30.     Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement and this Sale Order.

31.     The failure specifically to include any particular provisions of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the efficacy of such provisions, it being the intent of the Court that the Asset Purchase Agreement be approved in its entirety.

32.     The Debtor (and, to the extent applicable, its agents and attorneys) is authorized to return the Good Faith Deposits actually delivered by Five Star, Top Rock LLC and Covington Investment, LLC in accordance with the Sale Procedures.

33.     This Sale Order constitutes an itemized statement of the property sold, the name of each purchaser and the price received for the property as a whole as required pursuant to Rule 6004(f)(1) of the Bankruptcy Rules.

At Springfield, Massachusetts, in said District, this _3rd_ day of _August_, 2009.

_____
The Honorable Henry J. Boroff
Chief United States Bankruptcy Judge

4507998

# EXHIBIT A

## Asset Purchase Agreement

4507998

*Execution Version*

ASSET PURCHASE AGREEMENT

by and between

LOOMIS SENIOR LIVING, INC.

and

WESTERN MASSACHUSETTS LIFECARE CORPORATION

Dated as of June 22, 2009

4495483

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of June 22, 2009, is made by and between Western Massachusetts Lifecare Corporation, d/b/a Reeds Landing, a Massachusetts non-profit corporation ("**Seller**"), and Loomis Senior Living, Inc., a Massachusetts non-profit corporation ("**Buyer**"). Capitalized terms used in this Agreement are defined or cross-referenced in Article 11.

## INTRODUCTION

A.     On May 4, 2009 (the "**Petition Date**"), Seller commenced voluntary cases for reorganization (the "**Bankruptcy Cases**") under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Massachusetts (the "**Bankruptcy Court**").

B.     Seller is engaged in the provision continuing care services, including independent living, onsite assisted living and skilled nursing care services (the "**Business**").

C.     The Business has operating facilities located in Springfield, Massachusetts.

D.     Buyer desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign and transfer to Buyer the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer hereby agree as follows:

## ARTICLE 1
## PURCHASE AND SALE OF THE ACQUIRED ASSETS

**1.1     Transfer of Acquired Assets.** At the Closing, and upon the terms and conditions herein set forth, Seller shall sell to Buyer, and Buyer shall acquire from Seller, the Acquired Assets free and clear of all Liens, other than Permitted Liens. "**Acquired Assets**" shall mean all of Seller's right, title and interest in, to and under the following property, rights and assets to the extent relating to or used in or held for use in connection with the operation of the Business, but shall exclude the Excluded Assets:

        (a)     the leased real property rights of Seller in the Amended and Restated Ground Lease relating to the premises listed on Schedule 1.1(a) (the "**Seller Real Property**");

        (b)     all (i) of Seller's equipment, machinery, computer hardware, furniture, fixtures and improvements, and other tangible assets whether located on the Seller Real Property or elsewhere (the "**Owned Equipment**"), (ii) of Seller's right, title and interest in

and to the equipment, machinery, computer hardware, furniture, fixtures and improvements, tooling and spare parts and other tangible assets whether located on the Seller Real Property or elsewhere that are leased pursuant to a Designated Executory Contract (the "**Leased Equipment**," and collectively with the Owned Equipment, the "**Equipment**") and (iii) rights of Seller to the warranties and licenses received from manufacturers, sellers and/or lessors of the Equipment;

(c)     (i) the Amended and Restated Ground Lease and (ii) any other leases and other Contracts entered into by Seller primarily relating to the Business that are unexpired or executory as of the Closing Date (excluding the Resident Contracts) that are designated by Buyer by written notice to Seller, delivered no later than ten (10) days prior to the Closing Date (the "**Designated Executory Contracts**");

(d)     to the extent assignable under applicable license agreements or applicable Law, any computer software, systems and applications (including, without limitation, process control software);

(e)     to the extent transferable under applicable Law, all permits, authorizations and licenses (the "**Permits**") issued by any Government to Seller and all pending applications therefor, including, without limitation, those Permits set forth on Schedule 1.1(e);

(f)     [*Reserved.*];

(g)     all "**Resident Contracts**" set forth on Schedule 1.1(g);

(h)     (i) the registered trademarks and common law trademarks, and the goodwill associated therewith, owned by Seller and set forth on Schedule 1.1(h); (ii) the copyrights (registered and unregistered) and copyrightable works of Seller; (iii) any and all other rights in Intellectual Property of Seller, including, without limitation, trade secrets, proprietary information, technology, know-how, inventions (whether patentable or not and whether or not reduced to practice), improvements, software and software applications; (iv) any and all rights to sue for claims and remedies against past, present and future infringements of any or all of the foregoing, and rights for priority and protection of interests therein under the laws of any jurisdiction; (v) tangible embodiments of any of the foregoing (in any medium, including without limitation, electronic media); (vi) licenses or other contractual rights with respect to the Intellectual Property of any third party; and (vii) all goodwill relating to the foregoing and any and all applications, registrations and renewals (if any) for the foregoing;

(i)     all inventory, including food and sundries, linens, and other supplies owned by Seller and necessary to operate the Business in the ordinary course of business (the "**Inventory**");

(j)     all cars, trucks and other motor vehicles, other than that certain 1958 Cadillac owned by the Seller, related to, used in or held for use in connection with the Business, as identified in Schedule 1.1(j);

2

4495483

(k)     all rights of Seller to the warranties received from suppliers to the Business with respect to Inventory;

(l)     all entrance fee receivables existing as of the Petition Date and all Claims arising in connection therewith and any accounts receivable from Reeds Landing Foundation, Inc. (the "Foundation");

(m)     all Customer Prepayments;

(n)     each outstanding purchase order or other commitment of Seller relating to the Business to suppliers of goods and services for materials, supplies or other items and all rights of Seller thereunder to the extent such order or commitment was made in the ordinary course of business and covers goods not yet delivered as of the Closing Date (the "**Purchase Orders**");

(o)     all copies and originals of the lists, data and information pertaining to customers and suppliers of Seller, trade correspondence, data storage tapes, accounts receivable ledgers, whether in hard copy or electronic format;

(p)     all copies and originals of all books, records, accounts, checks, payment records, personnel files, Tax records (including payroll, unemployment, real estate and other Tax records) and other similar books, records and information of Seller, to the extent relating specifically to the Business, whether in hard copy or electronic format (the "**Records**"); provided, however, that Buyer shall provide Seller access to the Records as provided in Section 5.2(e);

(q)     except as provided in Section 1.2(h), all deposits, refund and offset rights, and prepayments of Seller held by utilities or under any Designated Executory Contract that are assumed by and assigned to Buyer;

(r)     the name "Reeds Landing" and all variants thereof and all other intangible property rights, including goodwill, of Seller relating specifically to the Business;

(s)     all rights of the Seller in any patient accounts, deposits and other property held by Seller on behalf of residents, and all rights of Seller in all other Customer Prepayments;

(t)     Seller's wait lists, deposit lists, related agreements and deposits of prospective residents held by Seller pursuant thereto;

(u)     all rights to Seller's telephone numbers and website; and

(v)     all other assets used for or held for use in connection with the Business.

1.2     **Excluded Assets.** The Acquired Assets do not include (i) any right, title or interest of any Person other than Seller in any property or asset, (ii) Seller's right, title and interest in, to and under properties and assets not relating to, used for or held for use in connection with the operation of the Business and (iii) the following properties and assets of

3

4495483

Seller (all such assets not being acquired by Buyer being herein referred to as the "Excluded Assets"):

(a)    all of Seller's cash and cash equivalents, including all petty cash and undeposited checks;

(b)    all of Seller's prepaid insurance premiums and deposits including, without limitation, rights to refunds or adjustments in respect of periods prior to the Closing Date and all rights to insurance proceeds or other insurance Contract recoveries (the "Prepaid Accounts");

(c)    except as provided in Section 1.1(k) and Section 1.1(l), any and all rights, claims, causes of action, known or unknown, pending or threatened (including, without limitation, all claims arising under Sections 510, 544 through 551 and 553 of the Bankruptcy Code or under similar state Laws including, without limitation, fraudulent conveyance claims, all claims for professional negligence, malpractice or breach of fiduciary duty and all other claims of a trustee and debtor-in-possession under the Bankruptcy Code) or Qualified Rights of Set-Off (collectively, "Claims"), of the Trustee or Seller, including but not limited to, Claims arising out of or relating in any way to the Bankruptcy Cases, or any of the transactions contemplated thereby or entered into as a consequence thereof;

(d)    all rights to or claims for refunds, overpayments, abatements or rebates of any Taxes for all Pre-Closing Tax Periods, and, with respect to real and personal property Taxes, for any Straddle Period, a percentage of any refund, overpayment or rebate of any such Taxes that relates to such period shall be prorated and apportioned between Seller and Buyer consistent with the proration provisions contained in Section 6.3;

(e)    that certain 1958 Cadillac owned by Seller;

(f)    except as provided in Section 1.1(l), the accounts receivable of the Business as of the Closing Date (including, without limitation, all receivables and other obligations owing to Seller arising out of or in connection with services rendered to residents through the Closing Date) and all Claims arising in connection therewith;

(g)    any assets other than the Acquired Assets;

(h)    all deposits held by Seller or any utility in connection with the Utility Order; and

(i)    all rights of Seller under this Agreement.

1.3    **Assumption of Liabilities.** At the Closing, Buyer shall assume, and Buyer hereby agrees to thereafter pay, perform and discharge when due, and be responsible solely for, only the following liabilities (the "Assumed Liabilities"):

(a)    all liabilities and obligations of Seller under the Designated Executory Contracts, and all cure costs ("Cure Costs") required to be paid and all defaults required to

4

4495483

be cured pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Designated Executory Contracts;

(b)    liabilities under Section 6.2 for Transfer Taxes payable in connection with the transactions contemplated under this Agreement;

(c)    the accounts payable of the Business incurred in connection with the Purchase Orders;

(d)    all liabilities and obligations arising out of and related to the Resident Contracts, including without limitation, all existing and future refund obligations to existing residents of the Business as disclosed in Schedule 1.3(d), and all Cure Costs disclosed in said Exhibit required to be paid and all defaults required to be cured pursuant to Section 365 of the Bankruptcy Code in connection with the assumption of the Resident Contracts;

(e)    all of the Seller's obligations with respect to refund obligations, if any, to any former or prior resident party to a Residence and Care Agreement, as set forth on Schedule 1.3(e);

(f)    all liabilities and obligations arising out of an event or occurrence exclusively after the Closing Date solely to the extent such liabilities and obligations relate to or arise out of the Acquired Assets;

(g)    all liabilities and obligations arising out of and relating to the Amended and Restated Ground Lease and the Restructured Bridge Loan Agreements;

(h)    INTENTIONALLY OMITTED; and

(i)    liabilities with respect to unused vacation days and other paid time off, to the extent set forth in Section 5.3(h).

1.4    **Retention of Liabilities.** Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of whatever nature, whether presently in existence or arising hereafter. All such other liabilities and obligations shall be retained by, and remain liabilities and obligations of, Seller (all such liabilities and obligations not being assumed being herein referred to as the "**Excluded Liabilities**"). The Excluded Liabilities include, without limitation, the following liabilities and obligations:

(a)    all liabilities and obligations of Seller relating to any environmental, health or safety matter, including, without limitation, any liability or obligation arising under any Environmental Law (except to the extent otherwise provided in Section 1.3(f) and except to the extent that Buyer exacerbates or contributes to such liabilities and obligations);

(b)    all liabilities and obligations of Seller relating to the Seller Benefit Plan, other than accrued but unused vacation days and other paid time off of its employees;

5

(c)    all liabilities and obligations of Seller of whatever nature (including Purchase Orders), whether presently in existence or hereafter arising, other than the Assumed Liabilities; and

(d)    all Taxes with respect to the Business or the Acquired Assets that are attributable to or allocable to any Pre-Closing Tax Period, and, with respect to real and personal property Taxes for any Straddle Period, a percentage of such Taxes that relates to such period shall be provided and apportioned between Seller and Buyer consistent with the proration provisions contained in Section 6.3.

**1.5    Non-Assignment of Contracts.** This Agreement shall not constitute an agreement to assign any Designated Executory Contract, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without the Consent of the third party thereto, would be unenforceable. If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, such Consent is required but not obtained, then Seller shall cooperate with Buyer without further consideration in any reasonable arrangement designed to both (a) provide Buyer with the benefits of or under any such Designated Executory Contract (including, without limitation, enforcement for the benefit of Buyer of any and all rights of Seller against a third party thereto arising out of the breach or cancellation by such third party), and (b) cause Buyer to bear all costs and obligations of or under any such Designated Executory Contract. Any assignment to Buyer of any Designated Executory Contract that shall, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, require the Consent of any third party for such assignment as aforesaid shall be made subject to such Consent being obtained.

## ARTICLE 2
## CONSIDERATION

**2.1    Consideration.** As consideration for the sale and transfer of the Acquired Assets, the Buyer (i) shall pay to U.S. Bank, National Association in cash in immediately available funds an aggregate purchase price of $2,750,000 (two million seven hundred fifty thousand dollars) (the "**Cash Purchase Price**") and (ii) shall assume the Assumed Liabilities. The following items shall be apportioned between the Seller, on the one hand, and the Buyer, on the other hand, with such adjustments to be made as of the Closing Date: (a) rents; (b) occupancy and service fees under the Resident Contracts; (c) taxes; and (d) charges and payments with respect to water, sewer and other utilities. Such apportionments shall be made *pro rata*, on a per diem basis, as of the Closing Date so that all such rents, fees, taxes, charges and payments attributable to the period prior to and including the Closing Date are for the account of the Seller and all such rents, fees, taxes, charges and payments attributable to the period from and after the Closing Date are for the account of the Buyer. In the event that, on a net basis, (a) the Buyer owes money to the Seller pursuant to the foregoing apportionment, the Cash Purchase Price shall be increased on a dollar-for-dollar basis in an amount equal to the net amount so owed, and (b) the Seller owes money to the Buyer pursuant to the foregoing apportionment, the Cash Purchase Price shall be decreased on a dollar-for-dollar basis in an amount equal to the net amount so owed.

**2.2    Performance Deposit.** Buyer has executed and delivered to Seller the Performance Escrow Agreement and deposited with the Escrow Agent $100,000 (the

4495483

**"Performance Deposit"**).  The Performance Deposit shall be held and disbursed pursuant to the terms of the Performance Escrow Agreement and this Agreement.

## ARTICLE 3
## CLOSING AND DELIVERIES

3.1    **Closing**.  The consummation of the transactions contemplated hereby (the "**Closing**") shall take place at the offices of Lyon & Fitzpatrick, LLP, 14 Bobala Road, Holyoke, Massachusetts 01040 at 10:00 a.m. on the 10th Business Day following the satisfaction or waiver by the appropriate party of all the conditions contained in Article 7 hereof, or on such other date and/or at such other place and time as may be mutually agreed to by the parties hereto (the "**Closing Date**").

3.2    **Seller's Deliveries**.  The sale, transfer, assignment and delivery by Seller of the Acquired Assets to Buyer, as herein provided, shall be effected on the Closing Date by bills of sale, endorsements, stock certificates or stock powers (as appropriate, duly endorsed or executed in blank), assignments, certificates of title and other instruments of transfer and conveyance, as shall be consistent with the terms of this Agreement and reasonably satisfactory in form and substance to counsel for Buyer.

3.3    **Buyer's Deliveries**.  At the Closing, Buyer shall execute and deliver to Seller an instrument of assumption of liabilities with respect to the Assumed Liabilities reasonably satisfactory in form and substance to counsel for Seller and the Escrow Agent shall return the Performance Deposit to Buyer.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

4.1    **Representations and Warranties of Seller**.  Seller represents and warrants to Buyer as follows:

(a)    **Corporate Organization**.  Seller is a corporation duly organized and validly existing under the Laws of the jurisdiction of its incorporation.  Seller is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the Business is located or in which the operation of the Business makes such licensing or qualification necessary, except where the failure to be so registered or qualified would not have a Material Adverse Effect.  Subject to any necessary authority from the Bankruptcy Court, Seller has all requisite corporate power and authority to own its properties and assets used in the Business, to conduct the Business as presently conducted and to consummate the transactions contemplated hereby and by the Ancillary Agreements to which it is a party.

(b)    **Authorization and Validity**.  Seller has all requisite corporate power and authority to enter into this Agreement and the Ancillary Agreements to which it is a party and, subject to (i) the Bankruptcy Court's entry of the Sale Order and (ii) the receipt of the Consents set forth on Schedule 4.1(d) to carry out its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Ancillary Agreements to which it is a party and its performance of its obligations hereunder and thereunder have been duly authorized by all necessary corporate action by the Seller, and no other corporate action on

7

4495483

the part of Seller is necessary to authorize such execution, delivery and performance. This Agreement and the Ancillary Agreements have been or will be duly executed by Seller and, subject to the Bankruptcy Court's entry of the Sale Order, constitute, or will when executed constitute, its valid and binding obligations, enforceable against it in accordance with their terms.

(c)    **No Conflict or Violation.** Subject to the receipt of the Consents set forth on Schedule 4.1(d), the execution, delivery and performance by Seller of this Agreement and the Ancillary Agreements to which it is a party (i) do not and will not violate or conflict with any provision of the certificate of incorporation or by-laws of Seller, (ii) do not and will not violate any Law, or any order, judgment, writ or decree of any court or Government ("Order") applicable to Seller, (iii) do not and will not violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any contract, lease, loan agreement, mortgage, security agreement, trust indenture or other agreement or instrument ("Contract") entered into by Seller after the Petition Date, to which Seller is a party or by which it is bound or to which its properties or assets are subject, which violation, conflict, breach or default would reasonably be expected to have a Material Adverse Effect and (iv) do not and will not result in the imposition of a Lien, other than a Permitted Lien, upon or with respect to any of the Acquired Assets.

(d)    **Consents.** Schedule 4.1(d) sets forth a true and complete list of each material Consent (other than the Bankruptcy Court's entry of the Sale Order) and each material declaration to or filing or registration with any such Government (other than those required to be made to or filed with the Bankruptcy Court), that is required in connection with the execution and delivery of this Agreement by Seller or the performance by Seller of its obligations hereunder.

(e)    **Compliance with Law.** Except as set forth on Schedule 4.1(e), Seller, to Seller's Knowledge, has not violated and is not in violation of any Law applicable to the Acquired Assets or the operation of the Business, and Seller is not in default with respect to any Order applicable to the Acquired Assets or the operation of the Business other than violations or defaults the consequences of which would not reasonably be expected to have a Material Adverse Effect.

(f)    **Litigation.** As of the date of this Agreement, and except as set forth on Schedule 4.1(f), there are no Claims, actions, suits, proceedings or investigations pending or, to Seller's Knowledge, threatened, before any court, arbitrator or Government brought by or against or otherwise involving Seller or the Acquired Assets that, if adversely determined, would reasonably be expected to have a Material Adverse Effect or materially impair the ability of Seller to consummate the transactions contemplated by this Agreement.

(g)    **Title and Ownership.** Seller has good and marketable title to, or right by Contract to use, the Acquired Assets. Subject to the entry of the Sale Order, at the Closing, Seller will have the right to transfer the Acquired Assets to Buyer free and clear of all Liens, other than Liens included in the Assumed Liabilities and Permitted Liens, as set forth on Schedule 4.1(g). The Acquired Assets constitute all assets and properties that are reasonably necessary for the operation of the Business by Seller prior to the Closing.

8

4495483

(h)     **Resident Contracts.** Copies (including all modifications and amendments) of the Resident Contracts have been provided or made available to Buyer. As of the date of this Agreement, other than as set forth on Schedule 4.1(h), neither Seller nor any other party to any of the Resident Contracts has commenced any action against any of the parties to such Resident Contracts or given or received any written notice of any material default or violation under any Resident Contract that was not withdrawn or dismissed. To Seller's Knowledge, Seller is not in default of any of the Resident Contracts.

(i)     **Brokers.** Except for B.C. Ziegler and Company, Seller has not dealt with any broker, finder or similar agent with respect to the transactions contemplated by this Agreement, and Seller is not under any obligation to pay any broker's fee, finder's fee or commission other than to B.C. Ziegler and Company, for which it shall bear sole responsibility, in connection with the transactions contemplated by this Agreement.

(j)     **Exclusivity of Representations and Warranties.** The representations and warranties made by Seller in this Agreement are in lieu of and are exclusive of all other representations and warranties, including, without limitation, any implied warranties. Seller hereby disclaims any such other or implied representations or warranties, notwithstanding the delivery or disclosure to Buyer or its officers, directors, employees, agents or representatives of any documentation or other information (including any financial projections or other supplemental data not included in this Agreement).

**4.2     Representations and Warranties of Buyer.** Buyer hereby represents and warrants to Seller as follows:

(a)     **Organization.** Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation, and has all requisite power and authority to own its properties and assets and to conduct its businesses as now conducted.

(b)     **Qualification to do Business.** Buyer is duly qualified to do business as a foreign entity and is in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the business conducted by it makes such qualification necessary.

(c)     **Authorization and Validity.** Buyer has all requisite power and authority to enter into this Agreement and the Ancillary Agreements to which it is a party and to carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Ancillary Agreements to which it is a party and the performance of Buyer's obligations hereunder and thereunder have been duly authorized by all necessary action by the Buyer, and no other organizational action on the part of Buyer is necessary to authorize such execution, delivery and performance, except as set forth in Section 4.2(e). This Agreement and Ancillary Agreements to which Buyer is a party have been or will be duly executed by Buyer and, subject to the Bankruptcy Court's entry of the Sale Order, constitute, or will when executed constitute, its valid and binding obligations, enforceable against it in accordance with their terms.

9

4495483

(d)    **No Conflict or Violation.** The execution, delivery and performance by Buyer of this Agreement and the Ancillary Agreements to which it is a party do not and will not violate or conflict with any provision of the certificate of incorporation or by-laws (or equivalent documents) of Buyer and do not and will not violate any provision of Law, or any Order applicable to Buyer, nor will they result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contract to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject.

(e)    **Consents.** The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Buyer is a party do not and will not require any Consent or filing with any Government or any other Person except (i) as may be required to be obtained by Buyer after the Closing in order to own or operate any of the Acquired Assets; (ii) for entry of the Sale Order by the Bankruptcy Court; (iii) the Consents described in Schedule 4.2(e); and (iv) for such Consents and filings, of which the failure to obtain or make would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated hereby.

(f)    **Adequate Assurances Regarding Designated Executory Contracts and Resident Contracts.** Buyer believes that it will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Designated Executory Contracts and the Resident Contracts.

(g)    **Litigation.** There is no action, suit, investigation or proceeding pending against, or to the knowledge of Buyer, threatened, before any court or arbitrator or any Government brought by or against or otherwise involving Buyer or its Related Persons that in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement.

(h)    **Brokers.** There is no investment banker, broker, finder or other intermediary who has been retained by or is authorized to act on behalf of Buyer who might be entitled to any fee or commission from Seller upon consummation of the transactions contemplated by this Agreement.

(i)    **INTENTIONALLY OMITTED.**

(j)    **WARN Act.** Buyer has no intention to, at any time prior to ninety (90) days after the Closing Date, effectuate a "plant closing" or "mass layoff" as those terms are defined in the WARN Act or any similar state or local law.

**4.3    Survival of Representations and Warranties.** None of the representations or warranties of the parties hereto set forth in Article 4 or in any certificate delivered pursuant to Section 7.1(a), Section 7.1(b), Section 7.2(a) or Section 7.2(b) shall survive the Closing.

## ARTICLE 5
## COVENANTS AND OTHER AGREEMENTS.

**5.1    Covenants of Seller.** Seller covenants as follows:

10

4495483

(a)    **Conduct of Business.** Except as otherwise contemplated by this Agreement, other than those filings and proceedings before the Bankruptcy Court and the incurrence of expenses required thereunder, Seller covenants and agrees that from the date hereof to the Closing Date, Seller shall cause the Business to be conducted in the ordinary course of business. Except as provided in this Agreement, without the prior written consent of Buyer, which consent shall not be unreasonably withheld, delayed or conditioned, Seller shall:

(i)    Other than as required pursuant to any Seller Benefit Plan, agreement or other arrangement existing as of the date hereof or as may be required by applicable Law, not (A) adopt any new Seller Benefit Plan or amend any existing Seller Benefit Plan in any material respect, except for changes as may be required by applicable Law or (B) increase any compensation or enter into or amend any employment, severance, termination or similar agreement with any former, present or future employees of the Business;

(ii)    not sell or otherwise dispose of any of the Acquired Assets, or grant or suffer any Lien on any of the Acquired Assets, except for Permitted Liens or make any agreement or commitment to do so, other than in the ordinary course of business or as permitted by the Bidding Procedures;

(iii)    not change in any respect any of its methods or procedures relating to accounting, other than such changes required by GAAP;

(iv)    not bring, settle, compromise or waive any claim or legal right included in the Acquired Assets materially affecting the validity of or value of the Acquired Assets;

(v)    maintain sufficient inventories, in accordance with its past practices, of food, sundries, linens and other supplies, as of the Closing Date; and

(vi)    consult with Buyer prior to transferring Residents between units of independent or assisted living, provided that Seller shall retain authority to make decisions regarding such transfers.

(b)    **Commercially Reasonable Efforts.**

(i)    Between the date hereof and the Closing Date, Seller shall use commercially reasonable efforts to (A) obtain all necessary consents, waivers, authorizations and approvals of all Governments, and of all other Persons required to be obtained by Seller in connection with the execution, delivery and performance by Seller of this Agreement and (B) take, or cause to be taken, all action, and do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated hereby, and Seller shall use commercially reasonable efforts, except as may be required by a specific Order of the Bankruptcy Court, to maintain the Acquired Assets substantially in accordance with Seller's current practices and procedures.

11

4495483

(ii)    Prior to the Closing or the earlier termination of this Agreement, Seller shall use commercially reasonable efforts to cause the Seller Parties to observe and comply with the Bidding Procedures as approved by the Bankruptcy Court.

(c)    **Buyer's Access to Personnel, Properties and Records; Confidentiality.** Between the date hereof and the Closing Date, Seller shall afford to Buyer, and to the accountants, counsel, financial advisors and other authorized representatives of Buyer, reasonable access during normal business hours to all books and records of Seller relating to the Acquired Assets and the Assumed Liabilities. Additionally, Seller shall promptly respond to Buyer's written requests for information and documentation relating to its Business and otherwise reasonably cooperate in Buyer's investigation of the Business. Upon reasonable prior notice and in addition to the foregoing, Seller shall afford Buyer reasonable access during such period, taking into account Seller's resources and other commitments, during normal business hours, to the employees of the Business in order to permit Buyer to talk with or otherwise provide information to such employees as Buyer deems appropriate for the purpose of considering their employment by Buyer after the Closing Date (provided, however, that Buyer shall use reasonable efforts to prevent any such contacts from unreasonably interfering with the operations of the Business and such employees' duties with Seller). The rights of access contained in this Section 5.1(c) are granted subject to, and on, the following terms and conditions:  (A) any such investigation will be conducted in a reasonable manner; (B) Buyer shall not have access to personnel records of Seller relating to individual medical histories, the disclosure of which, in Seller's good faith opinion, could subject Seller or any of its Affiliates to material risk of liability; and (C) during the period from the date hereof to the Closing Date, all information provided to Buyer or its agents or representatives by or on behalf of Seller or its agents or representatives (whether pursuant to this Section 5.1(c) or otherwise) will be governed and protected by the Confidentiality Agreement between Buyer and Seller (the "**Confidentiality Agreement**").

(d)    **Further Assurances.** At the request and at the sole expense of Buyer, at any time after the Closing Date, Seller shall execute and deliver such documents as Buyer or its counsel may reasonably request to effectuate the purposes of this Agreement.

**5.2    Covenants of Buyer.**  Buyer covenants as follows:

(a)    **Commercially Reasonable Efforts.**  Between the date hereof and the Closing Date, Buyer shall use commercially reasonable efforts to (i) obtain all consents and approvals of all Governments, and all other Persons, required to be obtained by Buyer to effect the transactions contemplated by this Agreement, and (ii) take, or cause to be taken, all action, and do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated hereby, subject to all the terms and conditions hereof.

(b)    **Adequate Assurances Regarding Designated Contracts and Required Orders.**  With respect to each Designated Executory Contract and Resident Contract, Buyer shall, not fewer than (10) Business Days prior to the closing, provide adequate assurance of the future performance of such Designated Executory Contract and Resident Contracts.

12

4495483

(c)     **Cure of Defaults.** Buyer shall, at or prior to the Closing, cure any and all defaults under the Designated Executory Contracts and cure any and all defaults under the Resident Contracts, which defaults are required to be cured under the Bankruptcy Code, so that such Designated Executory Contracts and Resident Contracts may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

(d)     **Performance under Designated Executory Contracts, Resident Contracts and Assumed Liabilities.** From and after the Closing Date, Buyer (a) shall assume, perform and be solely responsible for all obligations and liabilities of Seller that accrue or are to be performed from and after the Closing Date (i) under the Amended and Restated Ground Lease; (ii) under the Designated Executory Contracts (iii) under the Resident Contracts and (iv) with respect to all other Assumed Liabilities and (b) shall take all actions necessary to satisfy its obligations and liabilities under the terms and conditions of each of the Amended and Restated Ground Lease, the Designated Executory Contracts, the Resident Contracts and all other Assumed Liabilities.

(e)     **Seller's Access to Records.** Following the Closing Date, Buyer shall permit Seller and its respective counsel, tax, financial and other advisors as may be retained from time to time, Affiliates and successors and assigns (collectively, the **"Seller Parties"**), reasonable access during normal business hours and upon reasonable prior notice to (i) the Records transferred to Buyer pursuant to Section 1.1(p) of this Agreement and (ii) the continuing employees of the Business, for any purpose related to the administration, sale, operation, wind-down, liquidation or reorganization of the assets, liabilities and bankruptcy estate of Seller. The access referenced in the preceding sentence shall include the right of the Seller Parties to copy and use such Records as they request, provided that the Seller Parties shall reimburse Buyer for its reasonable out-of-pocket expenses related thereto. Buyer shall provide the Seller Parties with reasonable access to management-level employees of the Business during normal business hours to assist the Seller Parties with the foregoing. In the event Buyer wishes to destroy or remove such Records to another location, Buyer shall provide Seller with reasonable notice of such intent and a reasonable opportunity to copy such Records. The rights of access provided to the Seller Parties in the preceding sentences of this in this Section 5.2(e) shall be exercised by the Seller Parties in a manner that does not unreasonably interfere with the business or operations of Buyer.

(f)     **List of Designated Executory Contracts.** No later than ten (10) Business Days prior to the Closing, Buyer shall deliver to Seller a list (or, as applicable, an amendment thereto) of the Designated Executory Contracts to be acquired by Buyer in connection with the Closing, pending approval of such list by the Bankruptcy Court.

(g)     **Collection of Accounts Receivable.** The parties acknowledge that, except as provided in Section 1.1(l), the Excluded Assets include the accounts receivable of the Business as of the Closing Date (including, without limitation, all receivables and other obligations owing to Seller arising out of or in connection with services rendered to residents through the Closing Date). To the extent that Buyer receives any funds from customers or residents of the Business after the Closing which are paid in satisfaction of such accounts

13

receivable, Buyer shall hold such funds in trust for the benefit of Seller and, within five (5) Business Days remit such funds to Seller.

### 5.3    Offer of Employment.

(a)    Prior to the Closing Date, Buyer intends to interview current employees of the Business and, in its sole discretion, offer employment, conditioned on Closing, to certain employees of the Business (the "**Business Employees**") on such terms including, without limitation, base salary, benefits, medical plans and vacation. Each Business Employee who accepts Buyer's employment offer and becomes an employee of Buyer shall be a "**Transferred Employee.**" Buyer shall use its commercially reasonable efforts to continue to employ the Transferred Employees for a period of at least 90 days after the Closing. Within the 60-day period beginning on the Closing Date, Buyer will offer each eligible Transferred Employees participation in a plan intended to be qualified under Section 403(b) of the Code. Notwithstanding anything contained in this Agreement to the contrary, (A) the employment of the Transferred Employees by Buyer shall be subject to Buyer's usual terms, conditions and policies of employment, including, without limitation, Buyer's policies regarding modifications of the terms and conditions of employment, and (B) nothing in this Agreement shall limit the ability of Buyer and its affiliates from revising or terminating any employee benefit plan, program or policy from time to time or modifying the compensation of any Transferred Employee.

(b)    Seller shall retain all liability, responsibility and obligation with respect to all Business Employees' compensation and benefits (including, but not limited to, vacation accruals except as set forth in clause (h) below) up to the Closing Date, the Seller Benefit Plans on and after the Closing Date and for any workers compensation and unemployment claims that relate to events occurring on or prior to the Closing Date. Seller agrees that such liability, responsibility and obligation of the Seller Benefit Plans shall include, but not be limited to, satisfying all medical, dental or other welfare benefit claims incurred on or prior to the last day of the 60-day period beginning on the Closing Date (the "**Transition Period**") with respect to the Transferred Employees and their beneficiaries, regardless of whether the payment therefore is due or a claim is filed before or after the last day of the Transition Period. For the purposes of this Section 5.3(c), a claim is deemed incurred when the services, materials or supplies that are the subject of the claim are performed or provided; in the case of life insurance, when death occurs; in the case of disability benefits, when the event causing disability occurs; and in the case of a hospital stay, when the hospital stay begins.

(c)    Prior to the Closing Date, Seller shall take all such action as may be necessary, if any, to cause the Transferred Employees to become (i) ineligible to contribute to the Seller Benefit Plan which is intended to be qualified under Section 403(b) of the Code in respect of compensation earned on or after the Closing Date, and (ii) fully vested, as of the Closing Date, in their accrued benefits under each Seller Benefit Plan which is a "pension plan" within the meaning of Section 3(2) of ERISA.

(d)    All wages and commissions, accrued vacation and other paid time off (except as set forth in clause (h) below), all employee payroll deductions, employer

14

matching, profit sharing, retirement or other similar contributions to the Seller Benefit Plans, and all employee withholding taxes relating to services provided by the Transferred Employees through the date immediately preceding the Closing Date shall be paid or contributed by Seller prior to the Closing Date.

     **(e)**    No provision of this Section 5.3 shall create any third party beneficiary rights in any Transferred Employee or any other employee or former employee (including any beneficiary or dependent of any Transferred Employee or other employee or former employee) of Seller in respect of continued employment (or resumed employment) or any other matter.

     **(f)**    Seller shall have all responsibility and obligation to make COBRA continuation coverage available to all persons who are "M&A qualified beneficiaries" within the meaning of Treasury Regulation Section 54.4980B-9 Q&A 4 with respect to the transactions contemplated by this Agreement; provided, however, that in the event Seller and seller's group ceases to maintain a group health plan following the Closing Date, Buyer shall have sole responsibility to provide COBRA continuation coverage benefits under Buyer's group health plans to all such M&A qualified beneficiaries.

     **(g)**    Seller shall cooperate with Buyer so as to allow Buyer to (i) arrange and conduct for Business Employees prior to the Closing Date an open enrollment period for Buyer's benefit plans and employee orientation sessions (with such sessions to be held at times reasonably agreed to by Buyer and Seller), and (ii) meet with the Business Employees (either individually or in groups) during breaks, outside of scheduled work hours or as otherwise agreed to by Buyer and Seller.

     **(h)**    Buyer agrees to assume up to $70,000.00, plus on a dollar-for-dollar basis the amount of any Committed Foundation Funds, of Seller's liabilities with respect to unused vacation days and other paid time off existing as of the Closing Date with regard to Transferred Employees up to the full amount of such liabilities to Transferred Employees existing as of the Closing Date, provided that such amounts assumed by the Buyer shall be applied first to those Transferred Employees who are exempt from the federal Fair Labor Standards Act.

     **(i)**    Buyer shall credit, as of the end of the Transition Period, all Transferred Employees with Buyer with all of their time of service with the Business pursuant to Buyer's medical and other welfare benefit plans in computing the benefits available to such employees under such welfare benefit plans, and, as of the Closing Date and except as set forth in clause (h) above, shall allow such employees to carry over all of their vacation time and paid time off accrued and not taken (or cashed out) during their employment with the Business. With respect to each medical plan of Buyer in which Transferred Employees become participants as of the end of the Transition Period, Buyer shall cause there to be waived any pre-existing condition exclusions, except to the extent such pre-existing condition exclusions actually applied as of the last day of the Transition Period to limit, restrict or deny coverage to a Transferred Employee under the Seller Benefit Plans which provided medical coverage to the Transferred Employee on the last day of the Transition Period.

15

**5.4    Covenants of Buyer and Seller.** Buyer and Seller agree that:

(a)    **Reasonable Efforts; Further Assurances.** Subject to the terms and conditions of this Agreement, Buyer and Seller will use their commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable Law to consummate the transactions contemplated by this Agreement, including the execution of the Amended and Restated Ground Lease and the Restructured Bridge Loan Agreements. Seller and Buyer agree to use their commercially reasonable efforts to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate the Closing.

(b)    **Certain Filings.** Seller and Buyer shall cooperate with one another (i) in determining whether any action by or in respect of, or filing with, any Government is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement and (ii) in taking such actions, causing such actions to be taken, making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

(c)    [*Reserved.*]

(d)    **Restructured Bridge Loans.** Seller and Buyer shall cooperate with one another in an effort to amend and restate the Loan and Security Agreement dated as of December 19, 2008 (the "**Bridge Loans**"), by and among Seller, Baystate Health, Inc. and Springfield College, and each of the documents executed in connection therewith, effective as of immediately following the Closing, pursuant to which the obligations of Seller under the Bridge Loans will be restructured to include, but not be limited to, the provisions (the "**Restructured Bridge Loan Agreements**") set forth on Schedule 5.4(d).

(e)    **Amended and Restated Ground Lease.** Seller and Buyer shall cooperate with one another in an effort to amend and restate the Ground Lease dated May 22, 1990, effective immediately prior to the Closing, in substantially the form attached hereto under Schedule 5.4(e).

(f)    Notices. Prior to the Closing, each party hereto shall promptly notify the other party in writing in accordance with Section 10.5 of all facts, events, circumstances and occurrences arising after the date of this Agreement which could be reasonably expected to results in a breach of representation or warranty or covenant of such party in this Agreement or which could be reasonably expected to have the effect of making any representation or warranty of such party in this Agreement untrue or incorrect.

**5.5    Survival of Covenants.** Except for the covenants and agreements expressly by their terms to be performed after the Closing Date, none of the respective covenants and agreements of Seller and Buyer herein, or in any other document delivered prior to or at the Closing, will survive the Closing.

16

4495483

# ARTICLE 6
## TAXES.

**6.1**   **Payment of Taxes.** Subject to Section 6.2, Seller shall retain liability for and shall pay all Taxes with respect to the Business or Acquired Assets that are attributable to or allocable to any Pre-Closing Tax Period, and Seller shall be entitled to any refund of Taxes that is attributable to any Pre-Closing Tax Period. Buyer shall pay all Taxes with respect to the Business or the Acquired Assets that are attributable to or allocable to any Post-Closing Tax Period and shall be entitled to any refund of Taxes that are attributable or allocable to any Post-Closing Tax Period. Real and personal property Taxes set forth on Schedule 6.3 shall be prorated and apportioned between Buyer and Seller in accordance with Section 6.3 herein.

**6.2**   **Transfer Taxes Related to Purchase of Acquired Assets.** All federal, foreign, state and local sales, transfer, stamp, excise, value-added or other similar Taxes, recording and filing fees (collectively, **"Transfer Taxes"**), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets, shall be paid by the Seller. Buyer and Seller agree to cooperate to determine the amount of Transfer Taxes payable in connection with the transactions contemplated under this Agreement. Buyer agrees to assist Seller reasonably in the preparation and filing of any and all required returns for or with respect to such Transfer Taxes with any and all appropriate taxing authorities.

**6.3**   **Proration and Payment of Real and Personal Property Taxes.** The items listed on Schedule 6.3 hereto relating to real and personal property taxes and assessments on the Acquired Assets for any taxable period commencing on or prior to the day immediately preceding the Closing Date (the **"Adjustment Date"**) and ending after the Adjustment Date shall be prorated, unabated, between Buyer and Seller as of the close of business on the Adjustment Date. All such prorations shall be allocated so that items relating to time periods ending prior to the Adjustment Date shall be allocated to Seller based upon the number of days in the period prior to the Closing Date and items related to time periods beginning on or after the Adjustment Date shall be allocated to Buyer based upon the number of days in the period from and after the Closing Date; provided, however, that the parties shall allocate any real property Tax in accordance with Section 164(d) of the Code. The amount of all such prorations of the items listed in Schedule 6.3 shall be settled and paid by the respective parties on the Closing Date; provided, however, that final payments with respect to prorations that are not able to be calculated on the Closing Date shall be calculated and paid by the respective parties as soon as practicable thereafter.

**6.4**   **Cooperation on Tax Matters.**

(a)   Buyer and Seller agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any governmental or regulatory inquiry relating to Tax matters.

17

4495483

(b)    Buyer agrees to retain possession, at its own expense, of all accounting, business, financial and Tax records and information relating to the Acquired Assets or the Assumed Liabilities that are in existence on the Closing Date and transferred to Buyer hereunder for a period of at least six (6) years from the Closing Date, and will give Seller notice and an opportunity to retain at Seller's cost any such records in the event that Buyer determines to destroy or dispose of them after such period. In addition, from and after the Closing Date, each party agrees that it will provide access to the other party and its attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge), to the books, records, documents and other information relating to the Acquired Assets or the Assumed Liabilities as either may reasonably deem necessary to (x) properly prepare for, file, prove, answer, prosecute and/or defend any such Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer or (y) administer or complete any cases under Chapter 11 of the Bankruptcy Code of Seller or the other Seller Parties. Such access shall include, without limitation, access to any computerized information retrieval systems relating to the Acquired Assets or the Assumed Liabilities.

6.5    **Allocation of Purchase Price and Purchase Price Allocation Forms.** Buyer and Seller agree to allocate the Purchase Price and the Assumed Liabilities among the Acquired Assets in accordance with Schedule 6.5 hereto (the "**Allocation**"). Seller and Buyer will cooperate in filing with the Internal Revenue Service their respective Forms 8594 as provided for in Section 1060 of the Code on a basis consistent with the Allocation, and the Allocation shall be reflected on any Tax Returns required to be filed as a result of the transactions contemplated hereby. Neither Seller nor Buyer shall take any position on any of their respective Tax Returns that is contrary to the Allocation.

## ARTICLE 7
## CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES.

7.1    **Conditions Precedent to Performance by Seller.** The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the condition contained in Section 7.1(c)(i)) may be waived by Seller in its sole discretion):

(a)    **Representations and Warranties of Buyer.** All representations and warranties made by Buyer in Section 4.2 shall be accurate on and as of the Closing Date as if again made by Buyer on and as of such date (except for those representations and warranties that expressly relate to a particular date, in which case such representations and warranties shall have been accurate as of such date), except for inaccuracies that do not result in a material adverse effect on Buyer's ability to perform its obligations hereunder, and Seller shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, to that effect.

(b)    **Performance of the Obligations of Buyer.** Buyer shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date in accordance with the terms of this Agreement, and Seller shall have received a certificate dated the Closing Date and signed by a duly authorized officer of Buyer, to that effect.

18

4495483

(c)    **Consents and Approvals.**

(i)       The Bankruptcy Court shall have entered the Sale Order, and no Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date.

(ii)      All other Consents required from any Government entity to permit the consummation of the transactions contemplated by this Agreement and set forth on Schedule 4.1(d) shall have been obtained and be in full force and effect.

(d)    **No Violation of Orders.** No preliminary or permanent injunction or other Order by any Government that declares this Agreement or any Ancillary Agreement invalid or unenforceable in any respect or enjoins, restrains, prohibits, or prevents the consummation of the transactions contemplated hereby or thereby shall be in effect.

(e)    **Cure of Defaults.** At or prior to the Closing, Buyer shall have cured, or made arrangements, to cure promptly, any and all defaults under the Designated Executory Contracts and the Resident Contracts that are required to be cured under the Bankruptcy Code, so that such Designated Executory Contracts and Resident Contracts may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

(f)    **Receipt of Documents.** Seller shall have received all documents it may reasonably request relating to the existence of Buyer and the authority and ability of Buyer to execute this Agreement and perform its obligations hereunder, all in form and substance reasonably satisfactory to Seller.

(g)    **Investigation by Buyer.** Seller shall have received Buyer's Certificate setting forth that: Buyer is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of property and assets such as the Acquired Assets as contemplated in the Agreement. Buyer has conducted its own independent review and analysis of the Acquired Assets and the Assumed Liabilities and the business, operations, technology, assets, liabilities, financial condition and prospects of the Business as formerly carried on by Seller and that Seller has provided Buyer with access to the personnel, properties, premises and records of the Business for this purpose. Buyer has conducted its own independent review of all Orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with Bankruptcy Cases. In entering into this Agreement, Buyer has relied solely upon its own investigation and analysis, and Buyer (i) acknowledges that neither Seller nor any of its Affiliates nor any of their respective Related Persons makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or its Affiliates or any of their respective Related Persons, except for the representations and warranties contained in Section 4.1 (which are subject to the limitations and restrictions contained in the Agreement); and (ii) agrees, to the fullest extent permitted by Law, that none of Seller, its Affiliates or any of their respective Related Persons shall have any liability or responsibility whatsoever to Buyer or its Affiliates or Related Persons on any basis based upon any information provided or made available, or statements made, to Buyer

19

4495483

or its Affiliates or Related Persons (or any omissions therefrom), including, without limitation, in respect of the specific representations and warranties of Seller set forth in this Agreement, except, with regard to Seller, for the representations and warranties contained in Section 4.1 and, with respect to such representations and warranties, subject to the limitations and restrictions contained in the Agreement.

7.2    **Conditions Precedent to the Performance by Buyer.** The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the condition contained in Section 7.2(c)(i)) may be waived by Buyer in its sole discretion:

(a)    **Representations and Warranties of Seller.** All representations and warranties made by Seller in Section 4.1 shall be accurate on and as of the Closing Date as if again made by Seller on and as of such date (except for those representations and warranties that expressly relate to a particular date, in which case such representations and warranties shall have been accurate as of such date), except for inaccuracies that do not result in a Material Adverse Effect, and Buyer shall have received a certificate, dated the Closing Date and signed by the Chief Executive Officer of Seller, to that effect.

(b)    **Performance of the Obligations of Seller.** Seller shall have performed all obligations required under this Agreement to be performed by it on or before the Closing Date, other than failures of performance that do not result in a Material Adverse Effect, and Buyer shall have received a certificate, dated the Closing Date and signed by the Chief Executive Officer of Seller, to that effect.

(c)    **Consents and Approvals.**

(i)    The Bankruptcy Court shall have entered the Sale Order, and no Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date.

(ii)    All other Consents required from any Government entity set forth on Schedules 4.1(d) and 4.2(e) to permit the consummation of the transactions contemplated by this Agreement and the operation of the Business by Buyer shall have been obtained and be in full force and effect.

(d)    **No Violation of Orders.** No preliminary or permanent injunction or other Order by any Government that declares this Agreement or any of the agreements to be entered into in connection with this Agreement invalid or unenforceable in any respect or enjoins, restrains, prohibits, or prevents the consummation of the transactions contemplated hereby or thereby shall be in effect.

(e)    **Resident Contracts.** Prior to the Closing, Seller shall have obtained the approval of the Bankruptcy Court for the assignment to and assumption by Buyer of the Resident Contracts.

(f)    **Title to Assets.** Upon entry of the Sale Order and execution by the Seller and delivery to the Buyer of a bill of sale and all other instruments of transfer as provided in

20

4495483

Section 3.2 with respect to the Acquired Assets, the Seller will have transferred to the Buyer good, clear and marketable title to the Acquired Assets, free and clear of all liens, claims, interests and encumbrances, other than the liens, claims, interests and encumbrances (i) of the residents pursuant to the Resident Contracts, (ii) under the Restructured Bridge Loan Agreements, (iii) under the Amended and Restated Ground Lease and (iv) under the Designated Executory Contracts.

(g)   **Insurance.** Buyer and its Lender shall have obtained the commitment of a national title insurance company with respect to title insurance policies, in standard ALTA form, with waiver of all exceptions regarding liens, survey, and zoning with only such other exceptions as Buyer deems acceptable.

(h)   **Buyer's Financing.** Buyer has received a commitment for financing, in an amount not less than $3,500,000.00, upon terms acceptable to Buyer from PeoplesBank ("Lender"); said commitment contains certain contingencies inclusive of title, environmental investigations and appraisals satisfactory to the Lender and Buyer. Buyer's performance hereunder is conditioned upon the satisfaction of each contingency to its satisfaction and completion of the financing on or before the Closing;

(i)   **Material Adverse Effect.** No event or series of events having a Material Adverse Effect on the Business shall have occurred or shall be likely to occur between the end of the Due Diligence Period and the Closing Date, including, but not limited to, decreases in the occupancy rate to less than 111 total combined units of IL and AL; and

(j)   **Entrance Fee Refunds.** There shall be no material increase in the aggregate amount of entrance fee refunds now or hereafter owing to former residents of IL's whether due to resident transfers within the facility, move-outs or death. "Material" for purposes of this Section shall mean an amount in excess of $330,000 over the refunds so owing as of May 31, 2009 of $1,095,184.

7.3   **Conditions Precedent to Performance by both Buyer and Seller.** The obligations of Buyer and Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing Date, of the following conditions:

(a)   **Restructured Bridge Loan Agreements.** Buyer, Seller, Baystate and the College shall have entered into the Restructured Bridge Loan Agreements without cure costs, which shall be effective simultaneously with the Closing, on terms reasonably satisfactory to the Buyer and Seller;

(b)   **Amended and Restated Ground Lease.** Buyer, Seller and the College shall have entered into Amended and Restated Ground Lease, which shall be effective simultaneously with the Closing, on terms reasonably satisfactory to the Buyer and Seller, and there shall be no Cure Costs associated with respect to the assignment to the Buyer of the Amended and Restated Ground Lease; and

(c)   **Reeds Landing Foundation.** Reeds Landing Foundation, Inc (the "Foundation") shall enter into a written agreement with the Buyer and Seller by July 15, 2009 (the "Foundation Agreement") which shall provide that the Foundation, (i) on the Closing Date,

21

4495483

will amend its Articles of Organization and Bylaws to name Buyer as the sole member of the Foundation, to substitute the Buyer's name where the same appears in each of said documents, and to give the Buyer the right to elect the majority of the directors of the Foundation and (ii) shall agree to provide Committed Foundation Funds in an amount acceptable to the Buyer and Seller, it being understood that the provision of the Committed Foundation Funds may be subject to the approval of the Massachusetts Probate Court. Seller agrees to cooperate and assist Buyer and the Foundation in enacting all reasonably necessary changes and further agrees to cooperate with Buyer in any action filed for the purpose of cy-pres or reasonable deviation as Buyer deems reasonably appropriate.

## ARTICLE 8
## TERMINATION.

**8.1    Conditions of Termination.** This Agreement may be terminated at any time before the Closing:

(a)    By mutual written consent of Seller and Buyer;

(b)    By Seller, by written notice to Buyer, or by Buyer, by written notice to Seller, on or after the date that is 120 days after the date hereof (the "**Termination Date**") if the Closing shall not have occurred on or prior to the Termination Date, subject, however, to extension by the mutual written consent of Seller and Buyer; provided, however, that a party shall not have the right to terminate this Agreement under this Section 8.1(b) if the failure of the Closing to occur on or prior to the Termination Date is as a result of such party's conduct or if such party is then in material breach of this Agreement;

(c)    By Seller, by written notice to Buyer, or by Buyer, by written notice to Seller, if any injunction or other Order contemplated by Section 7.1(d) and Section 7.2(d) shall have become effective; provided, however, that a party shall not have the right to terminate this Agreement under this Section 8.1(c) if such party is then in material breach of this Agreement;

(d)    By Seller, by written notice to Buyer, on or after August 10, 2009 (the "**Warranty Termination Date**"), if the conditions contained in Section 7.1(a) or Section 7.1(b) would not be satisfied or waived if the Closing Date were the date of such notice; provided that Seller has previously provided Buyer with notice under Section 5.4(f) of any breach of representation or warranty or covenant resulting in such condition not being satisfied, and Buyer has failed, within ten (10) days after such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Seller of Buyer's ability, to remedy such inaccuracy or perform such covenant; provided, further, that Seller shall not have the right to terminate this Agreement under this Section 8.1(d) if Seller is then in material breach of this Agreement;

(e)    By Buyer, by written notice to Seller, on or after the Warranty Termination Date, if the conditions contained in Section 7.2(a) and Section 7.2(b); provided that Buyer has previously provided Seller with notice under Section 5.4(f) of any breach of representation or warranty or covenant resulting in such condition not being satisfied, and

22

Seller has failed, within ten (10) days after such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Buyer of Seller's ability, to remedy such inaccuracy or perform such covenant; provided, further, that Buyer shall not have the right to terminate this Agreement under this Section 8.1(e) if Buyer is then in material breach of this Agreement;

      (f)     Automatically, if Seller consummates an Alternative Transaction;

      (g)     By Buyer, by written notice to Seller on or before July 15, 2009, in the event that the results of Buyer's due diligence review are unsatisfactory to Buyer in its reasonable discretion; or

      (h)     By Buyer, by written notice to Seller, or by Seller, by written notice to Buyer, in the event that any of the conditions precedent set forth in Section 7.2 has not been satisfied or waived by Buyer prior to the Closing.

**8.2    Effect of Termination; Remedies.**

      (a)     In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall become null and void and have no effect (other than Articles 8 and 10), which shall survive termination, with no liability on the part of Seller or Buyer, or their respective Affiliates or Related Persons, with respect to this Agreement, except for (i) the liability of a party for its own expenses pursuant to Section 10.3; and (ii) any liability provided for in Section 8.2(b) through Section 8.2(d), inclusive (or by the express terms of any other Section of this Agreement that survives such termination) and (iii) the Confidentiality Agreement.

      (b)     If this Agreement is terminated pursuant to Section 8.1(a), Section 8.1(b), Section 8.1(c), Section 8.1(e), Section 8.1(f), or Section 8.1(g), then, within three Business Days after such termination, the Performance Deposit, together with any interest accrued thereon, shall be returned to Buyer in accordance with the terms of the Performance Escrow Agreement, as Buyer's sole and exclusive remedy, subject to Section 8.2(c) below.

      (c)     If this Agreement is terminated pursuant to Section 8.1(f), then within three Business Days after such termination, the Break-Up Fee shall be paid to Buyer in accordance with the terms of the Sale Procedures Order.

      (d)     If this Agreement is terminated pursuant to Section 8.1(d) or Section 8.1(h) then, within three Business Days after such termination, the Performance Deposit, together with any interest accrued thereon, shall be paid to Seller in accordance with the terms of the Performance Escrow Agreement, as Seller's sole and exclusive remedy.

4495483

## ARTICLE 9
## BANKRUPTCY MATTERS.

**9.1    Sale Procedures Order.**

    **(a)**    The Sale Procedures Order shall be consistent with the Bidding Procedures attached hereto as <u>Exhibit A</u> and otherwise in form and substance reasonably satisfactory to Seller and Buyer. The Sale Order shall be in form and substance satisfactory to Seller and Buyer.

    **(b)**    Seller (a) shall conduct the auction process of the Acquired Assets in material accordance with the Sale Procedures Order, subject to the approval of the Bankruptcy Court and (b) shall not amend, waive, modify or supplement the Sale Procedures Order except as set forth therein.

## ARTICLE 10
## MISCELLANEOUS.

**10.1    Successors and Assigns.**  No party hereto shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other party hereto, and any such attempted assignment without such prior written consent shall be void and of no force and effect. This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto.

**10.2    Governing Law; Jurisdiction.**  This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of The Commonwealth of Massachusetts (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such Commonwealth are superseded by the Bankruptcy Code. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court, subject to the right of any party to seek withdrawal of the reference with respect to any matter. After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, the United States District Court for the District of Massachusetts or any Massachusetts state court sitting in Springfield, Massachusetts.

**10.3    Expenses.**  Each of the parties hereto shall pay its own expenses in connection with this Agreement and the Ancillary Agreement and the transactions contemplated hereby and thereby, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated hereby are consummated. Buyer shall pay the cost of all surveys, title insurance policies and title reports requested by Buyer that are not already in the possession of Seller.

**10.4    Severability.**  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement

24

shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

10.5   **Notices.**  (a)  All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been given when received and shall be deemed duly given if:  (i) served personally on the party to whom notice is to be given at the address specified below for such party; (ii) sent to the party to whom notice is to be given via facsimile transmission to the facsimile number of such party specified below, and telephonic confirmation of receipt is obtained promptly after completion of transmission; (iii) sent to the party to whom notice is to be given at the address specified below for such party by Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (iv) mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Seller:

Western Massachusetts Lifecare Corporation
807 Wilbraham Road
Springfield, MA  01109
Attention:  Mr. Matthew J. Leahey, Executive Director
Facsimile:  413-782-8038

Copy to:

Choate, Hall & Stewart LLP
Two International Place
Boston, Massachusetts 02120
Attention:  John Ventola, Esq.
Facsimile: (617) 248-4000

If to Buyer:

c/o Loomis Communities, Inc.
246 North Main Street
South Hadley, Massachusetts 01075
Attention:  Carol Katz
Facsimile: (413) 532-8676

Copy to:

Lyon & Fitzpatrick, LLP
14 Bobala Road
Holyoke, Massachusetts 01040
Attention:  Peter C. Connor, Esq.
Facsimile: (413) 536-3773

25

4495483

(a)    Any party may change its address for the purpose of this Section 10.5 by giving the other party written notice of its new address in the manner set forth above.

10.6    **Amendments; Waivers.** This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties hereto, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

10.7    **Public Announcements.** The parties have made a joint press release regarding the transaction contemplated herein. Thereafter, no party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written approval of the other party, unless a press release or public announcement is required by Law or Order of the Bankruptcy Court or permitted by the Bidding Procedures, the Preliminary Order or the Sale Order. If any such announcement or other disclosure is required by Law or Order of the Bankruptcy Court, the disclosing party agrees to give the nondisclosing party prior notice of, and an opportunity to comment on, the proposed disclosure. The parties acknowledge that Seller shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order.

10.8    **Entire Agreement.** This Agreement, the Performance Escrow Agreement, Amended and Restated Ground Lease, Restructured Bridge Loan Agreements, the Foundation Agreement and the Confidentiality Agreement contain the entire understanding between the parties hereto with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. All schedules hereto are expressly made a part of this Agreement as fully as though completely set forth herein.

10.9    **Parties in Interest.** Nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and Buyer and their respective successors and permitted assigns. Nothing in this Agreement is intended to or shall relieve or discharge the obligations or liability of any third Persons to Seller or Buyer. This Agreement is not intended to nor shall give any third Persons any right of subrogation or action over or against Seller or Buyer.

10.10    **Bulk Sales Laws.** Buyer hereby waives compliance by Seller and Seller hereby waives compliance by Buyer, with the provisions of the "bulk sales," "bulk transfer" or similar laws of any state other than any Laws that would exempt any of the transactions contemplated by this Agreement from any Tax liability.

26

4495483

**10.11  Headings.** The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

**10.12  Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument.

## ARTICLE 11
## DEFINITIONS.

**11.1  Certain Terms Defined.** As used in this Agreement, the following terms have the following meanings:

"Alternative Transaction" means any one or more transactions (regardless of the form thereof) involving in the aggregate a sale of all or any substantial portion of the Acquired Assets by Seller to a purchaser or purchasers other than Buyer, or the proposal of a plan of reorganization that does not contemplate the sale of the Acquired Assets by Seller to Buyer in accordance with the terms of this Agreement.

"Ancillary Agreements" means the Performance Escrow Agreement and any other agreement executed by the Seller and the Buyer in connection with this Agreement.

"Break-Up Fee" means the fee in the amount of $75,000 to be paid to the Buyer on the terms set forth in this Agreement and in the Sale Procedures Order

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by Law or other governmental action to close.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9604, et seq.), as amended, and rules, regulations and standards issued thereunder.

"Code" means the Internal Revenue Code of 1986, as amended.

"Committed Foundation Funds" means any funds that the Foundation has agreed to provide to the Buyer, in the Foundation Agreement or otherwise, to make capital improvements or expenditures after the Closing Date as needed in connection with the Business.

"Consent" means any consent, approval, authorization, qualification, waiver or notification of a Government or any other Person.

"Customer Prepayments" means all deposits from residents and customers of the Business and all prepayments and advances and the like received from residents and customers of the Business in connection with any Designated Executory Contracts and Resident Contracts for services to be rendered to such residents and customers after the Closing Date or the pro rated portion of any such advanced payment or deposit received from residents and customers of the Business in connection with any of the Designated Executory Contracts and Resident Contracts for services to be rendered after the Closing Date.

27

4495483

"Employee Records" means all employment and benefit records (in whatever form maintained) in the possession of Buyer or its agents and pertaining to any Person employed by the Business before the Closing Date, or any spouse, dependent or other beneficiary of any such Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" has the meaning set forth in the definition herein of Seller Benefit Plan.

"Escrow Agent" means Choate, Hall & Stewart, LLP, which shall be the escrow agent under the Performance Escrow Agreement and under the Holdback Escrow Agreement.

"Estimated Cure Cost" means, with respect to any Designated Executory Contract and any Resident Contract, Seller's good faith estimate of the Cure Cost for such Designated Executory Contract and Resident Contract.

"Final Cure Cost" means, with respect to any Designated Executory Contract and any Resident Contract, the Cure Cost for such Designated Executory Contract and Resident Contract as determined by final order of the Bankruptcy Court.

"Government" means any federal, state, or municipal court, or other executive, legislative or judicial governmental or quasi-governmental, department, commission, board, bureau, agency or instrumentality, including any division, subdivision, audit group, procuring office or governmental or regulatory authority or any adjudicatory body thereof, of the United States, or any state thereof, or any foreign country.

"Improvements" mean the buildings, improvements and structures now existing on the Seller Real Property and/or demised under any lease of, or other Contract for the use of, Seller Real Property.

"Intellectual Property" means all (A) patents, patent applications and patent disclosures, (B) trademarks, service marks, trade dress, trade names, logos and corporate names (in each case, whether registered or unregistered) and registrations and applications for registration thereof together, to the extent applicable, with all of the goodwill associated therewith, (C) copyrights (registered or unregistered) and copyrightable works and registrations and applications for registration thereof, (D) computer software, data, data bases and documentation thereof, (E) trade secrets and other confidential information (including, without limitation, ideas, formulas, compositions, inventions (whether patentable or unpatentable and whether or not reduced to practice), know-how, manufacturing and production processes and techniques, research and development information, drawings, specifications, designs, plans, proposals, technical data, copyrightable works, financial and marketing plans and customer and supplier lists and information), and (F) domain names.

"IRS" means the Internal Revenue Service.

4495483

"Knowledge of Seller," "Seller's Knowledge" or any other similar term or knowledge qualification means the actual knowledge, after reasonable inquiry, of Seller's officers and management level employees, in each case as of the date hereof.

"Law" means any U.S. and foreign federal, state or local statutes, laws, rules, regulations, ordinances, codes, policies, rules and principles of common law, and the like, now or hereafter in effect, including any judicial or administrative interpretations thereof, and any judicial or administrative orders, consents, decrees or judgments.

"Lien" means any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement, right, interest or obligation of any sort whatsoever other than (a) a lessor's interest in, and any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement on or affecting a lessor's interest in, property underlying any leases; and (b) such recorded covenants, restrictions, easements, encroachments or encumbrances that are not created pursuant to mortgages or other financing or security documents, or any other state of facts, that do not materially interfere with the current occupancy or use of an asset.

"Material Adverse Effect" means a state of facts, event, change in or effect on the value of the Acquired Assets or the Business that results in a material adverse effect on the value of the Acquired Assets taken as a whole, but excludes any state of facts, event, change or effect caused by events, changes or developments relating to (A) any action of any or all of the Seller pursuant to any Order of the Bankruptcy Court entered, including, without limitation, the implementation of the transactions contemplated by this Agreement, the Ancillary Agreements or the announcement thereof; or (B) changes resulting from, or from any motion, application, pleading or Order filed related to, the Bankruptcy Case.

"Performance Escrow Agreement" means that Performance Escrow Agreement by and among Buyer, Seller and Escrow Agent, dated as of the date hereof.

"Permitted Liens" means: (a) all Liens set forth on Schedule 4.1(g); (b) Liens for Taxes, assessments and Government or other similar charges that are not yet delinquent, that relate to pre-petition periods or that are being contested in good faith; and (c) restrictions under applicable organizational documents.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or Government.

"Post-Closing Tax Period" means, with respect to any Tax, any reporting period ending after the Closing Date (in the case of a Straddle Period including only the portion of such taxable period beginning on the day after the Closing).

"Pre-Closing Tax Period" means, with respect to any Tax, any reporting period beginning on or before the Closing Date (in the case of a Straddle Period, including only the portion of such taxable period ending on and including the Closing Date).

29

"Qualified Rights of Set-Off" means any right of set-off against a claim asserted by a creditor in the Bankruptcy Cases (except to the extent that an amount owed by such creditor to Seller constitutes an Acquired Asset).

"Related Person" means, with respect to any Person, all past, present and future directors, officers, members, managers, trustees, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, investment bankers or representatives of any such Person.

"Release" shall mean any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, depositing, or disposing into the environment, including the abandonment or discarding of barrels, containers and other receptacles containing any Pollutant.

"Removal, Remedial and Response" means actions that include the types of investigation and environmental cleanup activities required by CERCLA, RCRA, and other comparable Environmental Laws, whether the activities are undertaken by a Government or any other Person.

"Resident Contracts" means all current resident agreements for independent units, assisted living leases and nursing home admission agreements to which the Seller is bound relating to operation of the Business.

"Sale Order" means an order authorizing Seller to sell the Acquired Assets to Buyer pursuant to this Agreement and Sections 105 and 363 and 365 of the Bankruptcy Code, free and clear of all Liens in or on the Acquired Assets (including any and all "claims and interests" in the Acquired Assets within the meaning of Section 363(f) of the Bankruptcy Code), other than Permitted Liens and otherwise free and clear of claims and liabilities and authorizing Seller, among other things, to assume and to assign to Buyer the Amended and Restated Ground Lease, the Resident Contracts, the Assumed Liabilities and the Designated Executory Contracts and liabilities thereunder under Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code.

"Sale Procedures Order" means the *Order Approving Motion For Order (A) Approving Sale Procedures, Including Break-Up Fee, For Proposed Sale Of Substantially All Of The Debtor's Assets; (B) Approving Form And Manner Of Notice; (C) Scheduling A Hearing To Consider The Sale Of Such Assets; And (D) Granting Related Relief* [Dkt. No. 57], entered by the Bankruptcy Court on May 19, 2009.

"Seller Benefit Plan" means any bonus, incentive compensation, stock option, severance pay, medical, life insurance, profit sharing or pension plan, and each other employee benefit plan program or agreement of any kind, including, but not limited to, any employee benefit plan (as defined in Section 3(3) of ERISA) that is sponsored, maintained or contributed to by Seller or by any trade or business, whether or not incorporated, that together with Seller would be deemed a "single employer" under Section 414 of the Code (an "ERISA Affiliate") that is maintained for the benefit of employees of the Business.

30

"Straddle Period" means any taxable period that begins on or before the Closing Date and ends after the Closing Date.

"Taxes" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workmen's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under Section 59A of the Code) and other obligations of the same or a similar nature, whether arising before, on or after the Closing Date; and "Tax" shall mean any one of them.

"Tax Return" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"Utility Order" means the *Final Order Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Payment, and (C) Establishing Procedures for Determining Adequate Assurance of Payment* [Dkt. No. 94], entered by the Bankruptcy Court on June 3, 2009.

**11.2    All Terms Cross-Referenced.**  Each of the following terms is defined in the Section set forth opposite such term:

Acquired Assets ................................................................................Section 1.1
Adjustment Date ...............................................................................Section 6.3
Agreement..........................................................................................Preamble
Allocation...........................................................................................Section 6.5
Alternative Transaction ....................................................................Section 11.1
Amended and Restated Ground Lease.............................................Section 5.4(e)
Ancillary Agreements .......................................................................Section 11.1
Assumed Liabilities ..........................................................................Section 1.3
Bankruptcy Cases.............................................................................Introduction
Bankruptcy Code ..............................................................................Introduction
Bankruptcy Court.............................................................................Introduction
Bidding Procedures ..........................................................................Section 9.1(a)
Break-Up Fee ....................................................................................Section 11.1
Bridge Loans.....................................................................................Section 5.4(d)
Business .............................................................................................Introduction
Business Day......................................................................................Section 11.1
Business Employee ...........................................................................Section 5.3(a)
Buyer..................................................................................................Preamble
Cash Purchase Price..........................................................................Section 2.1
CERCLA.............................................................................................Section 11.1

Claims ........................................................................Section 1.2(c)
Closing ......................................................................Section 3.1
Closing Date..............................................................Section 3.1
Code ..........................................................................Section 11.1
Committed Foundation Funds......................................Section 11.1
Confidentiality Agreement..........................................Section 5.1(c)
Consent .....................................................................Section 11.1
Contract.....................................................................Section 4.1(c)
Cure Cost ..................................................................Section 1.3(a)
Customer Prepayments ..............................................Section 11.1
Designated Executory Contracts..................................Section 1.1(c)
Employee Records .....................................................Section 11.1
Equipment..................................................................Section 1.1(b)
ERISA .......................................................................Section 11.1
ERISA Affiliate .........................................................Section 11.1
Escrow Agent ............................................................Section 11.1
Estimated Cure Cost ..................................................Section 11.1
Excluded Assets .........................................................Section 1.2
Excluded Liabilities ...................................................Section 1.4
Final Cure Cost .........................................................Section 11.1
Foundation Agreement...............................................Section 7.3(c)
Government................................................................Section 11.1
Improvements ...........................................................Section 11.1
Intellectual Property...................................................Section 11.1
Inventory ...................................................................Section 1.1(i)
IRS ...........................................................................Section 11.1
Knowledge of Seller ..................................................Section 11.1
Law ...........................................................................Section 11.1
Leased Equipment......................................................Section 1.1(b)
Lien ...........................................................................Section 11.1
Material Adverse Effect ..............................................Section 11.1
Order .........................................................................Section 4.1(c)
Owned Equipment .....................................................Section 1.1(b)
Performance Deposit..................................................Section 2.2
Performance Escrow Agreement..................................Section 11.1
Permits ......................................................................Section 1.1(e)
Permitted Liens .........................................................Section 11.1
Person........................................................................Section 11.1
Petition Date..............................................................Introduction
Post-Closing Tax Period.............................................Section 11.1
Pre-Closing Tax Period ..............................................Section 11.1
Preliminary Order ......................................................Section 9.1(a)
Prepaid Accounts .......................................................Section 1.2(b)
Purchase Orders ........................................................Section 1.1(n)
Qualified Rights of Set-Off.........................................Section 11.1
Records .....................................................................Section 1.1(p)

32

Related Person ...................................................................Section 11.1
Release ...............................................................................Section 11.1
Removal, Remedial and Response.........................................Section 11.1
Resident Contracts ..............................................................Section 11.1
Restructured Bridge Loan Agreements ................................Section 5.4(d)
Sale Order ..........................................................................Section 11.1
Sale Procedures Order.........................................................Section 11.1
Seller Benefit Plan .............................................................Section 11.1
Seller ..................................................................................Preamble
Seller Parties .....................................................................Section 5.2(e)
Seller Real Property ...........................................................Section 1.1(a)
Straddle Period ...................................................................Section 11.1
Tax / Taxes .........................................................................Section 11.1
Tax Return...........................................................................Section 11.1
Termination Date ...............................................................Section 8.1(b)
Transfer Taxes ....................................................................Section 6.2
Transferred Employee.........................................................Section 5.3(a)
Transition Period.................................................................Section 5.3(c)
WARN Act ..........................................................................Section 4.2(j)
Warranty Termination Date.................................................Section 8.1(d)
Utility Order........................................................................Section 11.1

[Signatures are on the following page.]

4495483

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

LOOMIS SENIOR LIVING, INC.

By: _____

Name:  Carol C. Katz
Title: President and CEO

WESTERN MASSACHSUSETTS
LIFE CARE CORPORATION

By: _____

Name:
Title:

4495483

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

LOOMIS SENIOR LIVING, INC.

By: _____

     Name:
     Title:

WESTERN MASSACHSUSETTS
LIFE CARE CORPORATION

By: _____

     Name: Matthew J. Leahey
     Title: Executive Director

4495483

## DISCLOSURE SCHEDULES

These Disclosure Schedules (these "**Schedules**") are being delivered by Western Massachusetts Lifecare Corporation, d/b/a Reeds Landing, a Massachusetts non-profit corporation (the "**Seller**"), to Loomis Senior Living, Inc. (the "**Buyer**"), pursuant to an Asset Purchase Agreement by and between the Seller and the Buyer dated as of June 22, 2009 (the "**Agreement**").  Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Agreement.

**Schedule 1.1(a)**

**Real Property**

The land in Springfield, Hampden County, Massachusetts, situated on the southerly side of Wilbraham Road, bounded and described as follows:

BEGINNING at a point situated on the southerly line of Wilbraham Road, said point being No. 87° 19' 05" W, along the southerly line of Wilbraham Road, a distance of one hundred sixty and 00/100 (160.00) feet from a drill hole in a concrete walk, being the northeast corner of land now or formerly of Springfield College; thence

| | |
|---|---|
| S. 02° 40' 55" W | A distance of one hundred thirty and 00/100 (130.00) feet to a point; thence |
| SOUTHERLY | Along a curve to the right having a radius of three hundred two and 57/100 (302.57) feet, an arc length of one hundred fifty-one and 99/100 (151.99) feet to a point; thence |
| S. 75° 58' 48" E | A distance of two hundred twenty-two and 16/100 (222.16) feet to a point at land now or formerly of William Hayre, Trustee of Lakeview Villa, said point being S. 00 58' 48" E., three hundred twenty and 00/100 (320.00) feet from the above mentioned drill hole on the southerly line of Wilbraham Road, and the northeast corner of land now or formerly of Springfield College; thence |
| S. 00° 58' 48" E | Along land now or formerly of said William Hayre, a distance of one hundred eighty and 00/100 (180.00) feet to a concrete bound; thence |
| S. 00° 58' 48" E | Along land now or formerly of said Hayre, two hundred fifty and 00/100 (250.00) feet to a concrete bound; thence |
| S. 00° 58' 48" E | Along land now or formerly of said Hayre, a distance of two hundred fifty and 00/100 (250.00) feet to a concrete bound; thence |

| | |
|---|---|
| S. 00° 58' 48" E | Along land now or formerly of said Hayre, a distance of two hundred fifty and 00/100 (250.00) feet to a concrete bound; thence |
| S. 00° 58' 48" E | Along land now or formerly of said Hayre, a distance of one hundred forty and 00/100 (140.00) feet to a point; thence |
| S. 82° 01' 31" W | A distance of three hundred fifty-one and 77/100 (351.77) feet to a point; thence |
| S. 36° 52' 13" W | A distance of three hundred seventy-one and 29/100 (371.29) feet to a point; thence |
| S. 81° 43' 45" W | A distance of sixty-nine and 40/100 (69.40) feet to a point; thence |
| NORTHERLY | Along a curve to the right having a radius of eighty and 00/100 (80.00) feet, an arc length of one hundred twenty-five and 66/100 (125.66) feet to a point; thence |
| N. 08° 16' 15" W | A distance of eighty-nine and 71/100 (89.71) feet to a point; thence |
| N. 53° 16' 15" W | A distance of one hundred forty-five and 00/100 (145.00) feet to a point; thence |
| NORTHERLY | along a curve to the right having a radius of one hundred seventy and 00/100 (170.00) feet, an arc length of two hundred sixty-seven and 04/100 (267.04) feet to a point; thence |
| N. 36° 43' 45" E | A distance of one hundred eighty-four and 57/100 (184.57) feet to a point; thence |
| NORTHWESTERLY | Along a curve to the left having a radius of thirty-five and 00/100 (35.00) feet, an arc length of fifty-six and 64/100 (56.64) feet to a point of reverse curvature; thence |
| NORTHERLY | Along a curve to the right having a radius of two hundred fifty-nine and 19/100 (259.19) feet, an arc length of four hundred five and 65/100 (405.65) feet to a point; thence |

| | |
|---|---|
| N. 33° 40' 55" E | A distance of one hundred fifteen and 00/100 (115.00) feet to a point; thence |
| NORTHEASTERLY | Along a curve to the right having a radius of four hundred seventy-three and 18/100 (473.18) feet, an arc length of two hundred twenty-two and 98/100 (222.98) feet to a point; thence |
| N. 60° 40' 55" E | A distance of three hundred and 00/100 (300.00) feet to a point; thence |
| NORTHERLY | Along a curve to the left having a radius of two hundred thirty-seven and 57/100 (237.57) feet, an arc length of two hundred forty and 49/100 (240.49) feet to a point; thence |
| N. 02° 40' 55" E | A distance of Forty-five and 00/100 (45.00) feet to a point; thence |
| N. 02° 51' 42" W | A distance of eighty-five and 40/100 (85.40) feet to a concrete bound on the southerly line of Wilbraham Road; and thence |
| S. 87° 19' 05" E | Along the southerly line of Wilbraham Road, a distance of seventy-three and 25/100 (73.25) feet to the point of beginning. |

The above described parcel of land is shown on a plan entitled "Plan of Lease Line, Wilbraham Road, Springfield, Owner: Springfield College" prepared by TWM Northeast Flynn Engineers, dated May 14, 1990, and recorded in Hampden County Registry of Deeds in Book of Plans 274, Page 85.

For Title see Notice of Lease recorded aforesaid in Book 7591, Page 491.

*CONSTRUCTION AND MAINTENANCE EASEMENT*

Land in Springfield, Hampden County, Massachusetts, situated on the southerly side of Wilbraham Road, Springfield, Hampden County more particularly bounded and described as follows:

Beginning at a concrete bound situated on the southerly line of Wilbraham Road, Springfield, Hampden County, Massachusetts said point being N 87° 19' 05" W along the southerly line of Wilbraham Road a distance of two hundred thirty-three and 25/100 (233.25) feet from a dill hole in a concrete walk being the northeast corner of land of the lessor, thence:

| | |
|---|---|
| S 02° 51' 42" E | A distance of eighty-five and 40/100 (85.40) feet to a point, thence |
| S 02° 40' 55" W | A distance of forty five and 00/100 (45.00) feet to a point, thence |
| Southerly | On a curve to the right having a radius of two hundred thirty-seven and 57/100 (237.57) feet an arc length of two hundred forty and 49/100 (240.49) feet to a point, thence |
| S 60° 40' 55" W | A distance of three hundred and 00/100 (300.00) feet to a point, thence |
| Southwesterly | On a curve to the left having a radius of four hundred seventy-three and 18/100 (473.18) feet an arc length of two hundred twenty-two and 98/100 (222.98) feet to a point, thence |
| S 33° 40' 55" W | A distance of one hundred fifteen and 00/100 (115.00) feet to a point, thence |
| Southerly | On a curve to the left having a radius of two hundred fifty-nine and 19/100 (259.19) feet an arc length of four hundred five and 65/100 (405.65) feet to a point of reverse curvature, thence |
| Southeasterly | On a curve to the right having a radius of thirty-five and 00/100 (35.00) feet an arc length of fifty-six and 64 (56.64) feet to a point, thence |

| | |
|---|---|
| S 36° 43' 45" W | A distance of one hundred eighty-four and 57/100 (184.57) feet to a point, thence |
| Southerly | On a curve to the left having a radius of one hundred seventy and 00/100 (170.00) feet an arc length of two hundred sixty-seven and 04/100 (267.04) feet to a point, thence |
| S 53° 16' 15" E | A distance of one hundred forty-five and 00/100 (145.00) feet to a point, thence |
| S 08° 15' 15" E | A distance of forty nine and 49/100 (49.49) feet to a pint, thence |
| N 53° 16' 15" W | A distance of one hundred eighty and 00/100 (180.00) feet to a point, thence |
| Northerly | On a curve to the right having a radius of two hundred five and 00/100 (205.00) feet an arc length of three hundred twenty-two and 01/100 (322.01) feet to a point, thence |
| N 36° 43' 45" E | A distance of one hundred eighty-four and 57/100 (184.57) feet to a point, thence |
| Northerly | On a curve to the right having a radius of two hundred ninety-four and 19/100 (294.19) feet an arc length of four hundred sixty and 42/100 (460.42) feet to a point, thence |
| N 33° 40' 55" E | A distance of one hundred fifteen and 00/100 (115.00) feet to a point, thence |
| Northeasterly | On a curve to the right having a radius of five hundred eight and 18/100 (508.18) feet an arc length of two hundred thirty-nine and 48/100 (239.48) feet to a point, thence |
| N 60° 40' 55" E | A distance of three hundred and 00/100 (43.31) feet to a point, thence |
| Northerly | On a curve to the left having a radius of two hundred two and 57/100 (202.57) feet an arc length of two hundred five and 06/100 (205.06) feet to a point, thence |

| | |
|---|---|
| N 02° 40' 55" E | A distance of forty-three and 31/100 (43.31) feet to a point, thence |
| N 02° 51' 42" W | A distance of eighty-seven and 39/100 (87.39) feet to a point at the southerly line of Wilbraham Road, thence |
| S 86° 51' 10" E | A distance of thirty-five and 19/100 (35.19) feet along the southerly line of Wilbraham Road to the point of beginning. |

The above described parcel of land contains one and 69/100 (1.69) acres of land and is shown on a on a plan recorded in Hampden County Registry of Deeds, Plan Book 287, Page 52.

*EASEMENT – REED'S LANDING*

Land in Springfield, Hampden County, Massachusetts, situated on the Southerly side of Wilbraham Road, Springfield, Hampden County shown on a plan recorded with the Hampden County Registry of Deeds in Book of Plans 287, Page 52, and more particularly bounded and described as follows:

Beginning at a point situated on the southerly line of Wilbraham Road, Springfield, Hampden County, Massachusetts said point being N 87° 19' 05" W along the southerly line of Wilbraham Road a distance of one hundred and ten (110.00) feet from a drill hole in a concrete walk thence:

| | |
|---|---|
| S 02° 40' 55" W | A distance of one hundred thirty and 00/100 (130.00) feet to a point, thence |
| Southerly | By a curve to the right having a radius of three hundred fifty-two and 57/100 (352.57) feet and an arc length of one hundred sixty-one and 50/100 (161.50) feet to a point, thence |
| N 75° 58' 48" W | A distance of fifty two and 06/100 (52.06) feet to a point, thence |
| Northerly | By a curve to the left having a radius of three hundred fifty-two and 57 (302.57) feet, and an arc length of one hundred fifty-one and 99/100 (151.99) feet to a point, thence |
| N 2° 40' 55" E | A distance of one hundred thirty and 00/100 (130.00) feet to a point in the southerly line of Wilbraham Road, thence |
| S 87° 19' 05" E | Along the southerly line of Wilbraham Road, a distance of fifty and 00/100 (50.00) feet to the point of beginning |

The above described easement contains 14,259 square feet of land and is shown as 50' Reed's Landing easement on plan recorded in Plan Book 287, Page 52.

### 30' SEWER EASEMENT

Beginning at a point in the southerly lease line, as shown on a plan by TWM Northeast-Flynn Engineers entitled "Plan of Lease Line" dated 4/27/90, said point being S 82° 01' 31" W a distance of thirty and 00/100 (30.00) feet from the southeasterly corner of the leased parcel, thence;

S 7° 58' 29" E                          A distance of seventy-six and 00/100
                                        (76.00) feet to appoint, thence

S 82° 01' 31" W                         A distance of thirty and 00/100 (30.00) feet
                                        to a point, thence

N 7° 58' 29" W                          A distance of seventy-six and 00/100
                                        (76.00) feet to a point, thence

N 82° 01' 31" E                         A distance of thirty and 00/100 (30.00) feet
                                        to the point of beginning

The above described easement contains 2,280 square feet of land and is shown as 30' Sewer Easement on plane recorded in PB 287, Page 52.

## Schedule 1.1(e)

### Permits

- Certificate for Occupancy, permit #72237, dated February 17, 1998, issued by the City of Springfield, Department of Enforcement.

- License to Maintain a Convalescent or Nursing Home, license #0990, dated December 20, 2008, issued by The Commonwealth of Massachusetts, Department of Public Health; expires December 19, 2010.

- 2009 Restaurant License, license # 332, dated August 27, 2008, issued by the Licensing Board of the City of Springfield; expires December 31, 2009.

- License for Food Service Establishment and Milk, license # 1747, dated June 2, 2008, issued by the City of Springfield, Department of Health & Human Services; expires June 30, 2009.

- License for Food Service Establishment and Milk, license # 0312, dated February 6, 2009, issued by the City of Springfield, Department of Health & Human Services; expires February 15, 2010.

- License to operate a registered cosmetologists shop, license #47995, issued by The Commonwealth of Massachusetts, Division of Professional Licensure of Cosmetologists; expires December 31, 2010.

- Certificate to Operate an Assisted Living Residence, dated August 31, 2008, issued by The Commonwealth of Massachusetts, Executive Office of Elder Affairs; expires September 30, 2009.

- Certificate For Use of Elevator, State ID#: 281-P-980, dated March 23, 2009, issued by The Commonwealth of Massachusetts; expires March 22, 2010.

- Certificate For Use of Elevator, State ID#: 281-P-981, dated March 23, 2009, issued by The Commonwealth of Massachusetts; expires March 22, 2010.

- Certificate For Use of Elevator, State ID#: 281-P-982, dated March 23, 2009, issued by The Commonwealth of Massachusetts; expires March 22, 2010.

- Certificate For Use of Elevator, State ID#: 281-P-983, dated March 23, 2009, issued by The Commonwealth of Massachusetts; expires March 22, 2010.

- Certificate For Use of Elevator, State ID#: 281-P-984, dated March 23, 2009, issued by The Commonwealth of Massachusetts; expires March 22, 2010.

- Certificate for Solicitation, Attorney General's Account Number: 026421, issued by The Commonwealth of Massachusetts Office of the Attorney General; expired February 15, 2009. Certificate to be renewed with the issuance of the Community's audited financial statements.

- Certificate of Waiver, CLIA ID Number: 22D0918764, dated August 20, 2008, issued by Centers for Medicare & Medicaid Services, Clinical Laboratory Improvement Amendments; expires August 19, 2010.

- Two building licenses issued to construct the "cottages" currently partially constructed. Such licenses were issued to the contractor, not Reeds Landing.

- License for Food Service Establishment and Milk, license # 0622, dated June 3, 2009, issued by the City of Springfield, Department of Health & Human Services; expires June 30, 2010.

- Medicare Provider Number 225691 issued to Seller by Centers for Medicare & Medicaid Services.

- MassHealth Provider Number 0922315 issued to Seller by Massachusetts Office of Medicaid.

**Schedule 1.1(g)**

**Resident Contracts**

| Party Name | Date of Agreement | Title of Agreement |
|---|---|---|
| Angelo Tougias | August 8, 2004 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Bernice Becker | April 17, 2007 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Constance Buswell | January 14, 2009 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Doris Gormbley | March 12, 2007 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Eileen Warwick | April 19, 2005 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Elizabeth Martens | July 24, 2008 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Florentine Piel | August 27, 2007 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Fred Johnson | August 13, 2007 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Gloria Colton | April 21, 2006 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Helen Leary | January 19, 2005 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Hervey Parke | December 15, 2008 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Jean Smith | January 27, 2009 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Joan McCarthy | August 13, 2008 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| John & Jane Pihl | July 24, 2003 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| John Deputy | January 20, 2009 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Loretta M. O'Neil | October 31, 2007 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Louise Smoluchowski | April 28, 2008 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Lucille McCabe | March 5, 2008 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Margaret Mitchell | October 27, 2006 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Marguerite Fisher | November 30, 2006 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Marianne Ladue | August 7, 2008 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Marjorie Flint | October 24, 2007 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Martha Brandfass | February 23, 2007 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Mary Richmond | April 29, 2008 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Rita Longworth | April 17, 2008 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Robert Ouimet | February 1, 2001 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Ruth Kidd | February 23, 2005 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Sheila Leahey | August 22, 2008 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Theresa Akey | March 26, 2009 | Admission Agreement to the skilled nursing unit at Reeds Landing |
| Addis Osborne | September 12, 2008 | Assisted Living Residence and Care Agreement with Levels of Care |

| Party Name | Date of Agreement | Title of Agreement |
|---|---|---|
| Caroline McDowell | September 22, 2008 | Assisted Living Residence and Care Agreement with Levels of Care |
| Dorothy Foley | September 16, 2008 | Assisted Living Residence and Care Agreement with Levels of Care |
| Elain K. Osterweil | January 23, 2009 | Assisted Living Residence and Care Agreement with Levels of Care |
| Ethel Anderson | September 12, 2007 | Assisted Living Residence and Care Agreement with Levels of Care |
| Fritz Schmidt | June 2, 2008 | Assisted Living Residence and Care Agreement with Levels of Care |
| George Sevigny | September 12, 2007 | Assisted Living Residence and Care Agreement with Levels of Care |
| Irene Stone | October 9, 2007 | Assisted Living Residence and Care Agreement with Levels of Care |
| Jean Smith | September 16, 2008 | Assisted Living Residence and Care Agreement with Levels of Care |
| Mary & Peter Marrinan | September 10, 2007 | Assisted Living Residence and Care Agreement with Levels of Care |
| Mary Louise Carey | August 3, 2006 | Assisted Living Residence and Care Agreement with Levels of Care |
| Agnes O'Flaherty | November 14, 2007 | Assisted Living Residence and Care Subcontract |
| Barbara O'Connor | November 13, 2008 | Assisted Living Residence and Care Subcontract |
| Christine Balch | November 1, 2007 | Assisted Living Residence and Care Subcontract |
| Margaret Maloney | February 23, 2009 | Assisted Living Residence and Care Subcontract |
| Marianne Ladue | October 1, 2007 | Assisted Living Residence and Care Subcontract |
| Serma Mutulian | October 1, 2007 | Assisted Living Residence and Care Subcontract |
| Yvonne Brown | January 24, 2008 | Assisted Living Residence and Care Subcontract |
| Audrey Kervick | November 29, 2006 | Independent Living Residence and Care Agreement |
| Barbara & Horrace Grover | October 18, 2005 | Independent Living Residence and Care Agreement |
| Barbara Anne Cinco | December 7, 2004 | Independent Living Residence and Care Agreement |
| Barbara Griffin | October 18, 2005 | Independent Living Residence and Care Agreement |
| Barbara O'Connor | March 3, 2008 | Independent Living Residence and Care Agreement |
| Charles & Dorothy Johnson | September 30, 2004 | Independent Living Residence and Care Agreement |
| Conrad W. Eberhardt | October 26, 2006 | Independent Living Residence and Care Agreement |
| Dorothy Mae Heffner | June 16, 2005 | Independent Living Residence and Care Agreement |
| Dr. Joel R. Cohen | August 8, 2005 | Independent Living Residence and Care Agreement |
| Effie Douglas | March 15, 2004 | Independent Living Residence and Care Agreement |
| Florence E. Vickers | November 22, 2004 | Independent Living Residence and Care Agreement |

| Party Name | Date of Agreement | Title of Agreement |
|---|---|---|
| Florence Wolstencroft | October 18, 2005 | Independent Living Residence and Care Agreement |
| Frances M. Smith | May 10, 2006 | Independent Living Residence and Care Agreement |
| George & Nancy Nieske | July 7, 2005 | Independent Living Residence and Care Agreement |
| Helen Cohn | September 2, 2003 | Independent Living Residence and Care Agreement |
| Helen Kidess | August 8, 2005 | Independent Living Residence and Care Agreement |
| Helen Patavino | February 4, 2005 | Independent Living Residence and Care Agreement |
| Irene Wisnoski | March 24, 2005 | Independent Living Residence and Care Agreement |
| James & Lillian Thomson | September 27, 2007 | Independent Living Residence and Care Agreement |
| Jean Swan | July 13, 2006 | Independent Living Residence and Care Agreement |
| Jeannette Drilling | December 31, 2000 | Independent Living Residence and Care Agreement |
| Judy Ingle | August 14, 2006 | Independent Living Residence and Care Agreement |
| June Singer | March 29, 2007 | Independent Living Residence and Care Agreement |
| Kenneth Palmer | January 4, 2005 | Independent Living Residence and Care Agreement |
| Lucretia Rettig | March 9, 2006 | Independent Living Residence and Care Agreement |
| Mary E. McDonnell | September 21, 2005 | Independent Living Residence and Care Agreement |
| Michael & Deborah McCurdy | September 26, 2003 | Independent Living Residence and Care Agreement |
| Mildred Johnson | September 30, 2004 | Independent Living Residence and Care Agreement |
| Norman Lagasse | March 15, 2004 | Independent Living Residence and Care Agreement |
| Patricia Olander | July 20, 2007 | Independent Living Residence and Care Agreement |
| Ralph Gelineau | April 29, 2008 | Independent Living Residence and Care Agreement |
| Raymond & Marguerite Montagna | September 29, 2004 | Independent Living Residence and Care Agreement |
| Rene & Cecile Dumas | October 23, 2006 | Independent Living Residence and Care Agreement |
| Rita Conway | October 18, 2005 | Independent Living Residence and Care Agreement |
| Robert & Patricia McMahon | May 6, 2003 | Independent Living Residence and Care Agreement |
| Robert & Thelma Latour | January 24, 2006 | Independent Living Residence and Care Agreement |
| Robert Latour | January 24, 2006 | Independent Living Residence and Care Agreement |
| Roland & Marianne Ladue | November 13, 2003 | Independent Living Residence and Care Agreement |
| Roland Holmes | August 15, 2003 | Independent Living Residence and Care Agreement |
| Ross L. Spencer Jr. and Carolyn M. | March 30, 2007 | Independent Living Residence and Care Agreement |
| Ruth Berger | March 11, 2008 | Independent Living Residence and Care Agreement |
| Sylvia R. Forastiere | December 15, 2006 | Independent Living Residence and Care Agreement |
| Theresa Akey | July 14, 2004 | Independent Living Residence and Care Agreement |
| Van Pelt & Loni Brower | May 31, 2006 | Independent Living Residence and Care Agreement |

| Party Name | Date of Agreement | Title of Agreement |
|---|---|---|
| William & Margaret Stevens | June 12, 2003 | Independent Living Residence and Care Agreement |
| William N. Hill | May 17, 2006 | Independent Living Residence and Care Agreement |
| Albert & Dorothy Pryor | June 19, 1993 | Residence and Care Agreement |
| Althea James | November 5, 2002 | Residence and Care Agreement |
| Barbara Illingworth | September 26, 1996 | Residence and Care Agreement |
| Bernie & Barbara Olmstead | June 9, 1999 | Residence and Care Agreement |
| Bertha M. Saltzgiver | January 3, 2001 | Residence and Care Agreement |
| Christine Balch | April 6, 2001 | Residence and Care Agreement |
| Donald & Diana Bliss | September 30, 2008 | Residence and Care Agreement |
| Donn Barton | July 11, 2002 | Residence and Care Agreement |
| Doris Maloney | September 10, 1998 | Residence and Care Agreement |
| Edward & Beatrice Kelly | October 19, 1993 | Residence and Care Agreement |
| Eleanor Forrest | December 5, 2002 | Residence and Care Agreement |
| Elizabeth R. Haig | January 18, 1993 | Residence and Care Agreement |
| Evelyn M. Bueker | June 5, 2000 | Residence and Care Agreement |
| Felix Salzano | June 19, 2008 | Residence and Care Agreement |
| Florence Busi and Helen Volta | March 28, 2000 | Residence and Care Agreement |
| Gladys L. & Marion F. Ruggles | March 15, 1992 | Residence and Care Agreement |
| Helen Witherspoon | August 20, 1993 | Residence and Care Agreement |
| Helene Knightly | May 10, 1993 | Residence and Care Agreement |
| Henry & Jean Hayes | August 21, 1992 | Residence and Care Agreement |
| Henry & Mary Frisbie | August 13, 2001 | Residence and Care Agreement |
| Hervey & Mary Parke | February 5, 2002 | Residence and Care Agreement |
| Ines Lull | October 30, 1996 | Residence and Care Agreement |
| Irene Mann | September 14, 2007 | Residence and Care Agreement |
| Jacqueline Crowder | December 12, 2000 | Residence and Care Agreement |
| Jane Dunn | September 8, 1997 | Residence and Care Agreement |
| Jean & Robert Vivian | September 10, 1997 | Residence and Care Agreement |
| Jean Schenk | May 2, 2008 | Residence and Care Agreement |
| Jeanne S. Murphy | July 6, 1994 | Residence and Care Agreement |
| Jeremiah Boucher | August 4, 2008 | Residence and Care Agreement |
| Joanna Mouroutsos | September 28, 2003 | Residence and Care Agreement |
| Johanna Osborne | July 15, 2003 | Residence and Care Agreement |

| Party Name | Date of Agreement | Title of Agreement |
|---|---|---|
| John & Catherine Eckel | August 26, 2001 | Residence and Care Agreement |
| John & Jane Pihl | September 6, 2001 | Residence and Care Agreement |
| John and Ethel Dizer | February 12, 1998 | Residence and Care Agreement |
| Josephine Plakias | August 20, 1993 | Residence and Care Agreement |
| Julia Winetrout | May 11, 2000 | Residence and Care Agreement |
| Kathleen Morehead | November 9, 1995 | Residence and Care Agreement |
| Kenneth L. and Nina H. Landon | February 9, 1998 | Residence and Care Agreement |
| Lucretia Rettig | March 9, 2006 | Residence and Care Agreement |
| Mae Cheney | September 22, 1997 | Residence and Care Agreement |
| Margaret Maloney | December 31, 1993 | Residence and Care Agreement |
| Mary Lesniak | August 25, 2002 | Residence and Care Agreement |
| Morey T. & Clio M. Stearns | March 6, 1992 | Residence and Care Agreement |
| Mr. & Mrs. Howard Williams | December 1, 1992 | Residence and Care Agreement |
| Mrs. Bernice McCarthy | October 28, 2005 | Residence and Care Agreement |
| Myrtle Balogh | May 1, 2001 | Residence and Care Agreement |
| Randall & Anaise Betsher | February 1, 2000 | Residence and Care Agreement |
| Raymond J. & Dorris C. Lord | May 25, 1993 | Residence and Care Agreement |
| Reverend & Mrs. John Parke | March 29, 2001 | Residence and Care Agreement |
| Richard W. Martin | March 19, 1992 | Residence and Care Agreement |
| Robert & Barbara Keith | March 10, 1997 | Residence and Care Agreement |
| Robert C. & Kathleen D. Smith | April 26, 1993 | Residence and Care Agreement |
| Robert Markarian | August 29, 1997 | Residence and Care Agreement |
| Ruth Byron | August 19, 1993 | Residence and Care Agreement |
| Saxton & Anne Fletcher | February 11, 1998 | Residence and Care Agreement |
| Victoria B. Drilling | December 31, 2000 | Residence and Care Agreement |
| Willard O. & Elizabeth K. Hale | March 25, 1992 | Residence and Care Agreement |
| William & Wanda Powers | April 17, 2000 | Residence and Care Agreement |
| Wilson T. & Lynne M. Forbes | March 19, 1998 | Residence and Care Agreement |
| Mary Parke | February 2, 2009 | Residence and Care Subcontract |

**<u>Schedule 1.1(h)</u>**

**Trademarks**

Reeds Landing (Reg. No. 1,702,655).

**Schedule 1.1(j)**

**Motor Vehicles**

1995 Ford Multi-Passenger Supreme Startrans Bus (VIN #1FDKE30G7SHB47764)

2002 Ford Mini Bus (VIN #1FDXE45S02HA08861)

2003 Buick LeSabre (VIN #1G4HP54K43U172340)

2005 Buick LeSabre (VIN #1G4HR54K55U181772)

2005 Chevy Silverado Truck (VIN #1GCHK39U05E335354)

1995 Chevy K2500 Truck (VIN #1GCGK24K1SZ204529)

## Schedule 1.3(d)

## Existing Resident Refund Obligations

| Resident | Refund Due[1] |
| --- | --- |
| Akey, Theresa | $      172,055 |
| Balch, Christine | 4,549 |
| Balogh, Myrtle | 4,688 |
| Barton, Donn | 187,006 |
| Becker, Bernice | 205,190 |
| Berger, Ruth | 199,106 |
| Bliss, Donald | 244,924 |
| Boucher, Jeremiah | 168,990 |
| Brandfass, Martha | 305,764 |
| Brower, Loni | 277,547 |
| Brown, Yvonne | 178,101 |
| Cassani, Carol | 13,500 |
| Cinco, Barbara | 72,439 |
| Cohen, Joel | 249,687 |
| Cohn, Helen | 69,667 |
| Colton, Gloria | 172,079 |
| Conway, Rita | 340,255 |
| Douglas, Effie | 50,191 |
| Drilling, Jeannette | 1,314 |
| Dumas, Cecile | 109,011 |
| Dunne, Jane | 163,455 |
| Eberhardt, Conrad | 144,720 |
| Eckel, Catherine | 341,696 |
| Flint, Marjorie | 273,139 |
| Forastiere, Sylvia | 337,825 |
| Forbes, Wilson | 167,450 |
| Forrest, Eleanor | 42,841 |
| Frisbie, Mary | 242,841 |
| Gelineau, H Ralph | 129,000 |
| Griffin, Barbara | 276,259 |

[1] Represents maximum amount due calculated as of May 31, 2009.

| Resident | Refund Due |
|---|---|
| Grover, Barbara | 134,603 |
| Hayes, Jean L. | 205,190 |
| Heffner, Dorothy | 220,775 |
| Hill, William | 139,990 |
| Holmes, Roland | 165,438 |
| Ingle, Jeannette (Judy) | 220,775 |
| James, Althea | 29,998 |
| Johnson, Charles | 273,139 |
| Johnson, Mildred | 12,425 |
| Keith, Barbara | 158,100 |
| Kelly, Beatrice | 219,300 |
| Kervick, Audrey | 264,282 |
| Kidd, Ruth | 140,675 |
| Kidess, Helen | 184,102 |
| Ladue, Roland | 56,135 |
| Lagasse, Norman | 50,191 |
| Latour, Robert | 25,849 |
| Latour, Thelma | 275,178 |
| Lesniak, Mary | 187,006 |
| Maloney, Doris | 205,020 |
| Markarian, Robert | 158,100 |
| Martens, Elizabeth | 96,985 |
| Mccabe, Lucille | 112,838 |
| Mccurdy, Michael | 61,874 |
| Mcdonnell, Mary E | 113,644 |
| Mcmahon, Robert | 67,432 |
| Mitchell, Margaret | 145,350 |
| Montagna, Marguerite | 86,470 |
| Mouroutsos, Joanna | 40,434 |
| Mutulian, Serma | 142,800 |
| Nieske, George | 137,661 |
| O'Connor, Barbara | 231,814 |
| O'Flaherty, Agnes | 36,252 |
| Olander, Patrica | 137,696 |

| Resident | Refund Due |
|---|---|
| O'Neil, Loretta M | 78,339 |
| Palmer, Kenneth | 66,944 |
| Parke, Hervey | 20,851 |
| Parke, Mary | 33,442 |
| Parke, John | 5,829 |
| Patavino, Helen | 214,345 |
| Pihl, Jane | 19,378 |
| Pihl, John | 1,511 |
| Powers, William | 5,907 |
| Rettig, Lucretia | 103,890 |
| Salzano, Felix | 156,974 |
| Schenk, Jean | 133,682 |
| Singer, June | 275,178 |
| Smith, Frances | 284,546 |
| Spencer, Ross | 215,315 |
| Stevens, William | 72,334 |
| Swan, Jean | 189,625 |
| Thomson, James | 226,247 |
| Tougias, Angelo | 19,688 |
| Vickers, Florence | 228,381 |
| Williams, Howard | 217,940 |
| Wisnoski, Irene | 184,102 |
| Witherspoon, Helen | 96,985 |
| Wolstencroft, Florence | 120,812 |
| Total | $    12,855,048 |

## Schedule 1.3(e)

### Former Resident Refund Obligations

| Refund Due to Estate of: | Total Refund Due | Refund Subject to Holdback | Current Refund Due | Unit Subject of Holdback |
|---|---|---|---|---|
| Robert Keith | $    12,750 | $    — | $    12,750 | NA |
| Paul Demontreux | 20,674 | — | 20,674 | NA |
| Bessie Givan | 64,265 | — | 64,265 | NA |
| Douglas Parker | 179,605 | 179,605 | — | 205 |
| Caroline Turtle | 268,987 | 268,987 | — | 304 |
| Pierrette Bourke | 151,045 | 151,045 | — | 308 |
| Veronica Leonard | 178,101 | 140,385 | 37,716 | 313 |
| Joyce Taylor | 192,616 | — | 192,616 | NA |
| Jane Davis | 27,141 | — | 27,141 | NA |
|  |  |  |  |  |
| Totals | $ 1,095,184 | $ 740,022 | $ 355,162 |  |
|  |  |  |  |  |

**Schedule 4.1(d)**

**Seller Consents**

Consent is required to transfer the following licenses and certificates to the Buyer or, where such transfer is not permitted under applicable law, to have a similar license or certificate (as applicable) issued to Buyer:

- License to Maintain a Convalescent or Nursing Home, license #0990, dated December 20, 2008, issued by The Commonwealth of Massachusetts, Department of Public Health; expires December 19, 2010.

- Certificate to Operate an Assisted Living Residence, dated August 31, 2008, issued by The Commonwealth of Massachusetts, Executive Office of Elder Affairs; expires September 30, 2009.

- Certificate for Solicitation, Attorney General's Account Number: 026421, issued by The Commonwealth of Massachusetts Office of the Attorney General; expired February 15, 2009. Certificate to be renewed with the issuance of the Community's audited financial statements.

- Certificate of Waiver, CLIA ID Number: 22D0918764, dated August 20, 2008, issued by Centers for Medicare & Medicaid Services, Clinical Laboratory Improvement Amendments; expires August 19, 2010.

- Medicare Provider Number 225691 issued to Seller by Centers for Medicare & Medicaid Services.

- MassHealth Provider Number 0922315 issued to Seller by Massachusetts Office of Medicaid.

## Schedule 4.1(e)

### Seller Compliance with Law

None.

## Schedule 4.1(f)

### Seller Litigation

Seller's bankruptcy proceeding before the United States Bankruptcy Court for the District of Massachusetts (Western Division), Chapter 11 Case No. 09-37037 (HJB).

Real estate property tax abatement appeal before the Massachusetts Appellate Tax Board regarding a valuation by the Springfield board of assessors on the Debtor's facility for the tax year ending June 30, 2008.

Application for real estate and personal property tax abatement for the tax year ending June 30, 2009, pending before the Springfield board of assessors.

## Schedule 4.1(g)

### Permitted Liens

Liens in favor of Baystate Health, Inc. and Springfield College as set forth in that certain Loan and Security Agreement dated as of December 19, 2008, that certain Leasehold Mortgage and Security Agreement dated as of December 19, 2008, and that certain Collateral Assignment of Residency Agreements dated as of December 19, 2008, in each case as amended and restated as set forth in the Agreement.

See also UCC Financing Statement filed on December 22, 2008, with the Secretary of the Commonwealth of the Commonwealth of Massachusetts, File Number 200870255630.

## Schedule 4.1(h)

### Resident Contract Litigation / Defaults

None.

## Schedule 4.2(e)

### Buyer Consents

Consent is required to transfer the following licenses and certificates to the Buyer or, where such transfer is not permitted under applicable law, to have a similar license or certificate (as applicable) issued to Buyer as consistent with the processes required under law:

- License to Maintain a Convalescent or Nursing Home, license #0990, dated December 20, 2008, issued by The Commonwealth of Massachusetts, Department of Public Health; expires December 19, 2010.

- Certificate to Operate an Assisted Living Residence, dated August 31, 2008, issued by The Commonwealth of Massachusetts, Executive Office of Elder Affairs; expires September 30, 2009.

- Certificate of Waiver, CLIA ID Number: 22D0918764, dated August 20, 2008, issued by Centers for Medicare & Medicaid Services, Clinical Laboratory Improvement Amendments; expires August 19, 2010.

- Medicare Provider Number 225691 issued to Seller by Centers for Medicare & Medicaid Services.

- MassHealth Provider Number 0922315 issued to Seller by Massachusetts Office of Medicaid.

- Local Board of Health Food Service Permit.

Buyer reserves the right to update Schedule 4.2(e) at any time on or prior to July 15, 2009.

**Schedule 5.4(d)**

**Terms of Restructured Bridge Loan**

- There shall be no required cash payments of principal or interest until August 1, 2011.

- Repayment of the Bridge Loan will commence on August 1, 2011 with interest payments, at the rate of five percent (5%) per annum, only being paid for the first three (3) years thereafter.

- Commencing on August 1, 2014, the Bridge Loan shall be amortized over the next ten (10) years with monthly payments of principal and interest at five (5%) percent per annum on a direct reduction basis being made until paid in full.

- The present loan documents shall remain in place and be assumed by the Buyer, which will execute such loan modification documentation as may be required by Baystate and the College at closing in order to document the above modifications.

- The Bridge Loan shall be subordinate to bank financing obtained by the Buyer in the maximum amount of $3,500,000 with payments of principal and interest being permitted to be paid provided that Buyer is not in payment default with the bank.

## Schedule 5.4(e)

### Form of Amended and Restated Ground Lease

See attached.

**AMENDED AND RESTATED**

**GROUND LEASE**

**LESSOR:  SPRINGFIELD COLLEGE**

**LESSEE:  LOOMIS SENIOR LIVING, INC.**

# TABLE OF CONTENTS

ARTICLE I – BASIC PROVISIONS ...................................................................................... 1

  1.  The Leased Premises ................................................................................... 1
  2.  Use of Leased Premises .............................................................................. 2
  3.  Condition of Leased Premises ...................................................................... 3
  4.  Term ......................................................................................................... 3

ARTICLE II - RENT ............................................................................................................ 3

  1.  Basic Rent ................................................................................................ 3
  2.  Lessor's Tax Status .................................................................................... 4
  3.  Net Lease .................................................................................................. 4

ARTICLE III - CONSTRUCTION AND MAINTENANCE OF IMPROVEMENTS ...................... 5

  1.  General ..................................................................................................... 5
  2.  Assignment of Operating Rights; Security Interest in Personal Property ........ 5
  3.  Operation and Maintenance of Senior Living Community .............................. 5
  4.  Repairs and Replacements ........................................................................... 6
  5.  Alterations, Replacements and Signs ............................................................ 6
  6.  Compliance with Law; Hazardous Waste ..................................................... 7

ARTICLE IV – TAXES AND UTILITIES ............................................................................... 7

  1.  Taxes ....................................................................................................... 7
  2.  Lessee's Right to Contest; Abatements ........................................................ 8
  3.  Utilities .................................................................................................... 8

ARTICLE V – INSURANCE AND INDEMNITY ..................................................................... 9

  1.  Insurance .................................................................................................. 9
  2.  Self-Insurance ........................................................................................... 10
  3.  Subrogation .............................................................................................. 10
  4.  Indemnification ......................................................................................... 10

ARTICLE VI – ASSIGNMENT ............................................................................................. 12

  1.  Assignment ............................................................................................... 12

ARTICLE VII – LEASEHOLD MORTGAGE .......................................................................... 13

  1.  Right to Mortgage Leasehold Interest .......................................................... 13
  2.  Leasehold Mortgage ................................................................................... 13
  3.  Required Amendments to Lease .................................................................... 14
  4.  Obligations of Mortgagee ............................................................................ 14
  5.  Amendments to Mortgage ............................................................................ 14
  6.  Payment of Mortgage .................................................................................. 15
  7.  Obligations of Lessor .................................................................................. 15

ARTICLE VIII – CASUALTY ............................................................................................... 15

  1.  Insured Casualty ........................................................................................ 15
  2.  Uninsured Casualty .................................................................................... 17
  3.  Continuation of Term ................................................................................. 17
  4.  Lessee's Termination Election ...................................................................... 18

ARTICLE IX - EMINENT DOMAIN ..................................................................................... 18

  1.  Total/Permanent ....................................................................................... 18

2.   PARTIAL TAKING ....................................................................................................... 19
3.   COOPERATION BETWEEN LESSOR AND LESSEE ............................................................... 19

**ARTICLE X – ACADEMIC INTEGRATION** ............................................................................ **20**

1.   PURPOSE .................................................................................................................. 20
2.   IMPLEMENTATION ....................................................................................................... 20

**ARTICLE XI – REVERSION, DEFAULT, REMEDIES** ................................................................. **21**

1.   REVERSION OF INTEREST AND IMPROVEMENTS .............................................................. 21
2.   EVENTS OF DEFAULT ................................................................................................... 21
3.   REMEDIES ................................................................................................................. 22
4.   REMEDIES NOT EXCLUSIVE ........................................................................................... 22
5.   TURNOVER OF PLANS AND DEVELOPMENT MATERIALS .................................................... 22

**ARTICLE XII – MISCELLANEOUS PROVISIONS** .................................................................... **23**

1.    LESSOR'S TITLE AND QUIET ENJOYMENT ...................................................................... 23
2.    NOTICES ................................................................................................................. 23
3.    NOTICE OF LEASE ..................................................................................................... 23
4.    ESTOPPEL CERTIFICATES ............................................................................................ 23
5.    FORCE MAJEURE ....................................................................................................... 24
6.    NO PARTNERSHIP ...................................................................................................... 24
7.    GOVERNING LAW ...................................................................................................... 24
8.    SEVERABILITY ........................................................................................................... 25
9.    ENTIRE AGREEMENT ................................................................................................... 25
10.   BROKERAGE .............................................................................................................. 25
11.   WAIVER .................................................................................................................... 25
12.   SUCCESSORS AND ASSIGNS .......................................................................................... 25
13.   ARBITRATION ........................................................................................................... 26
14.   LESSOR'S RIGHT TO ENTER ......................................................................................... 26
15.   CAPTIONS ................................................................................................................. 26
16.   GENDER .................................................................................................................... 26
17.   COUNTERPARTS ......................................................................................................... 26
18.   HOLDING OVER .......................................................................................................... 26
19.   COMMUNICATIONS FROM GOVERNMENT AUTHORITIES .................................................... 27
20.   SUBORDINATION ....................................................................................................... 27
21.   ATTORNMENT ........................................................................................................... 27
22.   COOPERATION ........................................................................................................... 27
23.   TIME IS OF THE ESSENCE ............................................................................................ 28

**AMENDED AND RESTATED**

**GROUND LEASE**

This Indenture, made this __ day _____, 2009 by and between **SPRINGFIELD COLLEGE**, a Massachusetts nonprofit corporation with a usual place of business at 263 Alden Street, Springfield, Massachusetts 01109 ("Lessor") and **LOOMIS SENIOR LIVING, INC.**, a Massachusetts corporation with a usual place of business in care of Loomis Communities, Inc., 246 North Main Street, South Hadley, Massachusetts 01075 ("Lessee").

**RECITALS**

This Lease is made with reference to the following facts:

A.    Pursuant to that certain Assignment of Lease and Assumption Agreement dated as of _____, 2009 by and between WESTERN MASSACHUSETTS LIFECARE CORPORATION, as Assignor, and Lessee, as Assignee, Lessee is the tenant under a certain Lease Agreement dated as of May 22, 1990 by and between SPRINGFIELD COLLEGE ("Lessor") and WESTERN MASSACHUSETTS LIFECARE CORPORATION, as Original Tenant, as amended by that certain First Amendment to Lease Agreement dated as of October 12, 1993, that certain Second Amendment to Lease Agreement dated as of September 29, 2000, and that certain Third Amendment to Lease Agreement dated as of December 21, 2006 (as so amended, the "Original Lease") pertaining to the Leased Premises (defined below).

B.    Lessor and Lessee desire to amend and restate in its entirety the Original Lease.

ARTICLE I –
BASIC PROVISIONS

1.    The Leased Premises

In consideration of the mutual covenants contained herein, and subject to the provisions of Article I(5) below, Lessor hereby leases to Lessee and Lessee hereby leases from Lessor certain real property located in the City of Springfield, County of Hampden and Commonwealth of Massachusetts, consisting of approximately 23.2 acres of area, as more particularly described in Exhibit "A", which is attached hereto and made a part hereof. The land leased to Lessee hereunder is hereinafter referred to as the "Leased Premises." In consideration of Lessee's agreement to lease the Leased Premises, Lessor agrees that it shall not make any material change to the condition of the land which lies within one hundred fifty (150') feet to the west of the centerline of the road which forms the western border of the Leased Premises (the "Western Road"), or to the land which lies within twenty-five (25') feet to the east of that portion of the eastern border of the Leased Premises which runs from Wilbraham Road to the point where the border of the Leased Premises runs eastward to Pocantico Avenue (the "Northeast Border"), or the

land which lies within twenty-five (25') feet of the border which runs from the Northeast Border to Pocantico Avenue, without the prior written consent of Lessee, which consent shall not be unreasonably withheld or delayed, and in any event may be withheld only if the proposed material change would demonstrably negatively affect the economic viability of the senior living community maintained on the Leased Premises pursuant to Article I(2) below.

In addition, Lessor agrees that, for the term of this Lease, Lessee shall be permitted to enter upon (1) the land which is fifty (50') feet to the west of the centerline of Western Road; and (2) the land which is fifty (50') feet to the east of that portion of the eastern border of the Leased Premises which runs from Wilbraham Road to the northeast border, both of which are more fully described in the portion of **Exhibit "A"** attached hereto. Both easements are granted for the purpose of constructing, grading, landscaping, maintaining or (i) improving a sidewalk, walkway, or footpath extending from Wilbraham Road in accordance with plans approved pursuant to Article III; and (ii) Western Road for laying and maintaining underground utility lines thereon.

Lessor agrees to advise any potential owner, mortgagee or lessee of the area containing said one hundred fifty feet of said covenant, such advice to be in writing prior to any such transfer, mortgage or lease. Further, Lessee agrees that, if Lessor's access to its land bordered by the Leased Premises, Wilbraham Road and Pocantico Avenue is restricted by the City of Springfield or other governmental authority, with the prior written consent of Lessee, Lessor may have a right of way to said land over the Northeast Border, so long as neither such right of way nor the use proposed for said land would demonstrably negatively affect the economic viability of the Senior Living Community built on the Leased Premises pursuant to Article I(2) below.

Lessor also agrees that Lessee may lay and maintain sewer or sanitary lines across Lessor's property in locations on the southern boundary of the Leased Premises, in order that Lessee may utilize an existing city sewer or sanitary line at that location including those as shown on a plan recorded in Hampden County Registry of Deeds, Plan Book 287, Page 52. Such lines shall be laid and maintained at Lessee's sole cost and expense, and Lessee agrees that, once such lines are laid and as they are maintained, Lessee shall restore Lessor's land to substantially the same condition as such land was before the laying or maintenance of such lines.

2.    Use of Leased Premises

Lessee shall use the Leased Premises to maintain and operate thereon a senior living community offering residential and health care to the elderly, which may include independent living, assisted living, and nursing services, and common areas and other uses incidental thereto, pursuant to the terms and conditions outlined herein. In no event, including an Event of Default by Lessee under any leasehold mortgage and the transfer of Lessee's interest in the Leased Premises by foreclosure or conveyance in lieu of foreclosure, shall the Leased Premises be used for any purpose other than senior living

community or related services, including without limitation senior living services, nursing, assisted living, rehabilitation, physical therapy and adult or child day care. Lessee may not use the Leased Premises for any purpose other than the purposes listed above without the prior written consent of Lessor which consent Lessor may, in its sole discretion, refuse to give.

Lessee agrees that Lessor and its students, faculty members and other members of the Springfield College community shall be entitled to use, during hours of daylight, the existing hiking trails (the "Trails"). Lessee shall maintain the Trails free of over-growth at its own expense throughout the term of this Lease. Lessee also agrees that Lessor shall have the right, at reasonable times during hours of daylight and so long as the exercise of such right does not interfere with the operation of the senior living community, to cross the Leased Premises in order to service or otherwise utilize land in the possession of Lessor.

Further, Lessor agrees that the residents of the Senior Living Community shall be entitled to use, during hours of daylight, the existing hiking trails existent on the East Campus of Springfield College.

3.   <u>Condition of Leased Premises</u>

The parties hereto agree that the Leased Premises are being leased subject to all laws, ordinances and/or regulations of governmental bodies having jurisdiction thereof, and further subject to all recorded covenants, easements, encumbrances and encroachments and accrued taxes, assessments, water and sewer charges which are to be adjusted with the prior Lessee.

4.   <u>Term</u>

The term of this Lease shall commence on the date of this Lease (the "Commencement Date") and continue for a term of seventy-five (75) years. On or before the date which is sixty-one (61) years after the Commencement Date, the parties shall commence discussions with respect to the possible extension of the term of this Lease. Lessee acknowledges that it has no right to renewal or extension of this Lease. A failure of Lessor to agree upon any extension shall not be deemed an Event of Default hereunder or otherwise actionable by Lessee.

ARTICLE II -
RENT

1.   <u>Basic Rent</u>

Lessee covenants and agrees to pay to Lessor, during the term of this Lease, Basic Rent, as provided in this Article, as follows:

(i)      There shall be no rent payable until August 1, 2014;

(ii)    The Rent Commencement Date shall be August 1, 2014; August 1, 2014 through July 31, 2018, rent shall be Forty Thousand ($40,000) Dollars per annum;

(iii)    August 1, 2018 through July 31, 2022, rent shall be Seventy-Five Thousand ($75,000) Dollars per annum;

(iv)    August 1, 2022 through the Rent Termination Date, rent shall be One Hundred Thousand ($100,000) Dollars per annum.

Notwithstanding the above, in the event Lessee shall begin repayment of its deferred Management Fees prior to August 1, 2022, then and in such event, Basic Rent shall increase to One Hundred Thousand ($100,000) Dollars per annum as of the date when deferred Management Fees have begun to be repaid.

All annual rent set forth above shall be paid in equal monthly installments on the first day of each month beginning on the Rent Commencement Date.

The Rent Termination Date shall be the date upon which Lessor shall have received from Lessee Basic Rent in the total amount of Three Million Ten Thousand ($3,010,000) Dollars.

2.    Lessor's Tax Status

The parties acknowledge that the terms of this Lease are intended to provide Lessor with payments from Lessee which shall constitute "rents from real property" as such term is defined in Section 856(d) of the Code, in order that all such payments shall not constitute unrelated business income, as such term is defined in the Code. The parties further agree that if, in the opinion of Lessor's counsel, there shall be any significant risk that any individual payment or type of payment to be made by Lessee under this Lease would be construed by the Internal Revenue Service as unrelated business income to Lessor instead of tax-exempt rental revenue, whether as a result of a change in law or otherwise, the parties agree to consult regarding an alternative to the individual payment or type of payment at issue so long as any such alternative would not result in an additional economic or administrative burden to Lessee.

3.    Net Lease

This is an absolutely net lease and Lessee shall pay for all expenses and costs, including, but not limited to, utilities, insurances, taxes, maintenance, repairs and replacements. From the date of execution of this Lease, and throughout the term hereof, Lessor shall not be expected or required to make any payment of any kind whatsoever, under any circumstances or conditions, whether presently existing or hereafter arising, except, however, that Lessor shall comply fully with all terms and conditions of any mortgage granted by Lessor of its fee interest in the Leased Premises, and further, Lessor shall not be under any obligation or liability with respect to the Leased Premises, the Senior Living Community, or any other improvement on the Leased Premises, except for those

obligations of Lessor arising under this Lease.

## ARTICLE III -
## CONSTRUCTION AND MAINTENANCE OF IMPROVEMENTS

1.    General

Lessee shall maintain and operate on the Leased Premises a high-quality senior living community as provided for in Article I(2), above.

2.    Assignment of Operating Rights; Security Interest in Personal Property

As security for the performance of all its covenants, agreements and obligations under this Lease, Lessee (i) hereby assigns (the "Assignment") to Lessor all of its right, title and interest in each contract, instrument and agreement relating to the management of the Senior Living Community and any other improvement on the Leased Premises, including any such right, title or interest arising or acquired after the date of this Lease (hereinafter referred to as the "Operating Rights"); and (ii) hereby grants to Lessor a security interest (the "Security Interest") in all of the tangible personal property located on the Leased Premises, including any such property located within the Senior Living Community or any other improvement constructed on the Leased Premises.

Lessor agrees that, until the term of this Lease expires, or until termination of this Lease for any reason, whichever is earlier, all of the rights of Lessor pursuant to this Article III(2) shall be subject and subordinate to any rights granted or assigned by Lessee to a Mortgagee, or to a lender with a purchase money security interest in Lessee's tangible personal property and Leasehold Mortgages as described in Article VII herein. After the expiration of the term of this Lease, or after termination of this Lease for any reason, whichever is earlier, the Assignment shall be indefeasible, and Lessor shall be vested with all of Lessee's right, title and interest in the Operating Rights.

Notwithstanding anything contained herein to the contrary, and except as otherwise provided in this Lease, and so long as Lessee is not in default under this Lease, Lessee may, without prior notice to Lessor, amend or terminate any of the Operating Rights and dispose of or replace any or all of Lessee's tangible personal property located on the Leased Premises.

Lessee agrees to take any and all actions necessary, and to execute such instruments as may be reasonably requested by and prepared by Lessor, to perfect or maintain the perfection of the Security Interest, including but not limited to the execution and filing of financing statements.

3.    Operation and Maintenance of Senior Living Community

During the term of this Lease, Lessee shall take all steps necessary, including modernization from time to time, to ensure that the Senior Living Community is operated and maintained in a manner comparable to other high quality senior living communities

in Hampden and Hampshire Counties of Commonwealth of Massachusetts.

4.    Repairs and Replacements

Lessee shall take good care of the Leased Premises, including any buildings and improvements constructed thereon, throughout the term of this Lease, and shall keep them free from waste and nuisance of any kind. Lessee shall make all necessary repairs and replacements to such buildings and improvements thereon, at its sole cost and expense, so as to keep the Leased Premises and the buildings and improvements thereon in at least as good repair, order and condition as they were at the date of this Lease, reasonable wear, tear and normal aging excluded. Notwithstanding anything contained herein to the contrary, however, Lessee shall not construct buildings other than those currently existing and those fourteen (14) cottage units previously approved and partially constructed without the prior written consent of Lessor.

Lessee shall make all necessary repairs and replacements to the Leased Premises, as well as any buildings or improvements thereon, which are necessary to maintain the Leased Premises, as well as any buildings or improvements thereon, in such repair, order and condition, or in such better repair, order and condition as may be required by any statute, law, ordinance, or regulation of any governmental or regulatory authority (the "Regulations"). If Lessee determines to defer compliance with any Regulation while challenging its validity or applicability, Lessee shall give prior written notice of such action to Lessor, and shall provide Lessor with such security as Lessor shall reasonably request to secure Lessee's compliance with such Regulation and to pay any damages, costs or expenses which may be suffered by Lessor as a result of deferring such compliance. Lessee only shall be entitled to defer such compliance as long as it continues to contest such Regulation with due diligence.

Lessee shall also, at its own cost and expense, put, keep and maintain in good repair and order, safe condition and free from dirt, snow, ice, rubbish and other obstructions and encumbrances, all roads, roadways, parking areas, sidewalks and curbs on the Leased Premises.

The Leased Premises shall not be maintained as, nor shall Lessee permit the Leased Premises to become, a public or private nuisance.

At the end of the term of this Lease, or other termination hereof, Lessee shall deliver to Lessor the Leased Premises, with all the buildings and improvements located thereon, in good repair and condition, ordinary wear, tear and natural aging excepted, subject to the provisions of Articles VIII and IX below.

5.    Alterations, Replacements and Signs

Lessee may not demolish the Senior Living Community or any exterior portion thereof nor (i) make any structural or exterior additions or alterations to the Senior Living Community, or (ii) construct any other building or improvements on the Leased Premises, or (iii) make any material or substantial change to the Senior Living

Community, without complying with the terms and provisions relating to change set forth in <u>Article III(l)</u>. Any consent required of Lessor shall not be unreasonably withheld or delayed. Lessee shall provide Lessor with such plans and specifications which Lessor requires to determine whether to consent to any such addition or alteration.

Lessee may not install any signs on the exterior of any building, structure or improvement on the Leased Premises, except those currently installed, and their replacement, without the prior written consent of Lessor, which consent shall not be unreasonably withheld or delayed. In any event, neither party shall use the other party's name or other materials which identify or tend to identify the other party, without the prior written consent of the other party.

6.  <u>Compliance with Law; Hazardous Waste</u>

Lessee agrees and covenants that the Leased Premises and any improvements constructed and maintained thereupon, shall conform to all applicable governmental standards. Lessee shall, at its own expense, obtain all licenses, permits and approvals appropriate to or required under any governmental standard or have the right to contest any regulation in good faith. Lessor agrees that it shall cooperate with Lessee whenever required in order to obtain any such licenses, permits and approvals.

Lessee agrees that no hazardous wastes and/or materials, as so classified by any law or regulation, shall be stored in or about the Leased Premises other than as may be permitted by law. Lessee herewith indemnifies and agrees to defend and hold Lessor harmless from and against any and all loss, damage, or claims arising out of the storage, handling, discharge, disposal, release or threat of release of such hazardous wastes and/or materials by Lessee. The indemnity contained herein shall survive the termination of this Lease.

ARTICLE IV –
TAXES AND UTILITIES

1.  <u>Taxes</u>

Lessee shall pay all taxes, special and general assessments, water rents, rates and charges, sewer rents and other governmental impositions and charges of every kind and make whatsoever, extraordinary as well as ordinary, including payments in lieu of taxes voluntarily made by Lessee (hereinafter collectively referred to as "Taxes") imposed upon or against or attributable to the Leased Premises and all buildings, furniture, fixtures, equipment and improvements now or hereafter on the Leased Premises during the term of this Lease and assessed either in the name of Lessor or Lessee, except franchise, income, estate, inheritance or other similar taxes or impositions which may be levied or assessed against Lessor, or its successors in title. If, for tax purposes, the Leased Premises and improvements thereon are assessed as a whole with other adjacent lands of Lessor, Lessor shall use its best efforts to cause the adjacent land to be separately assessed and taxed. If Lessor cannot cause the adjacent land to be separately assessed and taxed, Taxes and assessments shall be equitably allocated between the parties.

Taxes and other impositions payable by Lessee shall be paid not later than the date on which such Taxes become delinquent and to provide Lessor with evidence of such payments. In the event Lessee fails to make such payment within the time provided by law, Lessor may, after written notice to Lessee, pay the same, in which event Lessee shall remain liable to and be obligated to repay Lessor the amount so advanced together with interest thereon at the rate of eighteen (18%) percent per annum or the maximum amount permitted, whichever is less. In the event any Taxes or other impositions may be payable in installments, Lessee shall have the right to pay the same as the installments fall due.

2.   **Lessee's Right to Contest; Abatements**

Lessee shall have the right, at its own cost and expense, to initiate and prosecute any proceedings against the taxing authority permitted by law for the purpose of obtaining an abatement or of otherwise contesting the validity or amount of taxes assessed to or levied upon the Leased Premises and required to be paid against Lessor's estate and, if required by law, Lessee may take such action in the name of Lessor, if Lessee shall fully indemnify and save Lessor harmless from all loss, cost, damage and expense incurred by or to be incurred by Lessor as a result thereof, and further provided that Lessee shall pay in a timely manner all amounts with respect to such Taxes as shall be necessary to avoid the imposition of any late penalties or liens in connection therewith. Lessee shall diligently pursue any such action, and shall be entitled to all abatement proceeds allocable to those periods during the term of this Lease for which Lessee has paid such taxes.

3.   **Utilities**

Lessee shall be solely responsible for and shall promptly pay all charges for use or consumption for heat, sewer, water, gas, electricity or any other utility services from the date of execution hereof throughout the term of this Lease. Subject to the prior written approval of Lessor, which approval shall not be unreasonably withheld or delayed, Lessee shall have the right to enter into agreements with utility companies creating easements over the Leased Premises for the term of this Lease to the extent necessary to service the Senior Living Community, or any other improvement located on the Leased Premises. Subject to Lessee's prior approval, which approval shall not be unreasonably withheld or delayed, Lessor shall have the right to locate underground utility lines, or enter into agreements with utility companies to locate underground utility lines, within and through the Leased Premises in order to serve other land owned or leased by Lessor provided that such utility lines or the installation thereof do not unreasonably interfere with Lessee's use of the Leased Premises or cause any interruption in the supply of any utilities to the Leased Premises, and provided further that Lessor shall restore the Leased Premises to the same condition as the Leased Premises were before installation of such utilities, as soon as practicable after such installation.

## ARTICLE V –
## INSURANCE AND INDEMNITY

1.  **Insurance**

Lessee shall maintain insurance on the Leased Premises and itself of such types and/or such amounts, or in excess of such amounts, as may be required by any Mortgagee and as are customarily carried by businesses of like size and character to Lessee, which insurance shall include, but not be limited to, the following.

(a)  Insurance against loss and/or damage to the Leased Premises under a policy or policies covering such risks as are ordinarily insured against with respect to similar facilities, including without limiting the generality of the foregoing, fire, lightning, windstorm, hail, flood, earthquake, explosion, riot, riot attending a strike, civil commotion, damage from aircraft, vehicle or smoke and uniform standard extended coverage and vandalism and malicious mischief endorsements including boiler coverages. Such insurance shall be in an amount not less than the Full Insurable Replacement Value of the Leased Premises. The term "Full Insurable Replacement Value" shall mean the actual replacement cost of the Leased Premises (excluding foundation and excavation costs and costs of underground flues, pipe, drains and other uninsurable items).

(b)  Comprehensive general public liability insurance, including blanket contractual liability and personal injury liability (with employee exclusion deleted) protecting Lessee against liability for injuries to persons and property, under a policy or policies covering such risks as are ordinarily insured against with respect to similar facilities.

(c)  Professional liability insurance.

(d)  Workers' compensation insurance respecting all employees of Lessee and all persons engaged in work on the Leased Premises, in such amount as is customarily carried by like organizations engaged in like activities of like size and liability exposure.

(e)  During any construction relating to the Senior Living Community, builder's risk insurance to the, extent of the Full Insurable Replacement Value of the Leased Premises.

Lessor agrees that, if required by any Mortgagee, all policies of insurance required pursuant to this Lease may name such Mortgagee as mortgagee in accordance with the so-called "standard mortgagee clause" and require that all insurance proceeds from any clause be paid to such Mortgagee or its assignee up to the balance which may be owed on such mortgage. Notwithstanding anything contained herein to the contrary, Lessor shall be named an additional insured and an additional loss payee on all policies of insurance required pursuant to this Lease. Further, each such policy shall contain a provision that such policy shall not be modified adversely to the interests of Lessor without at least thirty (30) days prior notice to Lessor. All policies of insurance required pursuant to this

Lease shall be issued by insurers of recognized responsibility, qualified to do business in the Commonwealth of Massachusetts, except to the extent that the risks represented by such insurances are permitted to be self-insured in accordance with the provisions of Article V(2) below.

The parties agree that, in the absence of any interest in the Leased Premises on the part of any Mortgagee, every three (3) years during the term of this Lease the parties shall review Lessee's insurance coverages and agree as to the extent of such coverages for the next three (3) years. If the parties fail to agree, they shall retain the services of a qualified independent Insurance Consultant. The Insurance Consultant shall review Lessee's insurance and determine the proper insurance coverages for the next three (3) years. The Insurance Consultant's report shall be filed with Lessor and Lessee, and the insurance requirements specified herein shall be deemed modified or superseded as necessary to conform with the recommendations contained in said report. The costs of any Insurance Consultant hired pursuant to this paragraph shall be borne equally by Lessor and Lessee.

If an Insurance Consultant is required by any Mortgagee, Lessor agrees to provide Lessee with copies of any and all reports of such Insurance Consultant.

2.    Self-Insurance

With the prior written approval of Lessor, Lessee may elect to substitute a self-insurance program or enter into agreements with other corporations, the State or the federal government for any of the insurance required to be maintained pursuant to this Lease. If Lessee makes such an election, it shall file annually with Lessor a report relative to the actuarial soundness of the insurance.

3.    Subrogation

Lessor and Lessee each releases the other from any and all liability or responsibility (to such party or any one claiming through or under such party by way of subrogation or otherwise) for any loss or damage to the extent covered by the insurance policies maintained by, or for the benefit of, such party even if such casualty shall have been caused by the fault or negligence of the other party or its agents. All insurance maintained by Lessor or Lessee shall include provisions pursuant to which the insurer waives all rights of recovery against the other by subrogation.

4.    Indemnification

(a)    In addition to any other indemnification granted in this Article V(4), Lessee agrees to indemnify and hold Lessor (and its respective directors, officers, employees and affiliates) harmless from and with respect to any and all claims, liabilities, losses, damages, costs and expenses (including without limitation the fees and disbursements of counsel) related to or arising from, directly or indirectly, Lessee's use of the Leased Premises or other land of Lessor, or use of the Leased Premises by Lessee's invitees, from the date of execution of this Lease.

(b)     Lessor agrees to indemnify and hold Lessee (and its respective directors, officers, employees and affiliates) harmless from and with respect to any and all claims, liabilities, losses, damages, costs and expenses (including without limitation the fees and disbursements of counsel) related to or arising, directly or indirectly, out of any failure or any breach by Lessor of any representation or warranty, covenant, obligation or undertaking made by Lessor in this Lease, any Exhibit hereto, or any other statement, certificate or other instrument delivered pursuant hereto.

(c)     Lessee agrees to indemnify and hold Lessor (and its respective directors, officers, employees and affiliates) harmless from and with respect to any and all claims, liabilities, losses, damages, costs and expenses (including without limitation the fees and disbursements of counsel) related to or arising from, directly or indirectly, out of any failure or any breach by Lessee of any representation or warranty, covenant, obligation or undertaking made by Lessee in this Lease, any Exhibit hereto, or any other statement, certificate or other instrument delivered pursuant hereto.

(d)     In the event that either party hereto (an "Indemnified Party") desires to make a claim against another party hereto (the "Indemnifying Party", which term shall include all Indemnifying Parties if there be more than one) in connection with any action, suit, proceeding or demand at any time instituted against or made upon it for which it may seek indemnification hereunder (a "Claim"), the Indemnified Party shall notify the Indemnifying Party of such Claim and of its claims of indemnification with respect thereto, provided that failure to give such notice shall not relieve the Indemnifying Party of its obligations under this Article V(4) except to the extent, if at all, that the Indemnifying Party shall have been prejudiced thereby.  Upon receipt of such notice from the Indemnified Party, the Indemnifying Party shall be entitled to participate in the defense of such Claim, and if and only if each of the following conditions is satisfied, the Indemnifying Party may assume the defense of such Claim, and in the case of such an assumption the Indemnifying Party shall have the authority to negotiate, compromise and settle such Claim:

(i)     The Indemnifying Party confirms in writing that it is obligated hereunder to indemnify the Indemnified Party with respect to such Claim; and

(ii)    The Indemnified Party does not give the Indemnifying Party written notice that it has determined, in the exercise of its reasonable discretion, that matters of corporate or management policy or a conflict of interest make separate representation by the Indemnified Party's own counsel advisable.

(e)     The Indemnified Party shall retain the right to employ its own counsel and to participate in the defense of any claim, the defense of which has been assumed by an Indemnifying Party pursuant hereto, but the claimant shall bear and shall be solely responsible for its own costs and expenses in connection with such participation,

(f)    In the event of any claims under this section, the claimant shall advise the party or parties who are required to provide indemnification therefor in writing of the amount and circumstances surrounding such claim.

ARTICLE VI –
ASSIGNMENT

1.    <u>Assignment</u>

The rights and obligations of Lessee under this Lease may not be assigned without the prior written consent of Lessor. Notwithstanding anything in this paragraph to the contrary, Lessee may assign its rights and responsibilities under this Lease to any corporation which is owned by, or controlled by, Loomis Communities, Inc., or an affiliate of Loomis Communities, Inc. of which Loomis Communities, Inc. or any such affiliate are the sole shareholders or sole members, upon written notice to Lessor. Regardless of any assignment of Lessee's rights and responsibilities under this Lease, Lessee shall remain responsible for all obligations and covenants of Lessee under the terms of the Lease. Lessee shall not sublet the Leased Premises or any portion thereof, provided however Lessee may enter into Residency and Care Agreements and/or leases with the residents of each housing unit, and incidental leases for a convenience store, beauty shop, or similar amenities or services normally associated with senior living communities and intended primarily for the use of the residents of the Senior Living Community.

The rights and obligations of Lessor hereunder may be assigned by Lessor at any time.

For a period of sixty-five (65) years after the Commencement Date, Lessor grants to Lessee a "Right of First Notice" of the sale of Lessor's fee interest in the Leased Premises. Pursuant to the Right of First Notice, Lessor, if it determines to sell its fee interest in the Leased Premises, whether as part of a larger parcel of land or not, shall notify Lessee of such intent in writing (the "Notice"). The Notice shall include the terms and conditions, including but not limited to price and financing, upon which Lessor intends to sell its fee interest in the Leased Premises. Upon receipt of the Notice, Lessee shall have sixty (60) days to notify Lessor, in writing, of Lessee's election to purchase the Leased Premises on the terms and conditions set forth in the Notice, including but not limited to provisions for payment and date of closing. If Lessee does not so notify Lessor of Lessee's election to purchase the Leased Premises, Lessor may sell its fee interest in the Leased Premises to any third party, so long as such sale is pursuant to substantially the same or better conditions, as determined from the point of view of Lessor, as contained in the Notice. In the event that Lessee does notify Lessor of Lessee's interest to purchase the Leased Premises on the terms and conditions set forth in the Notice, Lessor shall notify Lessee, in writing, within ten (10) days, of Lessor's determination of whether to sell the Leased Premises to Lessee. If Lessor determines not to sell the Leased Premises to Lessee, this Lease shall continue in full force and effect, and Lessor may not sell its fee interest in the Leased Premises without first providing Lessee with a Right of First Notice as provided for in this <u>Article VI(1)</u>.

## ARTICLE VII –
## LEASEHOLD MORTGAGE

1.  <u>Right to Mortgage Leasehold Interest</u>

Upon thirty (30) days prior written notice to Lessor, Lessee shall have the right to grant Mortgages, so long as such Mortgages are subject to Lessor's fee interest in the Leased Premises ("Mortgage").  The making of a Mortgage shall not be considered an assignment, nor shall any Mortgagee not in possession of the Leasehold Estate be deemed an assignee of the Leasehold Estate so as to require such Mortgagee to assume the obligations of Lessee hereunder, but a sale of the Leasehold Estate upon foreclosure of a Mortgage shall be deemed an assignment of Lessee's obligations and rights hereunder, and any transferee whether by foreclosure or otherwise shall be deemed to have assumed the obligations of Lessee hereunder from and after the date of such possession, purchase or assignment.  Notwithstanding anything contained herein to the contrary, Lessee shall not be entitled to grant Mortgages on the Leasehold Estate unless such Mortgages are granted for the benefit of the Senior Living Community, including but not limited to Mortgages granted to raise monies to purchase the Senior Living Community, subsequent capital improvements to the Senior Living Community, reasonable working capital for the Senior Living Community, or for the purpose of restructuring or consolidating the obligations of Lessee and any permitted assignee set forth in Article VI.  Any Mortgages on the Leasehold Estate granted for any other purpose shall be granted only with the prior written approval of Lessor.  No Mortgage granted hereunder shall be for a period of time extending beyond the Term of this Lease and, at the date that the Lease terminates, all Leasehold Mortgage Obligations, if any, relating to the Leased Land shall be deemed null and void and any then Leasehold Mortgagee shall provide Lessor with a discharge of any such Mortgage(s).

2.  <u>Leasehold Mortgage</u>

In the event that Lessee shall grant a Mortgage, and if the Mortgagee notifies Lessor of the execution of such Mortgage, and the name and place for service of notice upon such Mortgagee, then in such event, Lessor hereby agrees that for the benefit of Lessee and such Mortgagee from time to time:

(a)   Lessor will give to any such Mortgagee simultaneously with service on Lessee a duplicate of any and all notices or demands given by Lessor to Lessee and no such notice to Lessee shall be effective unless a copy is so served upon the Mortgagee.

(b)   In the event of any default by Lessee hereunder or under the terms of the Mortgage, such Mortgagee shall have the privilege of performing any of Lessee's covenants hereunder or of curing any defaults by Lessee or of exercising any election, option or privilege conferred upon Lessee by the terms of this Lease.

(c)   Lessor shall not terminate this Lease or Lessee's right of possession for any default of Lessee if, during the period of time within Lessee might cure such

default, or within thirty (30) days thereafter such default is cured or caused to be cured by such Mortgagee or, if such Mortgagee within a period of thirty (30) days after the expiration of the period of time within which Lessee might commence to eliminate the cause of such default, proceeds diligently and with reasonable dispatch to eliminate the cause of such default.

(d)     The execution and delivery of a Mortgage or deed of trust in conditional assignment of this Lease as collateral security therefor shall not be deemed a lease assignment for any purpose.

3.     Required Amendments to Lease

Lessor and Lessee shall cooperate in including in this Lease by suitable amendment from time to time any provision which may reasonably be requested by Lessee or any proposed Mortgagee for the purpose of implementing the provisions of Article VII(2), above, and allowing such Mortgagee reasonable means to protect or preserve the lien of the Mortgage upon the occurrence of a default under the terms of this Lease. Lessor and Lessee each agree to execute and deliver (and to acknowledge, if necessary, for recording purposes) any agreement necessary to effect any such amendment; provided, however, that any such amendment shall not in any way affect the term or rent due under this Lease nor otherwise in any material respect adversely affect any rights of Lessor under this Lease.

4.     Obligations of Mortgagee

All Mortgages granted by Lessee must require the Mortgagee to give duplicate copies of all notices from Mortgagee to Lessee to Lessor, and such notice to Lessee shall not be effective unless a copy of such notice is sent to Lessor.

In the event Lessee defaults under the terms of any Mortgage, Lessor shall have the same period for remedying such default as is given to Lessee for such remedy, plus thirty (30) days thereafter. The Mortgagee shall agree to accept performance by Lessor as though such action had been performed by Lessee. No payment or performance made by Lessor, however, shall constitute agreement that such payment was, in fact, due under the terms of the Mortgage, if Lessor makes any payment or takes any action pursuant to a wrongful, improper or mistaken notice or demand, Lessor shall be entitled to the return of any such payment and to be compensated for any such action.

The Mortgagee shall agree that it will not foreclose the Mortgage or otherwise acquire the Leasehold Estate without first giving to Lessor written notice and reasonable time to cure such default, and if necessary to do so, to obtain possession of the Leased Premises, through legal proceedings, if necessary, and thereafter to cure such default with reasonable diligence.

5.     Amendments to Mortgage

No term or condition of a Mortgage shall be modified or waived without reasonable prior

written notice to Lessor.

6.    <u>Payment of Mortgage</u>

Lessee shall fully satisfy all obligations secured by any Mortgage during the term of this Lease as such become due and on or before the end of the term of this Lease.

7.    <u>Obligations of Lessor</u>

Lessor shall not be required to subordinate its fee interest in the Leasehold Estate to any Mortgagee.  Further, Lessor shall not be required to sign any Mortgage or guaranty Lessee's performance pursuant to the terms of any Mortgage.

ARTICLE VIII –
CASUALTY

1.    <u>Insured Casualty</u>

In case of damage to or destruction of any improvements on the Leased Premises, or any part thereof, by fire or otherwise, Lessee shall promptly give written notice thereof to Lessor.  If the damage or destruction is such that it renders less than fifty (50%) percent of the Senior Living Community, or the improvements existent on the Leased Premises, untenantable (a "Partial Destruction"), Lessee shall, at its sole cost and expense, and whether or not the insurance proceeds shall be sufficient for the purpose, restore, repair, rebuild or alter the same as nearly as possible to its value immediately prior to such damage or destruction, with such material or substantial changes or alterations as may be made at Lessee's election with the prior written consent of Lessor.  Such material or substantial change or/alterations shall be submitted by Lessee and approved by Lessor.  Such restorations, repairs, replacements, rebuilding or alterations shall be commenced within ninety (90) days from the date of occurrence of such damage or destruction, which time shall be extended by time commensurate with any delays due to required applications for zoning variances and re-zoning, and shall thereafter be prosecuted with reasonable diligence, delays by <u>force majeure</u>, as defined in <u>Article XII(5)</u> below, excepted.  All restorations, repairs, replacements, rebuilding or alterations shall be subject to the construction requirements of <u>Article III</u> above.  Notwithstanding anything contained herein to the contrary, however, upon written request of Lessee sent within thirty (30) days of the Partial Destruction, Lessor agrees to consult with Lessee regarding the advisability of restoring or reconstructing the Leased Premises as provided for herein.

If the damage or destruction renders fifty (50%) percent or more of the Senior Living Community, or the improvements existent on the Leased Premises, untenantable (a "Total Destruction"), Lessee shall, at its sole cost and expense, within thirty (30) days of such damage or destruction, determine whether the reconstruction of the damaged or destroyed portions of the Leased Premises is economically viable. If Lessee determines that such reconstruction is economically viable, it shall so notify Lessor and restore, repair, replace, rebuild or alter the same in the manner provided in the preceding paragraph.

If, in the event of a Total Destruction, Lessee determines that restoration or reconstruction of the damaged or destroyed portions of the Leased Premises is not economically viable, it shall so notify Lessor within thirty (30) days of the damage or destruction. Upon receipt of such notification, Lessor shall have thirty (30) days to determine whether, in its reasonable opinion, such reconstruction or restoration is economically viable. If Lessor determines that such reconstruction or restoration is not economically viable, and if the damage or destruction is to such an extensive portion of the Leased Premises that the Leased Premises are no longer suitable for the use to which the Leased Premises were being utilized immediately prior thereto by Lessee, this Lease shall terminate upon the date which Lessor so notifies Lessee, at which time all rights and obligations between the parties shall cease and rents and other charges apportioned. If Lessor determines that such reconstruction or restoration is economically viable, and if the damage or destruction does not render the Leased Premises no longer suitable for the use to which the Leased Premises were being utilized immediately prior thereto by Lessee, this Lease shall continue in full force and effect, and the parties shall consult as to the proper disposition of any insurance proceeds realized as a result of the damage or destruction. If the parties cannot agree as to the proper disposition of such insurance proceeds, the matter shall be submitted to arbitration pursuant to Article XII(13) below. In any event, if the Leased Premises are not restored or constructed pursuant to this paragraph, Lessee shall, at its sole cost and expense, restore and regrade the damaged portions of the Leased Premises to a condition similar to the condition in which they were upon the Commencement Date, improved by grading.

In the event that Lessor determines that restoration or reconstruction of the Leased Premises is economically viable, it shall so notify Lessee in writing within the thirty (30) day period set forth above. Promptly after Lessee's receipt of such notice, the parties shall retain the services of an independent consultant. The independent consultant shall review any information submitted by the parties regarding the economic viability of restoration or reconstruction, and shall, within thirty (30) days of appointment, render an opinion in writing to both parties as to whether such restoration or reconstruction is economically viable, which finding shall be binding on the parties. The costs of any independent consultant retained by the parties pursuant to this paragraph shall be borne equally by Lessor and Lessee.

For purposes of this Article VIII(11), in determining whether a proposed restoration or reconstruction is "economically viable," the person making such determination shall consider, inter alia, such factors as the cost of the proposed restoration or reconstruction, the marketability of the restored or reconstructed facilities, the costs of maintaining such restored and reconstructed facilities after reconstruction or restoration and the remaining term of this Lease.

Except as may be otherwise required by any Mortgagee, any and all insurance monies paid on account of damage or destruction to the Leased Premises shall be applied to the payment of the cost of the aforesaid restoration, repairs, replacement, rebuilding or alterations, including the cost of temporary repairs or for the protection of the Leased Premises pending the completion of permanent restoration, repairs, replacements, rebuilding or alterations. If the net insurance money shall be insufficient to pay the entire

cost of such restoration, Lessee shall pay any deficiency. If the net insurance money shall be in excess of that necessary to pay the entire cost of such restoration, Lessee shall be entitled to any surplus interest, so long as Lessee does not owe Lessor any past due Rent as provided for herein. Notwithstanding anything contained herein to the contrary, and unless otherwise required by any Mortgagee, all insurance proceeds paid on account of damage or destruction to the Leased Premises shall be paid to a Mortgagee or a national or commercial bank which is agreeable to acting as an Insurance Trustee hereunder. The Insurance Trustee shall retain such monies and disburse the same in accordance with the terms of this Lease. In the event that the Leased Premises are restored, repaired, replaced, rebuilt or altered, such disbursements shall be applied directly to the payment of bills submitted not more frequently than monthly by Lessee or Lessee's agent in connection with the restoration, repair, replacement, rebuilding or alteration of the Senior Living Community. All such disbursements shall be made in accordance with the standards for disbursements enforced by the Insurance Trustee on basic construction loan terms, including reasonable retainages and subject to receipt by the Insurance Trustee and Lessor of evidence of construction progress or expenditures normally required by the Insurance Trustee in accordance with basic construction loan terms normally imposed by the Insurance Trustee.

Except as otherwise provided herein, no destruction of or damage to the improvements on the Leased Premises or any part thereof by fire or any other casualty shall permit Lessee to surrender this Lease or shall relieve Lessee from its liability to pay the full rent payable under this Lease or from any of its other obligations under this Lease, and Lessee waives any rights now or hereafter conferred upon it by statute or otherwise to quit or surrender this Lease or the demise of the Leased Premises or any part thereof, or to any suspension, diminution, abatement or reduction of rent on account of any such destruction or damage.

2.    Uninsured Casualty

If any material portion of the Leased Premises is rendered untenantable as a result of a peril not insured against and not required to be insured against by the provisions of Article V, Lessee may, at its option, and by written notice delivered to Lessor within thirty (30) days after the occurrence, elect not to restore or rebuild, in which case this Lease shall terminate as of the date of the occurrence except that, at Lessor's election, Lessee shall, at its sole cost and within ninety (90) days of the occurrence, remove any or all structures or personal property, or any portion thereof, or so much as Lessor shall direct, and restore the Leased Premises to a condition similar to the condition in which they were upon the Commencement Date, improved only by grading. Unless Lessee timely elects not to restore or rebuild, then Lessee shall at its cost and expense make such restoration, repairs, replacements and rebuilding as are necessary and appropriate, such work to be pursued diligently, and all the provisions of this Lease shall remain in full force and effect.

3.    Continuation of Term

Except as provided herein, the term of this Lease shall continue, and this Lease shall remain in full force and effect with no abatement of rent notwithstanding any damage to

or destruction of the Leased Premises or any improvements thereon.   In no event, however, shall any portion of the rent be abated or refunded to Lessee.

4.    Lessee's Termination Election

If any damage or destruction occurs within the last fifteen (15) years of the term of this Lease which renders at least twenty-five (25%) percent of the Senior Living Community, or the improvements existent on the Leased Premises, untenantable, Lessee may elect, by written notice to Lessor within thirty (30) days of the occurrence, not to rebuild, in which case this Lease shall terminate as of the date of the occurrence except that, at Lessor's election, Lessee shall, at Lessee's sole cost and expense, remove any and all improvements or what remains thereof, or so much as Lessor shall direct, and to restore and regrade the Leased Premises as described in Article VIII(2) above.  Except as may otherwise be required by any Mortgagee, proceeds of any insurance, including any rental insurance or the portion of any business interruption insurance allocable to the period after the damage or destruction, shall be applied first to the costs of removal and regrading, with the balance thereof being the sole property of Lessor.

ARTICLE IX -
EMINENT DOMAIN

1.    Total/Permanent

If at any time during the term of this Lease, the entire Leased Premises or, in the judgment of Lessee, such a substantial portion thereof as would render the balance of the Leased Premises not suitable for the use to which the Leased Premises were being utilized immediately prior thereto by Lessee, shall be taken or appropriated by any competent authority for public or quasi-public use (the "Taking"), this Lease shall terminate upon the date that possession is surrendered to the condemning authority, at which time all rights and obligations between the parties shall cease and rents and other charges apportioned.

All sums received or recovered by either Lessor or Lessee or any other person as a result of the Taking shall be applied and paid in the following order:

(a)    To Lessor, the proportion of the award which is equal to the fair market value of Lessor's land;

(b)    To Lessor, the proportion of the award which (i) the present value of Lessor's interest in the Leased Premises, including any improvements thereon, bears to (ii) the fair market value of the Leased Premises, including any improvements thereon, determined as though the Taking in question had not occurred and without regard to this Lease;

(c)    To any Mortgagees, the principal amount and accrued interest and prepayment penalties, if any, on any Mortgage; and

(d)    To Lessee, the balance of all sums so recovered.

2.    <u>Partial Taking</u>

If only a part of the Leased Premises is the subject of a Taking (a "Partial Taking") and the portion remaining will, after restoration, permit the Senior Living Community to be operated satisfactorily in the manner contemplated under this Lease, then this Lease shall continue in full force and effect with no abatement of rent and the net proceeds of the damages awarded shall be applied to restore the Senior Living Community to the extent practicable in the manner described in <u>Article VIII(1)</u>. Any balance remaining after completion of restoration shall be distributed as provided in <u>Article IX(1)(a), (b) and (d)</u>. If the Senior Living Community may not be operated satisfactorily, Lessee may, at its option, terminate this Lease effective as of the date of Taking upon notice to Lessor delivered within thirty (30) days after the Taking. It shall be a condition of termination of this Lease that Lessee shall at its sole cost remove the remainder of any improvements on the Leased Premises, (unless otherwise requested by Lessor), restoring the remaining portion of the Leased Premises to a condition similar to the condition in which they were upon the Commencement Date, improved by grading. If the Lease is so terminated by Lessee, the net proceeds of the damages awarded shall be distributed as provided for a complete taking in <u>Article IX(1)</u>.

Notwithstanding the foregoing, any termination intended to take effect under this <u>Article IX(2)</u> shall not take effect without the prior written consent of the Mortgagee of any Mortgage then outstanding.

3.    <u>Cooperation between Lessor and Lessee</u>

Lessee shall have the right to choose counsel and to direct all proceedings hereunder provided that the choice of counsel and all decisions affecting Lessor's rights hereunder shall be subject to Lessor's consent, which shall not be unreasonably withheld or delayed. Lessee may not agree to any award or settlement of Lessor's interest without Lessor's prior consent, which shall not be unreasonably withheld or delayed.

Subject to the foregoing, Lessee shall institute and prosecute such proceedings as may be reasonably required to obtain an adequate award (the "Award") for damages to the Leased Premises and the Senior Living Community resulting from any Taking, such proceedings to be brought in the name of Lessor and Lessee. The cost of such proceedings shall be paid by Lessee, and upon receipt of the Award, Lessee shall be reimbursed for such cost out of the Award before the application and payment thereof as provided in this Article. To the extent that such expenses need not be paid until receipt of the Award, the same shall be paid out of the Award before the application and payment thereof as provided in this Article.

All rights to damages to the Leased Premises occurring hereunder in connection with a Taking shall be included in the Award and Lessor and Lessee hereby agree that Lessor's and Lessee's rights to such damages and awards shall be exclusively as set out herein. Each party shall execute and deliver such further instruments of assignment thereof as the

other may from time to time request, to the end that such damages and awards may be allocated as hereinabove provided.

## ARTICLE X –
## ACADEMIC INTEGRATION

1. <u>Purpose</u>

Lessor and Lessee acknowledge that Lessor, as a provider of health related academic/educational programs, requires the integration of the health care activities of the Senior Living Community into practical, fieldwork, internships, paid or unpaid, and investigational projects specific to a number of graduate and undergraduate majors/programs in the general areas of, but not limited to, Rehabilitation, Counseling, Health Promotion, Fitness, Gerontology, Recreation, Social Work, Occupational Therapy, Health Services Administration, Health Care Facility Management, Adapted Physical Education, Therapeutic Recreation, Physical Therapy, and Research in Exercise Physiology and Movement Science (the "Educational Programs"). Lessee understands and acknowledges that the provisions and covenants contained in this <u>Article X</u> are essential to Lessor and that Lessor would not enter into this Lease but for said provisions and covenants.

2. <u>Implementation</u>

Lessee agrees that it shall cooperate, as required by Lessor, with Lessor in the planning and implementation of the Educational Programs consistent with the operation of the Senior Living Community. All plans for the Educational Programs shall be submitted to Lessee by Lessor in meeting at least three (3) months before the date on which the Educational Program is to go into effect or any existing Program is to be amended. Lessee shall approve or disapprove any such Educational Program or amendment thereto, which approval shall not be unreasonably withheld, within twenty (20) days of receipt of the Educational Program or amendment thereto. In the event Lessee disapproves any aspect of any Educational Program, or amendment thereto, Lessee shall provide Lessor with written notice specifying in detail the basis of such objections, and Lessor shall have the right to resubmit such plans for approval on the same terms and conditions provided for above, with appropriate changes. In the event that Lessee believes that any Educational Program is being conducted in a manner inconsistent with the operation of the Senior Living Community, Lessee shall so notify Lessor in writing, specifying the particular objections which Lessee has to such Educational Program. Upon receipt of such notice, Lessor shall consult with Lessee in order to address the specified objections, and Lessor shall use its best efforts to alleviate the same. Notwithstanding anything contained herein to the contrary, however, Lessor shall be under no obligation to terminate an Educational Program during an academic semester. Further, the parties agree that, where appropriate, specific affiliation agreements will be entered into between Lessor and Lessee under which specific programs or departments of Lessor shall provide health care services at the Senior Living Community. The conduct of the Educational Programs shall be at the sole expense of Lessor, which shall maintain liability insurance

on the conduct of the Educational Programs of a type and amount normally carried by Lessor in the conduct of other educational programs on the campus of Springfield College.

## ARTICLE XI –
## REVERSION, DEFAULT, REMEDIES

1.  **Reversion of Interest and Improvements**

    Upon the termination or expiration of this Lease for any reason, title to any and all improvements or alterations on the Leased Premises, including but not limited to the Senior Living Community, shall become vested in Lessor, free and clear of any and all liens and encumbrances of Lessee. It is expressly understood and agreed that Lessee shall surrender the Leased Premises at the conclusion of the term of this Lease in good repair and condition, in accordance with the terms of Article III(4), above, subject to the provisions of Article VII and IX above.

2.  **Events of Default**

    The following events shall be deemed to be "Events of Default" by Lessee under this Lease:

    (a)  If Lessee shall fail to pay any installment of rent, within thirty (30) days after the same shall become due and payable;

    (b)  If Lessee shall fail to comply with any term, provision or covenant of this Lease, including but not limited to Lessee's covenants with regard to Academic Integration as contained in Article X above, and shall not cure such failure within thirty (30) days after written notice thereof is given by Lessor to Lessee, provided that if such default cannot reasonably be cured within thirty (30) days, then Lessee shall have an additional reasonable period of time within which to cure such default so long as Lessee begins to cure the default within the thirty (30) day period and thereafter continues diligently to prosecute such cure to completion;

    (c)  If Lessee shall become insolvent, or shall make a transfer in fraud of creditors or shall make an assignment for the benefit of creditors;

    (d)  If Lessee shall file a petition under any section or chapter of the bankruptcy laws of the United States, or under any similar law or statute of the United States or any state thereof, or Lessee shall be adjudged bankrupt or insolvent in proceedings filed against Lessee thereunder;

    (e)  If a receiver or trustee shall be appointed for all or substantially all of the assets of Lessee;

    (f)  Except as provided in Article VI(1), above, if any person shall take the leasehold interest granted by this Lease or any part thereof upon execution; and/or

(g)    If Lessee shall abandon the Leased Premises.

3.    Remedies

Upon the occurrence of any Event of Default, Lessor shall have the option to pursue one or more of the following remedies without any notice or demand whatsoever;

(a)    Terminate this Lease, in which event Lessee shall immediately surrender the Leased Premises and all improvements thereon to Lessor, and if Lessee fails to do so, Lessor may, without prejudice to any other remedy which it may have for possession or arrearages in rent, enter upon and take possession of the Leased Premises, and, to the extent permitted by law, expel or remove Lessee and any other person who may be occupying the Leased Premises, or any part thereof, by force, if necessary, without being liable for prosecution or any claim for damages thereof; and Lessee agrees to pay to Lessor on demand the amount of all loss or damage which Lessor may suffer by reason of such termination, whether through inability to relet the Leased Premises on satisfactory terms or otherwise;

(b)    To the extent permitted by law, enter upon the Leased Premises without being liable for prosecution or any claim for damages therefor, and do whatever Lessee is obligated to do under the terms of this Lease; and do whatever Lessee is obligated to do under the terms of any agreements with any persons occupying the Leased Premises; and Lessee agrees to reimburse Lessor for the cost thereof; and/or

(c)    Pursue any other remedy available at law or equity.

4.    Remedies Not Exclusive

Pursuit of any of the foregoing remedies by Lessor shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any rent due to Lessor hereunder or any damage accruing to Lessor by reason of any of the terms, provisions and covenants herein contained. Lessee may seek such remedy or remedies as may be provided herein or at law. Lessee's pursuit of any remedy provided herein shall not preclude pursuit of any other remedies provided by law nor shall it constitute a forfeiture or waiver of any damage accruing to Lessee by reason of any terms, provisions and covenants herein contained.

5.    Turnover of Plans and Development Materials

Upon termination of this Lease for any reason, Lessee shall deliver to Lessor all existing plans, drawings and engineering documents prepared by or for Lessee relating to the Leased Premises and any improvements thereon, including but not limited to the Senior Living Community, and any utility, sewer or sanitary lines laid and maintained on the Leased Premises on any land owned by Lessor. Notwithstanding anything contained herein to the contrary, Lessor shall have access to any documents identified in this Article

XI(5) at reasonable times, and upon reasonable prior notice to Lessee. Lessor agrees that it shall preserve the confidentiality of any information it acquires or receives pursuant to this Article XI(5).

## ARTICLE XII –
## MISCELLANEOUS PROVISIONS

1. **Lessor's Title and Quiet Enjoyment**

   Lessor covenants and warrants that it is seized in fee simple title to the Leased Premises, free, clear and unencumbered, except for restrictions and easements of record which do not materially interfere with the use of the Leased Premises by Lessee. Lessor covenants that so long as Lessee fulfills the conditions and covenants required of it to be performed hereunder, Lessee will have peaceful and quiet possession of the Leased Premises. Lessor further covenants and warrants that it has good right, full power and lawful authority to make this Lease for the full term hereof.

2. **Notices**

   All notices sent or required to be sent under this Lease shall be made by certified mail, return receipt requested or by a national overnight courier service, and delivered to the parties as follows:

   If to Lessor:   Attn: Vice President for Administration and Finance
   Springfield College
   263 Alden Street
   Springfield, Massachusetts 01109

   If to Lessee:   Attn: President
   Loomis Communities, Inc.
   246 No. Main Street
   South Hadley, Massachusetts 01075

   Notwithstanding any provision in this Lease to the contrary, a change in address may be effected by a certified letter sent by either party to the other.

3. **Notice of Lease**

   A notice of this Lease may be recorded as provided under the law of the Commonwealth of Massachusetts at the request of either party.

4. **Estoppel Certificates**

   Each party shall, on the Commencement Date and from time-to-time during the term of this Lease as requested by the other party, or the other party's lenders or purchasers, execute and deliver to Lessor a written declaration in recordable form: (i) ratifying this Lease; (ii) expressing the commencement and termination dates thereof; (iii) certifying

that this Lease is in full force and effect and has not been assigned, modified, supplemented or amended (except by such writings as shall be stated); (iv) certifying that all conditions under this Lease to be performed by Lessor have been satisfied or specifying with particularity those conditions that Lessee claims that Lessor has not performed; (v) certifying that there are no defenses or offsets against the enforcement of this Lease by the

Lessor, or stating those claimed by Lessee; (vi) stating the amount of advanced rental, if any, (or none if such be the case) paid by Lessee; (vii) stating the date to which rent has been paid; (viii) stating the amount of security deposited with Lessor, if any; and (ix) stating and certifying such other matters as Lessor may reasonably request.

5.    Force Majeure

If either party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this Lease, that party shall give to the other party prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended, during, but no longer than, the continuance of the force majeure. The affected party shall use all possible diligence to remove the force majeure as quickly as possible. In the event of any suspension due to force majeure, Lessee shall be liable to pay Lessor all accrued rents to the date of such suspension, as well as all expenses of Lessor connected with such suspension.

The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely with the discretion of the party concerned.

The term "force majeure" as herein employed shall mean an act of God, strike, lockout or other industrial disturbance, act of the public enemy, war, blockade, riot, lightning, fire, storm, flood, explosion, governmental restraint, unavailability of equipment, product or labor or any other cause, whether the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

6.    No Partnership

Lessor and Lessee are not and shall not be considered joint venturers nor partners and neither shall have power to bind or obligate the other except as set forth herein.

7.    Governing Law

This Lease shall be construed, and the rights and obligations of Lessor and Lessee hereunder shall be determined according to the laws of the Commonwealth of Massachusetts.

8.    <u>Severability</u>

If any provision of this Lease or the application thereof to any person or circumstances, shall, to any extent, be invalid or unenforceable, the remainder of this Lease or the application of such term or provision to persons whose circumstances are other than those to which it is held invalid or enforceable, shall not be affected thereby.

9.    <u>Entire Agreement</u>

This Lease sets forth the entire agreement between the parties. Any prior conversations or writings are merged herein and hereby extinguished. No subsequent amendment to this Lease shall be binding upon Lessor or Lessee unless produced in writing and signed by both parties. Submission of this Lease for examination does not constitute an option for the Leased Premises and becomes effective as a lease only upon execution and delivery thereof by Lessor to Lessee.

10.    <u>Brokerage</u>

Lessor and Lessee each represent that no broker or agent is entitled to any commission or fee in connection with the execution of this Lease. Each party hereto agrees to indemnify the other and hold it harmless from and against all claims and liabilities for brokerage fees or commissions arising from such party's action or breach of this representation.

11.    <u>Waiver</u>

Failure of Lessor to insist upon the strict performance of any provision of this Lease or to exercise any option or any rules or regulations herein contained shall not be construed as a waiver for the future of any such provision, rule or option. The receipt by Lessor of rent with knowledge of the breach of a provision of this Lease shall not be deemed a waiver of such breach. No provision of this Lease shall be deemed to have been waived unless such waiver is in writing and signed by Lessor. No payment by Lessee or receipt by Lessor of a lesser amount of Rent then due shall be deemed to be other than on account of the earliest Rent then unpaid nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction and Lessor may accept such check or payment without prejudice to Lessor's right to recover the balance of such Rent or pursue any other remedy provided in this Lease.

12.    <u>Successors and Assigns</u>

Except as otherwise expressly provided, all provisions herein shall be binding upon, and shall inure to, the benefit of the parties, their representatives, successors and assigns. Each provision to perform by Lessee shall be construed to be both a covenant and condition. In the event of any sale of the Leased Premises, or the lease of Lessor's interest in the Leased Premises, or a sale, assignment or lease of Lessor's interest in this Lease, provided Lessor's successor assumes its obligations hereunder, Lessor shall be entirely relieved of all obligations hereunder. "Lessor" shall be deemed to be Lessor in

possession of the Leased Premises from time to time as fee owner.

13. **Arbitration**

Except as otherwise provided in this Lease, any dispute arising from the interpretation or performance of this Lease shall be submitted to arbitration pursuant to the applicable rules of the Massachusetts Uniform Arbitration Act (M.G.L.A. c.251), such arbitration to take place in Springfield, Massachusetts, before an arbitrator selected pursuant to the procedures in said Act. The costs of arbitration shall be equally shared by the parties. Any award rendered by the arbitrator shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

14. **Lessor's Right to Enter**

Upon reasonable prior written notice, Lessor shall have the right to enter the Leased Premises, including any improvements thereon, in order to determine compliance with the terms of this Lease, including but not limited to inspection of the improvements, as well as to show the Leased Premises to prospective purchasers or mortgagees of Lessor's interest in the Leased Premises.   During the last two (2) years of the term of this Lease, Lessor also may enter the Leased Premises upon reasonable prior written notice for the purpose of showing the Leased Premises to prospective tenants.

15. **Captions**

The captions, numbers and index appearing herein are inserted only as a matter of convenience and are not intended to define, limit, construe or describe the scope or intent of any Article, nor in any way affect this Lease.

16. **Gender**

All terms and words used in this Lease, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and other gender, masculine, feminine or neuter, as the context or sense of this Lease or any paragraph or clause herein may require, the same as if such words had been fully and properly written in the number and gender.

17. **Counterparts**

This Lease may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original, but such counterparts together shall constitute but one and the same instrument.

18. **Holding Over**

In the event Lessee continues to occupy the Leased Premises after the last day of the term hereby created, a tenancy from month to month only shall be created.

19.  <u>Communications from Government Authorities</u>

Lessee shall promptly upon transmittal or receipt send to Lessor copies of all communications to or from government authorities potentially adversely affecting the Leased Premises or any part thereof or use thereof.

20.  <u>Subordination</u>

This Lease and Lessee's interest hereunder are subject and subordinate to any mortgage, deed of trust, ground or underlying leases, or any method of financing or refinancing now or hereafter placed against the Leased Premises by Lessor; and to all renewals, modifications, replacements, consolidations and extension thereof, provided that, if so requested by Lessee, any such mortgagee shall execute and deliver to Lessee a non-disturbance agreement in form and content reasonably satisfactory to counsel for Lessee and such mortgagee.

Notwithstanding anything to the contrary herein, neither the Lease nor Lessee's interests hereunder shall be made subject to any mortgage, deed of trust, ground, or underlying leases, or any method of financing or refinancing now or hereafter placed against the Leased Premises by Lessor without the prior approval of the holders of any leasehold mortgage with respect to the Leased Premises or the Senior Living Community provided, however, that Lessor may obtain mortgage financing on its fee interest in the Premises, if Lessor obtains from the Mortgagee a Subordination and Non-Disturbance Agreement in favor of Lessee in form and substance reasonably satisfactory to the Leasehold Mortgagee.

21.  <u>Attornment</u>

Lessee shall, in the event of the sale or assignment of Lessor's interest in the Leased Premises, in the event that any proceedings brought for foreclosure of, or in the event of exercise of the power of sale under any mortgage made by Lessor covering the Leased Premises, attorn to the purchaser or foreclosing mortgagee and recognize such purchaser or foreclosing mortgagee as Lessor under this Lease.

Lessor shall, in the event of (1) the permitted sale or assignment of Lessee's interest in the Leased Premises; (2) any proceedings being brought for foreclosure; or (3) in the event of exercise of the power of sale under any mortgage made by Lessor covering the Leased Premises, attorn to and recognize any subsequent purchaser or assignee of Lessee's interest in the Leased Premises.

22.  <u>Cooperation</u>

The parties agree that at reasonable times during the term of this Lease either party may request of the other party to discuss matters related to this Lease and the parties' rights and obligations set forth herein for the purpose of promoting on-going cooperation between Lessor and Lessee. Nothing contained in this <u>Article XII (22)</u>, however, shall be construed so as to alter or effect in any way the rights and obligations of the parties

hereunder.

23. <u>Time is of the Essence</u>

The parties acknowledge that, in the performance of any covenants or obligations under this Lease, TIME IS OF THE ESSENCE.

*{signature page to follow}*

IN WITNESS WHEREOF, the parties have hereunto caused this Amended and Restated Ground Lease to be executed the day and year above first written.


LESSOR:                         **SPRINGFIELD COLLEGE**


                                By:_____
                                    Its duly authorized



LESSEE:                         **LOOMIS SENIOR LIVING, INC.**


                                By:_____
                                    Its duly authorized

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF HAMPDEN


On this __ day of _____, 2009, before me, the undersigned notary public, personally appeared _____, as _____ for Springfield College, a Massachusetts nonprofit corporation, proved to me through satisfactory evidence of identification which was

☐  a valid _____ driver's license
☐  based on my personal knowledge of the identity of the person

to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he/she signed it voluntarily for its stated purpose.


_____
Notary Public
My commission expires:


COMMONWEALTH OF MASSACHUSETTS
COUNTY OF HAMPDEN


On this __ day of _____, 2009, before me, the undersigned notary public, personally appeared _____, as _____ for Loomis Senior Living, Inc, a Massachusetts Corporation, proved to me through satisfactory evidence of identification which was

☐  a valid _____ driver's license
☐  based on my personal knowledge of the identity of the person

to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he/she signed it voluntarily for its stated purpose.


_____
Notary Public
My commission expires:

<u>Exhibit A</u>

The land in Springfield, Hampden County, Massachusetts, situated on the southerly side of Wilbraham Road, bounded and described as follows:

BEGINNING at a point situated on the southerly line of Wilbraham Road, said point being No. 87° 19' 05" W, along the southerly line of Wilbraham Road, a distance of one hundred sixty and 00/100 (160.00) feet from a drill hole in a concrete walk, being the northeast corner of land now or formerly of Springfield College; thence

| | |
|---|---|
| S. 02° 40' 55" W | A distance of one hundred thirty and 00/100 (130.00) feet to a point; thence |
| SOUTHERLY | Along a curve to the right having a radius of three hundred two and 57/100 (302.57) feet, an arc length of one hundred fifty-one and 99/100 (151.99) feet to a point; thence |
| S. 75° 58' 48" E | A distance of two hundred twenty-two and 16/100 (222.16) feet to a point at land now or formerly of William Hayre, Trustee of Lakeview Villa, said point being S. 00 58' 48" E., three hundred twenty and 00/100 (320.00) feet from the above mentioned drill hole on the southerly line of Wilbraham Road, and the northeast corner of land now or formerly of Springfield College; thence |
| S. 00° 58' 48" E | Along land now or formerly of said William Hayre, a distance of one hundred eighty and 00/100 (180.00) feet to a concrete bound; thence |
| S. 00° 58' 48" E | Along land now or formerly of said Hayre, two hundred fifty and 00/100 (250.00) feet to a concrete bound; thence |
| S. 00° 58' 48" E | Along land now or formerly of said Hayre, a distance of two hundred fifty and 00/100 (250.00) feet to a concrete bound; thence |
| S. 00° 58' 48" E | Along land now or formerly of said Hayre, a distance of two hundred fifty and 00/100 (250.00) feet to a concrete bound; thence |

| | |
|---|---|
| S. 00° 58' 48" E | Along land now or formerly of said Hayre, a distance of one hundred forty and 00/100 (140.00) feet to a point; thence |
| S. 82° 01' 31" W | A distance of three hundred fifty-one and 77/100 (351.77) feet to a point; thence |
| S. 36° 52' 13" W | A distance of three hundred seventy-one and 29/100 (371.29) feet to a point; thence |
| S. 81° 43' 45" W | A distance of sixty-nine and 40/100 (69.40) feet to a point; thence |
| NORTHERLY | Along a curve to the right having a radius of eighty and 00/100 (80.00) feet, an arc length of one hundred twenty-five and 66/100 (125.66) feet to a point; thence |
| N. 08° 16' 15" W | A distance of eighty-nine and 71/100 (89.71) feet to a point; thence |
| N. 53° 16' 15" W | A distance of one hundred forty-five and 00/100 (145.00) feet to a point; thence |
| NORTHERLY | along a curve to the right having a radius of one hundred seventy and 00/100 (170.00) feet, an arc length of two hundred sixty-seven and 04/100 (267.04) feet to a point; thence |
| N. 36° 43' 45" E | A distance of one hundred eighty-four and 57/100 (184.57) feet to a point; thence |
| NORTHWESTERLY | Along a curve to the left having a radius of thirty-five and 00/100 (35.00) feet, an arc length of fifty-six and 64/100 (56.64) feet to a point of reverse curvature; thence |
| NORTHERLY | Along a curve to the right having a radius of two hundred fifty-nine and 19/100 (259.19) feet, an arc length of four hundred five and 65/100 (405.65) feet to a point; thence |
| N. 33° 40' 55" E | A distance of one hundred fifteen and 00/100 (115.00) feet to a point; thence |

| | |
|---|---|
| NORTHEASTERLY | Along a curve to the right having a radius of four hundred seventy-three and 18/100 (473.18) feet, an arc length of two hundred twenty-two and 98/100 (222.98) feet to a point; thence |
| N. 60° 40' 55" E | A distance of three hundred and 00/100 (300.00) feet to a point; thence |
| NORTHERLY | Along a curve to the left having a radius of two hundred thirty-seven and 57/100 (237.57) feet, an arc length of two hundred forty and 49/100 (240.49) feet to a point; thence |
| N. 02° 40' 55" E | A distance of Forty-five and 00/100 (45.00) feet to a point; thence |
| N. 02° 51' 42" W | A distance of eighty-five and 40/100 (85.40) feet to a concrete bound on the southerly line of Wilbraham Road; and thence |
| S. 87° 19' 05" E | Along the southerly line of Wilbraham Road, a distance of seventy-three and 25/100 (73.25) feet to the point of beginning. |

The above described parcel of land is shown on a plan entitled "Plan of Lease Line, Wilbraham Road, Springfield, Owner: Springfield College" prepared by TWM Northeast Flynn Engineers, dated May 14, 1990, and recorded in Hampden County Registry of Deeds in Book of Plans 274, Page 85. For Title see Notice of Lease recorded aforesaid in Book 7591, Page 491.

X:\DOCS\17223\26\DELETE\00138488.DOC;1 711783v5

*CONSTRUCTION AND MAINTENANCE EASEMENT*

Land in Springfield, Hampden County, Massachusetts, situated on the southerly side of Wilbraham Road, Springfield, Hampden County more particularly bounded and described as follows:

Beginning at a concrete bound situated on the southerly line of Wilbraham Road, Springfield, Hampden County, Massachusetts said point being N 87° 19' 05" W along the southerly line of Wilbraham Road a distance of two hundred thirty-three and 25/100 (233.25) feet from a dill hole in a concrete walk being the northeast corner of land of the lessor, thence:

| | |
|---|---|
| S 02° 51' 42" E | A distance of eighty-five and 40/100 (85.40) feet to a point, thence |
| S 02° 40' 55" W | A distance of forty five and 00/100 (45.00) feet to a point, thence |
| Southerly | On a curve to the right having a radius of two hundred thirty-seven and 57/100 (237.57) feet an arc length of two hundred forty and 49/100 (240.49) feet to a point, thence |
| S 60° 40' 55" W | A distance of three hundred and 00/100 (300.00) feet to a point, thence |
| Southwesterly | On a curve to the left having a radius of four hundred seventy-three and18/100 (473.18) feet an arc length of two hundred twenty-two and 98/100 (222.98) feet to a point, thence |
| S 33° 40' 55" W | A distance of one hundred fifteen and 00/100 (115.00) feet to a point, thence |
| Southerly | On a curve to the left having a radius of two hundred fifty-nine and 19/100 (259.19) feet an arc length of four hundred five and 65/100 (405.65) feet to a point of reverse curvature, thence |
| Southeasterly | On a curve to the right having a radius of thirty-five and 00/100 (35.00) feet an arc |

|  | length of fifty-six and 64 (56.64) feet to a point, thence |
|---|---|
| S 36° 43' 45" W | A distance of one hundred eighty-four and 57/100 (184.57) feet to a point, thence |
| Southerly | On a curve to the left having a radius of one hundred seventy and 00/100 (170.00) feet an arc length of two hundred sixty-seven and 04/100 (267.04) feet to a point, thence |
| S 53° 16' 15" E | A distance of one hundred forty-five and 00/100 (145.00) feet to a point, thence |
| S 08° 15' 15" E | A distance of forty nine and 49/100 (49.49) feet to a pint, thence |
| N 53° 16' 15" W | A distance of one hundred eighty and 00/100 (180.00) feet to a point, thence |
| Northerly | On a curve to the right having a radius of two hundred five and 00/100 (205.00) feet an arc length of three hundred twenty-two and 01/100 (322.01) feet to a point, thence |
| N 36° 43' 45" E | A distance of one hundred eighty-four and 57/100 (184.57) feet to a point, thence |
| Northerly | On a curve to the right having a radius of two hundred ninety-four and 19/100 (294.19) feet an arc length of four hundred sixty and 42/100 (460.42) feet to a point, thence |
| N 33° 40' 55" E | A distance of one hundred fifteen and 00/100 (115.00) feet to a point, thence |
| Northeasterly | On a curve to the right having a radius of five hundred eight and 18/100 (508.18) feet an arc length of two hundred thirty-nine and 48/100 (239.48) feet to a point, thence |
| N 60° 40' 55" E | A distance of three hundred and 00/100 (43.31) feet to a point, thence |
| Northerly | On a curve to the left having a radius of two hundred two and 57/100 (202.57) feet |

|  | an arc length of two hundred five and 06/100 (205.06) feet to a point, thence |
|---|---|
| N 02° 40' 55" E | A distance of forty-three and 31/100 (43.31) feet to a point, thence |
| N 02° 51' 42" W | A distance of eighty-seven and 39/100 (87.39) feet to a point at the southerly line of Wilbraham Road, thence |
| S 86° 51' 10" E | A distance of thirty-five and 19/100 (35.19) feet along the southerly line of Wilbraham Road to the point of beginning. |

The above described parcel of land contains one and 69/100 (1.69) acres of land and is shown on a work Plan of Land prepared for Springfield College, by Almer Huntley Jr. & Assoc., Inc., of Northampton, MA, and dated September 20, 1989. Not found on record.

The above described easement is shown on a Plan of Lease Line, of land owned by Springfield College prepared by TWM Northeast and dated April 7, 1990.

*EASEMENT – REED'S LANDING*

Land in Springfield, Hampden County, Massachusetts, situated on the Southerly side of Wilbraham Road, Springfield, Hampden County shown on a plan recorded with the Hampden County Registry of Deeds in Book of Plans 287, Page 52, and more particularly bounded and described as follows:

Beginning at a point situated on the southerly line of Wilbraham Road, Springfield, Hampden County, Massachusetts said point being N 87° 19' 05" W along the southerly line of Wilbraham Road a distance of one hundred and ten (110.00) feet from a drill hole in a concrete walk thence:

| | |
|---|---|
| S 02° 40' 55" W | A distance of one hundred thirty and 00/100 (130.00) feet to a point, thence |
| Southerly | By a curve to the right having a radius of three hundred fifty-two and 57/100 (352.57) feet and an arc length of one hundred sixty-one and 50/100 (161.50) feet to a point, thence |
| N 75° 58' 48" W | A distance of fifty two and 06/100 (52.06) feet to a point, thence |
| Northerly | By a curve to the left having a radius of three hundred fifty-two and 57 (302.57) feet, and an arc length of one hundred fifty-one and 99/100 (151.99) feet to a point, thence |
| N 2° 40' 55" E | A distance of one hundred thirty and 00/100 (130.00) feet to a point in the southerly line of Wilbraham Road, thence |
| S 87° 19' 05" E | Along the southerly line of Wilbraham Road, a distance of fifty and 00/100 (50.00) feet to the point of beginning |

Containing 14,259 square feet of land.

X:\DOCS\17223\26\DELETE\00138488.DOC;1 711783v5

### 30' SEWER EASEMENT

Beginning at a point in the southerly lease line, as shown on a plan by TWM Northeast-Flynn Engineers entitled "Plan of Lease Line" dated 4/27/90, said point being S 82° 01' 31" W a distance of thirty and 00/100 (30.00) feet from the southeasterly corner of the leased parcel, thence;

| | |
|---|---|
| S 7° 58' 29" E | A distance of seventy-six and 00/100 (76.00) feet to appoint, thence |
| S 82° 01' 31" W | A distance of thirty and 00/100 (30.00) feet to a point, thence |
| N 7° 58' 29" W | A distance of seventy-six and 00/100 (76.00) feet to a point, thence |
| N 82° 01' 31" E | A distance of thirty and 00/100 (30.00) feet to the point of beginning |

The above described easement contains 2,280 square feet of land.

X:\DOCS\17223\26\DELETE\00138488.DOC;1 711783v5

## <u>Schedule 6.3</u>

### Taxes

- Real property taxes on 23.2 acres of land in the City of Springfield, Massachusetts.

- Personal property taxes paid to the City of Springfield, Massachusetts.

## **Schedule 6.5**

### **Allocation**

To be completed prior to closing.